**No. 24-2355**

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

PAYSERVICES BANK,

*Plaintiff-Appellant*,

v.

FEDERAL RESERVE BANK OF SAN FRANCISCO,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Idaho
No. 1:23-cv-00305-REP
Hon. Raymond E. Patricco, Jr.

_____

**APPELLANT'S OPENING BRIEF**

_____

Jade A. Craig, Esq.
Jade A. Craig, P.A.
1048 S. Clearview Avenue, #3
Tampa, Florida 33629
Telephone: (813) 459-1309
jade@jadeacraigpa.com

*Attorney for Appellant*
PayServices

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant PayServices Bank discloses that it does not have a parent corporation. There is also no publicly held corporation that owns 10% or more of its stock.

Date: May 28, 2024

Jade A. Craig, P.A.


*/s/ Jade A. Craig*_____
Jade A. Craig

*Attorney for Appellant PayServices Bank*

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ................................................................... i

TABLE OF AUTHORITIES .................................................................. iv

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ........................................................7

STATUTORY AND REGULATORY AUTHORITIES ...........................7

ISSUES PRESENTED.........................................................................8

STATEMENT OF THE CASE.............................................................8

SUMMARY OF THE ARGUMENT ....................................................20

STANDARD OF REVIEW .................................................................23

ARGUMENT ....................................................................................23

    I.    The Federal Reserve Bank of San Francisco Is An "Agency" Covered By the Administrative Procedure Act. ................................................23

    II.    FRBSF Lacked the Statutory Authority To Deny Payservices A Master Account. ........................................................................32

        A.    This Court may exercise its mandamus authority to compel the granting of PayServices' request for a master account.............37

    III.    FRBSF's Decision to Deny Payservices A Master Account Was Arbitrary and Capricious Under the APA. ..........................................41

    IV.    Payservices Properly Alleged A Denial of Procedural Due Process. .47

    V.    The District Court Erred In Striking The Declaration Of Lionel Danenberg. ................................................................................48

CONCLUSION ................................................................................50

STATEMENT OF RELATED CASES…………………………………..……….…51

CERTIFICATE OF COMPLIANCE…………………………………………...52

ADDENDUM…………………………………………………………………..53

# TABLE OF AUTHORITIES

**Cases**

*Bank Stationers Ass'n, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 704 F.2d 1233 (11th Cir. 1983) ........................................................................12

*Barrington Manor Apts. Corp. v. United States*, 392 F.2d 224 (Ct. Cl. 1968) .......24

*Bd. of Liquidation v. McComb*, 92 U.S. 531 (1875)...................................38

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) ...................................47

*Blantz v. Calif. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917 (9th Cir. 2013) ..................................................47

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988)............................... 42, 43

*Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971 (Fed. Cir. 2020) .30

*Camacho v. Bridgeport Fin. Inc.*, 430 F.3d 1078 (9th Cir. 2005)...........................23

*Clark v. Community for Creative Non–Violence*, 468 U.S. 288 (1984).................36

*Comm. for Monetary Reform v. Bd. of Governors of Fed. Rsrv. Sys.*, 766 F.2d 538 (D.C. Cir. 1985)..........................................................9

*Conservation L. Found. of New England, Inc. v. Harper*, 587 F. Supp. 357 (D. Mass. 1984)..............................................................27

*Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053 (9th Cir. 2018) ...................46

*Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 640 F. Supp. 3d 1169 (D. Wyo. 2022) .................................................... 6, 25, 38, 39

*Data Disc, Inc. v. Systems Tech. Assoc., Inc.*, 557 F.2d 1280 (9th Cir.1977).........49

*Doe v. United States*, 58 F.3d 494 (9th Cir. 1995) ...................................46

*Dong v. Smithsonian Inst.*, 125 F.3d 877 (D.C. Cir. 1997) ...................................25

*Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100 (D.D.C. 2020)..............................................................25

*Farmers' and Merchants' Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649 (1923)..........................................................34

iv

*Fed. Rsrv. Bank of St. Louis v. Metrocentre Imp. Dist. No. 1*, 657 F.2d 183 (8th Cir. 1981) ...................................................................................30

*Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chi.*, 583 F. Supp. 674 (N.D. Ga. 1984) ...................................................................................30

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017) ........................................................ 5, 33, 34, 35

*In re Hoag Ranches*, 846 F.2d 1225 (9th Cir. 1988) ...............................................30

*In re Perkins*, 106 B.R. 863 (Bankr. E.D. Pa. 1989) .................................................44

*Independence Mining Co., Inc. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ..............39

*Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048 (9th Cir. 2007) ...........48

*Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221 (6th Cir. 1983) ...................................................................................30

*Kam Koon Wan v. Black*, 188 F.2d 558 (9th Cir. 1951) .............................................29

*Katsiavelos v. Fed. Rsrv. Bank of Chi.*, 859 F. Supp. 1183 (N.D. Ill. 1994) ............30

*Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012) ............................................46

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) .....................................................43

*Lee Constr. Co., Inc. v. Fed. Reserve Bank of Richmond*, 558 F. Supp. 165 (D. Md. 1982) ............................................................ 27, 28, 30, 31

*Lewis v. United States*, 680 F.2d 1239 (9th Cir. 1982) ..............................................30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................................................................................45

*Network Project v. Corp. for Pub. Broad.*, 398 F. Supp. 1332 (D.D.C. 1975) .......31

*New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524 (2d Cir. 2010) ..25

*Olson v. California*, 62 F.4th 1206 (9th Cir. 2023) .....................................................47

*Packingham v. North Carolina*, 582 U.S. 98 (2017) ..................................................36

*Patel v. Reno*, 134 F.3d 929 (9th Cir. 1997) ...............................................................39

*Persian Broad. Serv. Glob., Inc. v. Walsh*, 75 F.4th 1108 (9th Cir. 2023) ..............24

v

*Pub. Citizen Health Rsch. Grp. v. Dep't of Health, Ed., & Welfare*, 449 F. Supp. 937 (D.D.C. 1978) ............................................................................. 27, 29

*Scott v. Fed. Rsrv. Bank of Kan. City*, 406 F.3d 532 (8th Cir. 2005) ....................30

*Singh v. Still*, 470 F. Supp. 2d 1064 (N.D. Cal. 2007)...........................................39

*Snyder v. Phelps*, 562 U.S. 443 (2011) .................................................................36

*Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956 (9th Cir. 2023) ................. 42, 43

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)............................................ 25, 27

*Syed v. M-I, LLC*, 853 F.3d 492 (9th Cir. 2017) ....................................................24

*Tellabs, Inc. v. Makar Issues & Rts., Ltd.*, 551 U.S. 308 (2007)............................50

*United States ex rel. Kraus v. Wells Fargo & Co.*, 943 F.3d 588 (2d. Cir. 2019) ............................................................................... …26, 29

*United States v. Johnson*, 529 U.S. 53 (2000) ................................................ 24, 47

*United States v. Wells Fargo & Co.*, 943 F.3d 588 (2d Cir. 2019) ........................30

*Valiente v. Swift Transp. Co. of Ariz.*, LLC, 54 F.4th 581 (9th Cir. 2022) ............43

*W. B. Fishburn Cleaners, Inc. v. Army & Air Force Exch. Serv.*, 374 F. Supp. 162 (N.D. Tex. 1974)..........................................................................29

*Wash. Res. Project, Inc. v. Dep't of HEW*, 504 F.2d 238 (D.C. Cir. 1974) ...........27

*Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022)...............50

*WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) ...................................46

**Statutes**

12 U.S.C. § 1738 .....................................................................................................24

12 U.S.C. § 1739 .....................................................................................................24

12 U.S.C. § 1743 .....................................................................................................24

12 U.S.C. § 1744 .....................................................................................................24

12 U.S.C. § 1815 .....................................................................................................17

12 U.S.C. § 241 .........................................................................................................9

12 U.S.C. § 248 ................................................................. passim

12 U.S.C. § 248a .............................................................. passim

12 U.S.C. § 248c ..................................................... 14, 15, 21, 37

12 U.S.C. § 302 ..................................................................9, 38

12 U.S.C. § 304 ..................................................................9, 38

12 U.S.C. § 341 .....................................................................38

12 U.S.C. § 342 ............................................................... passim

12 U.S.C. § 461 .....................................................................17

12 U.S.C. § 632 ......................................................................7

28 U.S.C. § 1291 ....................................................................7

28 U.S.C. § 1331 ....................................................................7

28 U.S.C. § 1361 .............................................................. 37, 38

31 U.S.C. § 5311 *et seq.* ...........................................................2

47 U.S.C. § 396 ....................................................................31

5 U.S.C. § 551 .....................................................................23

5 U.S.C. § 555 .....................................................................39

5 U.S.C. § 701 ........................................................ 10, 23, 24, 28

5 U.S.C. § 702 .....................................................................23

5 U.S.C. § 706 ........................................................... 7, 39, 45

Act of June 21, 1917, Pub. L. No. 65-25, 40 Stat. 232 ...........................10

Federal Reserve Act of 1913, Pub. L. No. 63-43, 38 Stat. 251 ..........................9, 10

*James M. Inhofe National Defense Authorization Act for Fiscal Year 2023*, Pub. L. No. 117-263, 136 Stat. 2395 (Dec. 23, 2022)................................15

Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 .................. 10, 12

**Other Authorities**

., *FDIC, Risk Management Manual of Examination Policies*,
https://www.fdic.gov/regulations/safety/manual/section2-1.pdf (Apr. 2015)
............................................................................................................4

*A Brief History of Deposit Insurance in the United States*, FDIC (Sept. 1998),
https://www.fdic.gov/bank/historical/brief/brhist.pdf................................4

Adam J. Levitin, *Safe Banking: Finance and Democracy*, 83 U. Chi. L. Rev. 357
(2016).......................................................................................................4

Antonin Scalia & Bryan A. Gamer, Reading Law: The Interpretation of
Legal Texts (2012).................................................................................24

Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve's Key Policies for the
Provision of Financial Services: About*,
https://www.federalreserve.gov/paymentsystems/pfs_about.htm (last
updated Oct. 28, 2016)...........................................................................13

Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Principles for the Pricing of the
Federal Reserve Bank Services*,
http://www.federalreserve.gov/paymentsystems/pfs_principles.htm (last
updated Nov. 8, 2008) ...........................................................................12

Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Standards Related to Priced-
Service Activities of the Federal Reserve Banks* (emphasis added)
http://www.federalreserve.gov/paymentsystems/pfs_standards.htm ...........12

Bd. of Governors of the Fed. Rsrv. Sys., *Policies: The Federal Reserve in the
Payments System*,
http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm (last
updated Aug. 11, 2020) ..........................................................................12

*Freedom of Information Requests*, Fed. Rsrv. Bank of N.Y., .................................13

Julie Andersen Hill, *From Cannabis to Crypto: Federal Reserve Discretion in
Payments*, 109 Iowa L. Rev. 117 (2023) ......................................................14

Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. 453
(2023)............................................................................. 6, 13, 14, 32

Karla Karlson, Comment, *Check and Balances: Using the Freedom of Information
Act to Evaluate the Federal Reserve Banks*, 60 Am. U. L. Rev. 213 (2010)13

*Operating Circular 1: Account Relationships*, Fed. Reserve Fin. Servs. (Aug. 16,
2021), https://perma.cc/9ZAJ-7465 ......................................................9, 10

*Operating Circular 1: Account Relationships*, Fed. Reserve Fin. Servs. (eff. Sept.
1, 2023),

https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf............................................9, 10

ROGER LOWENSTEIN, AMERICA'S BANK: THE EPIC STRUGGLE TO CREATE THE FEDERAL RESERVE (2015)................................................................................3

*SR 20-16: Supervision of De Novo State Member Banks, Ltr. from Bd. of Governors of the Fed. Res. Sys., to the Officer in Charge of Supervision at Each Fed. Res. Bank* (June 24, 2020), https://www.federalreserve.gov/supervisionreg/srletters/SR2016.htm.........16

*The Role and Activities of the Federal Reserve System in the Nation's Check Clearing and Payments System*, Report of the Subcmte. on Domestic Monetary Pol'y of the Cmte. on Banking, Fin., and Urb. Aff., U.S. House of Representatives, 98th Cong., 2d Sess. (1984) ...............................................12

**Rules**

Fed. R. App. P. 4 ...........................................................................................30

Fed. R. App. P. 5 .............................................................................................7

Fed. R. Civ. P. 12 .......................................................................... 48, 49, 50

**Regulations**

12 C.F.R. § 327.16 ..........................................................................................4

*Guidelines for Evaluating Account and Services Requests*, 87 Fed. Reg. 51099 (Aug. 19, 2022)................................................................................. passim

**Constitutional Provisions**

U.S. Const., amend. V................................................................. 7, 18, 47

# INTRODUCTION

### A.    Prologue

The glaring irony is undeniable: Federal Reserve Banks extend unrestricted and uninsured access to the U.S. financial system to foreign retail banks and their customers located in terrorist hotspots like Egypt (Hamas), Nigeria (Boko Haram), and Pakistan (Al Qaeda), despite their failure to meet the minimum statutory requirements for eligibility for a master account to which U.S. institutions are subject and the lack of oversight and supervision by U.S. state or federal banking regulators over such foreign banks' clientele. At the same time, Appellant PayServices Bank ("PayServices") is a private banking corporation incorporated under the Idaho Bank Act and regulated under Idaho law. *See* ER-49 ¶ 1. It is undisputed that the entity is an eligible depository institution under the Federal Reserve Act. *See* ER-50, ¶ 4 & ER-46. It assists local farmers in exporting their potatoes under the supervision of the U.S. Customs and Border Protection, among other services.  Yet it faces vehement denial and the Federal Reserve Bank of San Francisco ("FRBSF") has refused to grant the bank a master account.

This refusal was only issued after a congressional inquiry on PayServices' behalf following FRBSF's 9.5-month disregard of PayServices without explanation, despite months of requests for information, underscores a troubling disregard for the law and due process. Considering PayServices's compliance with the federal Bank

Secrecy Act, 31 U.S.C. § 5311 *et seq.*, and regulations from the Idaho Department of Finance (PayServices's chartering banking authority and regulator), the federal Office of Foreign Assets Control, the U.S. Financial Crimes Enforcement Network, the Federal Bureau of Investigation, the Federal Bureau of Industry and Security, the Federal Bureau of International Security and Nonproliferation, and the federal Directorate of Defense Trade Controls, FRBSF's denial of access to a master account for the institution is absurd. FRBSF's assertion that PayServices's compliance with U.S. law while it processes payments on behalf of U.S. farmers exporting potatoes poses a threat to the stability of the U.S. economy while allowing unfettered and unregulated banking for potential terrorist groups from Pakistan, for example, relies on logical fallacy, sophism, flawed reasoning, and borders on deception, apparently motivated by pressure groups and internal turmoil within the Federal Reserve. PayServices is the victim fighting an organization with unlimited resources which disregards law, due process, accountability, and the wider interests of Idaho small businesses and farmers.

### B.    Background

PayServices follows a long line of state-chartered financial institutions that have brought innovation to America's dual banking system, that shares power

2

between the federal government and the states.[1] On August 3, 2022, the Idaho Department of Finance granted PayServices a provisional charter, approving its application to establish a state-chartered bank. ER-50, ¶ 2. PayServices is subject to regulation by the Idaho Department of Finance and under Idaho law. PayServices' business model focuses on providing payment processing solutions for merchants and commercial buyers in international transactions, along with a host of other services. It "focuses almost exclusively on facilitating trade commodities for the small to medium enterprises from and to the United States." *See* ER 50, 58-59.

As the district court recognized, PayServices "is not a lender, but instead provides payment processing to foreign merchants, buyers, and governments 'by linking the actual transaction to a physical verification of the merchandise by the customs agencies of both the United States and the equivalent agency of the receiving country.'" ER-18. "PayServices will only release the funds allocated for the transaction once it has received confirmation from the authorities that the transaction complies with applicable law and presents no danger to the public." ER-18-19. Indeed, PayServices alleged that "all deposits are available at all times because 100% of deposits are kept in reserve." ER-53.

---

[1] *See* ROGER LOWENSTEIN, AMERICA'S BANK: THE EPIC STRUGGLE TO CREATE THE FEDERAL RESERVE 3 & 136 (2015).

This type of institution offers a form of "safe banking."[2] As a result, it does not fit within the type of entity typically regulated by a federal banking agency.[3] For example, while many state-chartered banks are members of the Federal Deposit Insurance Corporation ("FDIC") and are regulated by the FDIC, the FDIC provides deposit insurance to protect depositors from losses based on a bank overleveraging debt.[4] In fact, the core factors in the FDIC's risk evaluation process for determining the insurance premiums institutions may be required to pay[5] involve leveraged deposits put at risk by products and services that PayServices' proposed bank

---

[2] The model within which a bank holds 100 percent of its deposits in reserve and that it is prohibited from lending deposits has been referred to as "Pure Reserve Banking." *See* Adam J. Levitin, *Safe Banking: Finance and Democracy*, 83 U. Chi. L. Rev. 357, 417-19 (2016).

[3] *See, e.g.*, Levitin, *supra* note 2, at 418. Levitin, a professor at Georgetown University Law Center in Washington, D.C., argues that "100% reserve banking renders most of the prudential bank regulatory apparatus as well as federal deposit insurance and the Federal Reserve System *entirely superfluous and unnecessary*." *Id.* at 418 (emphasis added). "Pure Reserve Banking presents the possibility of a rationally designed system that produces greater financial stability with less regulation and without the dangers of regulatory arbitrage." *Id.* at 419. Yet the FRBSF's refusal to issue a master account has been to create more roadblocks and to "increase the complexity of regulation." *Id.* at 418.

[4] The FDIC focuses heavily on "lending and its related risks" and "trends in credit risks." *A Brief History of Deposit Insurance in the United States*, FDIC (Sept. 1998), at 53, https://www.fdic.gov/bank/historical/brief/brhist.pdf. The FDIC's current risk management manual emphasizes that debt is the greatest threat to a bank's stability and security. "Loans typically comprise a majority of a bank's assets and carry the greatest amount of risk to their capital." *See, e.g.*, FDIC, *Risk Management Manual of Examination Policies*, § 3.1-2, https://www.fdic.gov/regulations/safety/manual/section2-1.pdf (Apr. 2015).

[5] *See* 12 C.F.R. § 327.16.

4

explicitly does not offer. Rather than increasing risk to the U.S. financial system, PayServices's model actually contributes to making it safer and more stable. This consideration is one of the reasons that, at the very outset of the application process, a representative of the FDIC who participated in an April 2022 call with PayServices and officials from the FRBSF about PayServices' application for a master account noted that PayServices' business model did not merit the issuance of FDIC insurance. ER-52, ¶¶ 16-17.

PayServices applied to the Federal Reserve Bank of San Francisco for a master account. The district court below recognized, as other courts have, that a master account is "put simply, a bank account for banks" that "gives deposit institutions access to the Federal Reserve System's services, including its electronic payments system." ER-16 (quoting *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052, 1053 (10th Cir. 2017) (Moritz, J.)). "A master account is a deposit account that permits a depository institution to make deposits into and withdrawals from an account held and administered by its regional Federal Reserve Bank. *Id.* "Without such access, a depository institution is nothing more than a vault." *Id*. "A master account also enables its holder to access various services promised by 12 U.S.C. § 248a beyond deposit and withdrawal services, including wire transfer services, automated clearinghouse services, settlement services,

securities safekeeping, and Federal Reserve float services." *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 640 F. Supp. 3d 1169, 1177 (D. Wyo. 2022).

Law professor Julie Hill explains: "Following the Monetary Control Act of 1980, banks opening an account at the Federal Reserve encountered a process like that of customers opening standard bank accounts[.]"[6] "Federal Reserve Banks opened accounts with little independent investigation as to the riskiness of the applicant. For many years, the Federal Reserve Banks' forms implied that account opening was quick, noting that '[p]rocessing may take 5-7 business days.'"[7]

FRBSF took more than nine months to complete a review process that its application materials indicate will take up to 30 days. *See* ER-56. FRBSF responded with effectively a one-page letter that does not cite any of PayServices' application materials or responses to requests for additional information to justify the decision to deny PayServices an account.[8] *See* ER-79. The reason given in the Motion to Dismiss, including unsupported claims of a "risk of illicit financial activity, including terrorism funding," are a post-hoc justification for a decision that was

---

[6] Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. 453, 455 (2023) (footnotes omitted).

[7] *Id*. at 456.

[8] The letter continues from the first page to a second page that include two lines of substantive content above the signature block. *See* ER-79-80. With the perfunctory greeting and signature blocks removed, the letter amounts to a page of substantive content. To describe it as "two pages" gives the impression that the letter is filled with more of a substantive explanation than it actually contains.

made arbitrarily, capriciously, and with the intent to block PayServices from operating its lawful business as a state-chartered banking institution. PayServices meets and exceeds the requirements for the issuance of a master account, and FRBSF's denial of the same is contrary to law.

## JURISDICTIONAL STATEMENT

PayServices sued the Federal Reserve Bank of San Francisco ("FRBSF") in the U.S. District Court for the District of Idaho, alleging a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2); a claim for relief under the Mandamus Act, 28 U.S.C. § 1361; and a violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution. The district court had original jurisdiction over the claims under 12 U.S.C. § 632 & 28 U.S.C. § 1331.

The district court granted FRBSF's motion to dismiss the complaint on March 30, 2024. ER-13-39. On March 30, 2024, the district court also entered final judgment in favor of FRBSF and disposing of all of PayServices' claims. ER-12. PayServices filed a timely notice of appeal and paid the filing fee required by Federal Rule of Appellate Procedure 5(d) on April 13, 2024. ER-10-11. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

1. Whether the Federal Reserve Bank of San Francisco's denial of master accounts to eligible depository institutions is subject to judicial review under the Administrative Procedure Act.

2. Whether 12 U.S.C. § 248a, as amended by the Monetary Control Act of 1980, limits the authority of the FRBSF to deny PayServices' master account application.

3. Whether access to a master account with FRBSF is a protected property interest of an eligible non-member depository institution under the Due Process Clause of the Fifth Amendment where federal law provides a right to receive Federal Reserve services on the same terms as member banks and those services require a master account to access them.

4. Whether the district court err in granting FRBSF's Motion to Strike the Declaration of Lionel Danenberg attached to PayServices' response to the Motion to Dismiss where it considered documents outside the four corners of the complaint attached as exhibits to FRBSF's Motion to Dismiss?

## STATEMENT OF THE CASE

### A.    History of Federal Reserve Act and MCA

Congress established the Federal Reserve System (the Federal Reserve) under the Federal Reserve Act in 1913. Federal Reserve Act of 1913, Pub. L. No. 63-43,

38 Stat. 251. It serves as "the nation's central bank [and] is composed of both public and private elements." *Comm. for Monetary Reform v. Bd. of Governors of Fed. Rsrv. Sys.*, 766 F.2d 538, 539 (D.C. Cir. 1985). The system includes twelve Federal Reserve Banks, which "are private corporations whose stock is owned by the member commercial banks within their districts." *Id*. at 540. They are, however, quasi-private because "each Reserve Bank consists of six members elected by the member commercial banks and three members appointed by the Board of Governors of the Federal Reserve System." *Id.* (citing 12 U.S.C. §§ 302 & 304). The Board members come through the political process, as they "are appointed by the President with the advice and consent of the Senate." *See id.* (citing 12 U.S.C. § 241). The Board, however, oversees the Reserve Banks' issuance of accounts, which the Federal Reserve calls "master accounts," and payment systems by developing regulations and exercising supervisory authority over the Reserve Banks. *See* 12 U.S.C. § 248(a) & (j); *Operating Circular 1: Account Relationships*, Fed. Reserve Fin. Servs. § 2.6 (Aug. 16, 2021) ("2021 Operating Circular"), https://perma.cc/9ZAJ-7465.[9] The Board also has the authority to delegate "any of

---

[9] This document is the version of the Operating Circular in effect when PayServices submitted its application for a master account on August 10, 2022. *See* ER-19, 50 & 54. The current version became effective on September 1, 2023. *Operating Circular 1: Account Relationships*, Fed. Reserve Fin. Servs. (eff. Sept. 1, 2023), https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf ("2023 Operating Circular"). Notably, the 2023 Operating Circular states that the Reserve Banks have discretionary control

its functions, other than those relating to rulemaking or pertaining principally to monetary and credit policies, to . . . Federal Reserve banks[,]" along with other specified entities, subject to provisions of the Administrative Procedure Act. *See* 12 U.S.C. § 248(k) (citing 5 U.S.C., tit. 7).

Since the Federal Reserve's inception in 1913, regional Reserve Banks have had the authority to accept deposits from "member banks." Federal Reserve Act of 1913, Pub. L. No. 63-43 § 13, 38 Stat. 251, 263. Over time, however, Congress has expanded the list of entities eligible for master accounts. As early as 1917, four years after the Federal Reserve Act was enacted, Congress amended the Act to make nonmember banks and trust companies eligible to open Federal Reserve accounts "solely for the purposes of exchange or collection" if they met sufficient balance requirements. Act of June 21, 1917, Pub. L. No. 65-25, § 4, 40 Stat. 232, 235. In 1980, Congress further expanded the list of institutions eligible for master accounts. Monetary Control Act of 1980, Pub. L. No. 96-221 § 105, 94 Stat. 132, 139 (codified at 12 U.S.C. § 342). In addition to "member banks," "other depository institutions" became eligible to open accounts. *See id*. As part of this expansion, Congress

---

over master accounts – a position it did not take in the earlier circular issued in 2021 when PayServices applied for an account. *See id.*, § 2.6 ("A Reserve Bank has discretion in deciding whether to provide a Financial Institution with access to a Master Account and may require a Financial Institution to provide additional information and documentation to the Reserve Bank to support its decision making."); *cf*. 2021 Operating Circular, § 2.6.

provided that access to these services must be provided on a non-discriminatory basis:

> The schedule of fees prescribed pursuant to this section shall be based on the following principles:
>
> . . . (2) ***All Federal Reserve bank services*** covered by the fee schedule ***shall be available*** to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks . . . .
>
> 12 U.S.C. § 248a(c)(2) (emphasis added).

The enumerated bank services include "(1) currency and coin services; (2) check clearing and collection services; (3) wire transfer services; (4) automated clearinghouse services; (5) settlement services; (6) securities safekeeping services; [and] (7) Federal Reserve float . . . ." *Id*. § 248a(b)(1)–(7). In addition, access must be given to (8) "any new services which the Federal Reserve System offers, including but not limited to payment services to effectuate the electronic transfer of funds." *Id*. § 248a(b)(8).

The Board has historically asserted that the MCA gave all eligible depository institutions access to the Federal Reserve payments system. Immediately after Congress passed the MCA, the number of institutions that could directly access Fed services went from "5,400 member banks to over 40,000 depository institutions."[10]

---

[10] *The Role and Activities of the Federal Reserve System in the Nation's Check Clearing and Payments System*, Report of the Subcmte. on Domestic Monetary

In 1980, the Board announced: "Services covered by the fee schedule are available to *all depository institutions*." Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Principles for the Pricing of the Federal Reserve Bank Services*, http://www.federalreserve.gov/paymentsystems/pfs_principles.htm (last updated Nov. 8, 2008) (emphasis added). An appeals court decision in 1983 noted that "[t]he Board contends that the language and legislative history of § [248a] evince an intent to provide nonmember financial institutions access to Federal Reserve services . . . ." *Bank Stationers Ass'n, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 704 F.2d 1233, 1236 (11th Cir. 1983) (emphasis added). This consistent recognition of the principle of open access has been maintained for almost forty years, until recently:

> 1984: "The Monetary Control Act of 1980 (MCA) has expanded the Federal Reserve's role by ***requiring the Federal Reserve to provide its services to all depository institutions on an equitable basis*** . . . ." Bd. of Governors of the Fed. Rsrv. Sys., *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks* (emphasis added) http://www.federalreserve.gov/paymentsystems/pfs_standards.htm.

> • 1984 / 1990 / 2001: "***Federal Reserve payment services are available to all depository institutions*** . . . ." Bd. of Governors of the Fed. Rsrv. Sys., *Policies: The Federal Reserve in the Payments System*, http://www.federalreserve.gov/paymentsystems/pfs_frpaysys.htm (last updated Aug. 11, 2020) (emphasis added).

> • 2016: "Congress expanded the Federal Reserve's role in the payment system with the enactment of the Monetary Control Act of 1980 (MCA). The MCA . . . ***gave all depository institutions access to the***

---

Pol'y of the Cmte. on Banking, Fin., and Urb. Aff., U.S. House of Representatives, 98th Cong., 2d Sess., at 11 (1984).

*Federal Reserve's payment services*." Bd. of Governors of the Fed. Rsrv. Sys., *Federal Reserve's Key Policies for the Provision of Financial Services: About*, https://www.federalreserve.gov/paymentsystems/pfs_about.htm (last updated Oct. 28, 2016) (emphasis added).

Although it is unclear when the shift occurred, "the Federal Reserve [has] changed its approach to processing account requests. Rather than encountering a process like opening a bank account, some recent Federal Reserve account applicants have encountered a lengthy process more like applying for a bank charter." *See* Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. 453, 456 (2023). The process has also become increasingly secretive. The Reserve Banks claim that they are not subject to the Freedom of Information Act, despite authority that suggests otherwise.[11] The restricted access to master accounts generally targets novel banks, such as non-lending banks like PayServices.[12]

---

[11] *See, e.g.*, *Freedom of Information Requests*, Fed. Rsrv. Bank of N.Y., https://www.newyorkfed.org/aboutthefed/freedom-of-information-requests (stating that although the "[t]he Federal Reserve Bank of New York is not an agency as defined by the Freedom of Information Act (FOIA) and is therefore not subject to the provisions of FOIA," it nevertheless "is committed to complying with the spirit of FOIA"); *cf.* Karla Karlson, Comment, *Check and Balances: Using the Freedom of Information Act to Evaluate the Federal Reserve Banks*, 60 Am. U. L. Rev. 213 (2010) (describing how FOIA may be interpreted to apply to Reserve Banks).

[12] *See* Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. 453, 458 (2023) ("Novel banks undergo a risk assessment, but there are no processes or bright-line rules that would facilitate consistent decisions across the twelve Federal Reserve Bank districts. . . . Novel banks requesting Federal Reserve accounts often wait years for a decision. The Federal Reserve does not make any of its decisions public.") (internal footnote omitted); Julie Andersen Hill, *From Cannabis to Crypto: Federal Reserve Discretion in Payments*, 109 Iowa L. Rev.

On August 19, 2022, more than a week after PayServices submitted its application for a master account, the Board adopted *Guidelines for Evaluating Account and Services Requests*, 87 Fed. Reg. 51099 (Aug. 19, 2022) (the "Guidelines"). While the Board recognized that the suddenly opaque process could benefit from "a more transparent and consistent approach," *id*., 87 Fed. Reg. at 51099, "the Guidelines do little to provide the transparency and consistency the Federal Reserve claims to value[,]" other than formalize the process that *de novo* banks like PayServices have faced that resembles applying for a bank charter, but without the clarity of statutes and regulations to make it clear the materials and proof necessary to obtain approval.[13] *See* Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. at 457-58.

The Federal Reserve Board and Banks have faced increasing criticism regarding the lack of transparency they have injected into the master account application process. In light of this criticism, Congress amended the Federal Reserve Act at 12 U.S.C. § 248c(b)(1), to require disclosure of applications for accounts and the decisions the board has reached on such applications. *James M. Inhofe National*

---

117, 188 n.428 (2023) ("In litigation with Fourth Corner Credit Union, [The Narrow Bank], Custodia Bank, PayServices, and [Banco San Juan International], the Federal Reserve has not provided any examples of Federal Reserve member banks that have been denied access to accounts or payment services.")

[13] Indeed, the Board acknowledged that "[i]n developing the Account Access Guidelines, the Board sought to incorporate as much as possible existing Reserve Bank risk management practices[.]" *Guidelines*, 87 Fed. Reg. at 51099 n.3.

*Defense Authorization Act for Fiscal Year 2023*, Pub. L. No. 117-263, § 5708, 136 Stat. 2395, 3419-20 (Dec. 23, 2022) (codified at 12 U.S.C. § 248c). This statute requires the Federal Reserve Board to "create and maintain a public, online, and searchable database that contains . . . a list of every entity that currently has access to a [R]eserve [B]ank master account and services." 12 U.S.C. § 248c(b)(1)(A). In addition, the Board must provide "a list of every entity that submits an access request" for a master account and whether the request "was approved, rejected, pending, or withdrawn." 12 U.S.C. § 248c(b)(1)(B)(ii).

### B.    PayServices Application Process

PayServices began communicating with FRBSF officials regarding its master account application request at least as early as April 2022. ER-52, ¶ 16. The consistent theme of the allegations is that over several months, FRBSF never indicated that there was a problem with the application or the likelihood of approval given its business model. According to the complaint, an FDIC official at an April 2022 indicated that "PayServices' business model did not warrant the need to carry FDIC insurance coverage of deposits because PayServices' business model does not involve any type of credit product such as loans, mortgages, or investments." ER-52, ¶ 17. "At the meeting, the officials concluded that the likelihood of a bank failure at PayServices is not possible because, at PayServices, all deposits are available at all times because 100% of deposits are kept in reserve. As a result, there would never

15

be a run on the bank or pose a risk of failure to due to a bank run for the FRBSF." ER-53, ¶ 18.

PayServices' regulator, the Idaho Department of Finance, determined that its "entire application [for a bank charter], procedures and risk management framework was the most sophisticated they had seen to date." ER-53-54, ¶ 21. Idaho issued a preliminary approval with conditions that "included the requirement to meet all federal regulations and be subject to a yearly examination by the Department instead of one every 18 months," more frequently than other banks.[14] *Id.* PayServices agreed to the conditions and a preliminary approval was issued on August 3, 2022. ER-54, ¶ 22. According to the complaint, PayServices filed an application on or around August 10, 2022 and timely provided the follow up documents FRBSF requested to process the application. ER-54, ¶¶ 23-25. For almost a year, Appellant "repeatedly reached out to the FRBSF and has repeatedly inquired as to the status of its approval request[.]" ER-54, ¶ 26. Consistent with the recent secrecy around the process,

---

[14] Indeed, the Board has directed Federal Reserve Banks to follow similar guidelines for de novo banks that seek to become State member banks. *SR 20-16: Supervision of De Novo State Member Banks, Ltr. from Bd. of Governors of the Fed. Res. Sys., to the Officer in Charge of Supervision at Each Fed. Res. Bank* (June 24, 2020), https://www.federalreserve.gov/supervisionreg/srletters/SR2016.htm ("The responsible Reserve Bank should conduct a full-scope examination, independently, jointly, or concurrently with the state, within 12 months of the de novo's formation or its conversion to a state member bank. Thereafter, the bank should remain on a 12-month cycle until two full-scope, on-site examinations have been conducted. . . .").

FRBSF "repeatedly replied that '*the review continues*' and that they are '*not sharing our process with you.*'" *Id.* (emphasis in original).

It took political intervention, from the office of Florida Sen. Marco Rubio, to spur FRBSF to issue a decision on May 31, 2023. *See* ER-57-58. In the meantime, PayServices repeatedly asked whether the FRBSF had identified any deficiencies in or concerns about the application. *See* ER-56-57. FRBSF consistently said no and agreed to notify PayServices if changes were necessary. ER-56-57. It never did so. *See id.* Instead, it issued a letter summarily denying the application based on Guidelines that had not been promulgated when PayServices applied for the account.

PayServices alleged in its complaint and federal law provides that it qualifies as a "depository institution" within the meaning of the Federal Reserve Act. It is a "bank which is eligible to make application to become an insured bank," 12 U.S.C. § 461(b)(l)(A)(i) & (b)(1)(B), as it will be "engaged in the business of receiving deposits[.]" 12 U.S.C. § 1815(a)(1). It is undisputed that the entity is eligible for an account. *See* ER-46 & 53.

### C.    Procedural History of the Case

PayServices filed its complaint against FRBSF on June 27, 2023. ER-73. PayServices alleged that the Federal Reserve Act, as amended by the MCA, provides a non-discretionary obligation to grant master accounts to eligible non-member depository institutions. "All Federal Reserve bank services covered by the fee

17

schedule shall be available to nonmember depository institutions . . . ."12 U.S.C. § 248a(c)(2) (emphasis added). ER-65. The services subject to the fee schedule all require a master account to use them. *See id.* Appellant contends that FRBSF constitutes an "agency" under the APA and its denial of a master account is subject to judicial review. *See* ER-66-70. Its three-tiered framework for reviewing applications in the Guidelines essentially places so-called "Tier 3" institutions, non-member banks which do not have a federal regulator, in the "no-tier" category, virtually redlining them out of access to the U.S. payment system. *See id.* PayServices also alleged that it holds a property interest in a master account where Congress has determined that eligible non-member banks are entitled to services provided by the account. ER-72. As a result, the deprivation violates the Fifth Amendment to the U.S. Constitution. *See id.* PayServices sought mandamus relief, in which the court would perform the non-discretionary to issue an account based on PayServices' eligibility. ER-70-71.

FRBSF filed a Motion to Dismiss in which it attached a declaration. ER-75. The declaration included a copy of FRBSF's denial letter as an exhibit. ER-78-80. PayServices filed a response to the Motion to Dismiss that included the Declaration of Lionel Danenberg ("Danenberg Declaration"), its incorporator, accompanied by an exhibit that countered the statements raised in the declaration and exhibit filed by FRBSF. ER-81. The district court dismissed the Complaint on FRBSF's Motion

18

without granting leave to amend. ER-39. The district court also granted FRBSF's Motion to Strike the Danenberg Declaration. *See* ER-37.

The district court essentially adopted FRBSF's arguments on all counts. The district court concluded that section 248a was a "pricing" provision related to services and that FRBSF had the authority to reject applications from eligible institutions based on the direction that a Federal Reserve Bank "*may* receive from any of its member banks, or other depository institutions, . . . deposits of current funds in lawful money, national-bank notes, Federal reserve notes, [etc.]" 12 U.S.C. § 342 (emphasis in opinion). ER-23 & 29. It also interpreted the amendment requiring disclosure of "rejected" applications in a database as indicative of Congress's approval of FRBSF's authority to reject master account applications from eligible institutions. *See* ER-26. The district court also ruled that, as an alternative ground for dismissal, that FRBSF was not an "agency" within the meaning of the APA because, although Federal Reserve Banks are "integral components of the Federal Reserve System, such that it can legitimately be argued that they are federal instrumentalities," ER-32, they are "more accurately described as private corporations, owned by their member commercial banks." ER-33.

Despite the ruling that the APA does not apply to Federal Reserve Banks, the district court determined that FRBSF's decision to deny PayServices a master account was not arbitrary and capricious because § 342 applies to master account

19

requests, not § 248a(c)(2) and that PayServices has not alleged a failure to follow the Guidelines. ER-37. With respect to the due process claim, the district court dismissed the claim based on its determination that there was no property interest associated with the account since FRBSF has complete discretion as to whether the grant the account and PayServices was not "denied any procedural protections." ER-37. The district court granted the Motion to Strike in a footnote, indicating that it could not consider material beyond the complaint, despite its reliance on evidence FRBSF submitted outside the complaint. *See* ER-19-20, 37. This appeal timely followed.

## SUMMARY OF THE ARGUMENT

FRBSF is an "agency" within the meaning of the APA. It is an "authority of the Government of the United States," even given its quasi-private characteristics. The APA specifies the entities that are excluded from its coverage and even identifies other banking-related functions that are specifically excluded. Yet it does not exclude Federal Reserve Banks. The Board has also delegated functions to FRBSF, including the authority to establish accounts and approve account requests. The authority by which these functions were delegated is subject to APA and, accordingly, so is FRBSF. Given that the APA applies to FRBSF, its denial of PayServices' application for a master account is not immune from judicial review.

20

Congress enacted the Monetary Control Act of 1980 to ensure that "[a]ll Federal Reserve services *shall* be available" to eligible non-member depository institutions. 12 U.S.C. § 248a(c)(2). As opposed to the discretionary authority that FRBSF "*may* accept deposits" under 12 U.S.C. § 342, the mandate to provide services requires the issuance of master accounts because master accounts are required to access all of the services Congress specified in the MCA. To be sure, FRBSF may deny accounts to ineligible institutions, refuse to take certain deposits, and reasonably regulate the use of the account. But it cannot deny the account altogether where the entity meets the statutory eligibility requirements. The Board has held this view for almost forty years and may not depart from it without congressional authorization. While the 2022 amendment to the Federal Reserve Act indicates that Congress wanted transparency with respect to "rejected" applications, *see* 12 U.S.C. § 248c(b)(1), it does not confer discretion to reject accounts for eligible depository entities to whom Federal Reserve services "shall be available[.]" 12 U.S.C. § 248a(c)(2). Consequently, mandamus relief is available to require the completion of this non-discretionary duty on the part of FRBSF.

FRBSF has an obligation to carry out the review of master account applications and avoid acting arbitrarily or capriciously under the APA. PayServices has sufficiently alleged an APA claim given that the complaint includes detailed allegations that directly contradict FRBSF's stated grounds for denial. PayServices

21

is, at a minimum, entitled to discovery to determine whether FRBSF sufficiently reviewed its application prior to issuing its denial. Likewise, the right to access Federal Reserve services for eligible institutions such as PayServices, provided under federal law, constitutes a protected property interest for which PayServices has a right to procedural and substantive due process under the U.S. Constitution. PayServices has sufficiently alleged a protected property interest and a lack of due process where the denial does not establish any lack of eligibility and FRBSF's findings are unsupported by the record, according to the complaint's allegations. Finally, with respect to the Motion to Strike, what is good for the goose is good for the gander. The district court specifically considered documents outside the four corners of the complaint filed by FRBSF. The district court had a responsibility to consider the documents that PayServices filed in response to those allegations that were based on matters specifically incorporated into and arising out of the complaint. Thus, the order striking PayServices' exhibit in response to the Motion to Dismiss must be reversed.

If this Court concludes that the complaint is defective in alleging any of its claims, it should at least reverse and remand to permit PayServices the chance to cure any defect on amendment.

22

## STANDARD OF REVIEW

"[This Court] review[s] a district court's decision to grant or deny a motion to dismiss pursuant to Rule 12(b)(6) *de novo*. [It] also review[s] questions of statutory interpretation *de novo*." *Camacho v. Bridgeport Fin. Inc.*, 430 F.3d 1078, 1079 (9th Cir. 2005) (internal citations omitted).

## ARGUMENT

## I.   THE FEDERAL RESERVE BANK OF SAN FRANCISCO IS AN "AGENCY" COVERED BY THE ADMINISTRATIVE PROCEDURE ACT.

The district court determined that Federal Reserve Banks are not "agencies" under the Administrative Procedure Act ("APA"). This position is incorrect and the consequences of such a position, writ large, would be astonishing. An entity that exercises many binding regulatory powers—including, as FRBSF asserts, the final authority over decisions affecting the U.S. financial system—would operate free of accountability.

The APA allows courts to review "agency actions." 5 U.S.C. § 702 ("A person suffering legal wrong because of *agency action*, or adversely affected or aggrieved by *agency action* within the meaning of a relevant statute, is entitled to judicial review thereof. . . .") (emphasis added). The APA defines "agency" as "each authority of the Government of the United States, whether or not it is within or subject to review by another agency[.]" 5 U.S.C. §§ 551(1) & 701(b)(1). The

23

definition includes exceptions not applicable here. *See id.* The very presence of those exceptions, however, indicates that Congress specified the entities that are specifically not to be considered agencies by statute. "When a provision contains express exceptions, 'the familiar judicial maxim *expressio unius est exclusio alterius* counsels against finding additional, implied, exceptions.'"[15] *Persian Broad. Serv. Glob., Inc. v. Walsh*, 75 F.4th 1108, 1113 (9th Cir. 2023) (quoting *Syed v. M-I, LLC*, 853 F.3d 492, 501 (9th Cir. 2017)); *see also United States v. Johnson*, 529 U.S. 53, 58 (2000). These exceptions include, for example, "functions conferred by" specific statutes, including specific authority conferred in title 12 of the U.S. Code – the same title in which the main statutory provisions at issue in this case are located. *See* 5 U.S.C. § 701(b)(1)(H).

The APA specifically does not apply to 12 U.S.C. § 1738, relating to the insuring of mortgages by the Federal Housing Administration ("FHA"). *See id.; see also Barrington Manor Apts. Corp. v. United States*, 392 F.2d 224, 227 (Ct. Cl. 1968), supplemented, 459 F.2d 499 (Ct. Cl. 1972). It also does not apply to 12 U.S.C. §§ 1739, 1743, & 1744, which all relate to lending related to housing. With all of these exceptions related to banks and banking that Congress specifically provided in the APA, it defies reason to conclude that a Federal Reserve Bank is not subject to

---

[15] This Latin maxim has been translated to mean that "expression of one thing implies the exclusion of others . . . ." Antonin Scalia & Bryan A. Gamer, Reading Law: The Interpretation of Legal Texts 107 (2012).

the APA and the functions of taking deposits (12 U.S.C. § 342) and providing Federal Reserve services to eligible non-member depository institutions (*see* 12 U.S.C. § 248a) would likewise not be covered. If Congress had intended to exempt Federal Reserve Banks from the APA, it knew how to do so.

Admittedly, as one court has observed, "the law is currently unsettled on whether a Federal Reserve Bank is an 'agency' for APA purposes." *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 640 F. Supp. 3d 1169, 1179 (D. Wyo. 2022). An analysis of the cases in which district courts have defined the contours of the types of entities covered under the APA, however, indicate that Federal Reserve Banks fall within the ambit of the statute. Courts look to "the structure, function, and mandate of the entity." *New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 531 (2d Cir. 2010) (internal quotation marks omitted). Particularly key is whether the entity exercises "substantial independent authority" to "take final and binding action affecting the rights and obligations of individuals." *Dong v. Smithsonian Inst.*, 125 F.3d 877, 881-82 (D.C. Cir. 1997) (internal alterations omitted); *accord Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971); *Elec. Priv. Info. Ctr. v. Nat'l Sec. Comm'n on A.I.*, 466 F. Supp. 3d 100, 109-11 (D.D.C. 2020).

The district court admitted that "Federal Reserve Banks are integral components of the Federal Reserve System, such that it can legitimately be argued that they are federal instrumentalities." ER-32 (citing *United States ex rel. Kraus v.*

25

*Wells Fargo & Co.*, 943 F.3d 588, 592 (2d. Cir. 2019)); *Kraus*, 943 F.3d at 592 (Federal Reserve Banks "are instrumentalities of the federal government and the operating arms of its central bank."). Yet it concludes that this level of authority "does not *ipso facto* make them government agencies." *Id.* The district court reasoned that Federal Reserve Banks are not subject to the APA in part because they are "separate . . . *from the government*"; "*do not 'have the authority* to promulgate regulations*"; and Congress did not "convert them formally into government agencies." ER-32-33 (quoting *Kraus*, 943 F.3d at 597-98) (emphasis in opinion).

The district court also concluded that Federal Reserve Banks are not subject to the APA because they "are more accurately described as private corporations, owned by their member commercial banks." ER-33. The district court emphasized the "combination of public and private characteristics" that historically has characterized FRBs and that they are "private corporations in which the government has an interest." *Id.* In determining whether the APA applies to a particular instrumentality of the federal government, courts have:

> [taken] cognizance of the varying arrangements Congress has designed for *implementing governmental functions through private or quasi-private entities*. Recognizing the "myriad organizational arrangements" adopted "for getting the business of the government done," it was forced to the "unavoidable fact" that each arrangement must be examined in its own context to determine whether or not it constitutes an "agency" within the term agency as defined in the APA.

26

*Pub. Citizen Health Rsch. Grp. v. Dep't of Health, Ed., & Welfare*, 449 F. Supp. 937, 940 (D.D.C. 1978) (quoting *Wash. Res. Project, Inc. v. Dep't of HEW*, 504 F.2d 238 (D.C. Cir. 1974), *cert. denied*, 421 U.S. 963 (1975)) (emphasis added).

The "APA apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions." *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971). "A court should inquire, therefore, whether the governmental unit has substantial authority to act with the sanction of the government behind it." *Conservation L. Found. of New England, Inc. v. Harper*, 587 F. Supp. 357, 364 (D. Mass. 1984) (citing *Lee Constr. Co., Inc. v. Fed. Reserve Bank of Richmond*, 558 F. Supp. 165, 172-76 (D. Md. 1982)). While "all factors must be weighed, 'the important consideration is whether it has any authority in law to make decisions.'" *Public Citizen*, 449 F. Supp. at 941 (quoting *Wash. Res. Project*, 504 F.2d at 248).

The Board has extensively delegated its functions and its authority to the Federal Reserve Banks. *See* 12 U.S.C. § 248(k); *Lee Constr. Co. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165, 177 (D. Md. 1982) (citing 12 U.S.C. § 248(k)). 12 U.S.C. § 248(k) provides in relevant part that

> [t]he Board of Governors of the Federal Reserve System shall be authorized and empowered . . . (k) [t]o delegate, by published order or rule and subject to subchapter II of . . . chapter 7, of Title 5, any of its functions, other than those relating to rulemaking or pertaining principally to monetary and credit policies, to . . . Federal Reserve banks.

> 12 U.S.C. § 248(k).

Thus, there are two limitations provided by statute: the delegation must be "by published order or rule" and it must be "subject to subchapter II of . . . chapter 7, of Title 5[.]" *Id*. In August 2022, the Board issued the Guidelines. Accordingly, if this Court accepts the conclusion that the Guidelines apply to Appellant, a published rule was issued that governed the denial. Likewise, chapter 7 of Title 5 includes the provisions of the APA under which Appellant has sought judicial review. *See* 5 U.S.C. §§ 701-706. Accordingly, both conditions are met.

"Thus, Federal Reserve Banks seemingly possess substantial independent authority in the exercise of specific functions, and seemingly have authority in law to make decisions. . . . [T]he Federal Reserve Banks would appear to be vested with substantial powers to act with respect to individuals and to function as a discrete, decision-producing layer," despite the Board's power to review their actions. *Lee Construction*, 558 F. Supp. at 178 (internal citations and quotation marks omitted). Based on these facts, which remain true for FRBSF, the court concluded that "since the language of the APA itself provides that an 'agency' is 'each authority of the Government of the United States, whether or not it is within or subject to review by another agency,' a Federal Reserve Bank may be considered such an 'agency' even though its actions may be subject to review by the Board." *Id*.

The Guidelines indicate that the Federal Reserve System Board of Governors provided Reserve Banks with the authority to deny master accounts on its behalf.

28

Therefore, FRBSF is subject to the APA as an instrumentality of the federal government. Indeed, it is estopped from claiming otherwise. *See W. B. Fishburn Cleaners, Inc. v. Army & Air Force Exch. Serv.*, 374 F. Supp. 162, 165 (N.D. Tex. 1974) (citing *Kam Koon Wan v. Black*, 188 F.2d 558 (9th Cir.), cert. denied, 342 U.S. 826 (1951)).

While the district court emphasized the unique structure of the Federal Reserve Banks and noted that Congress uniquely designed FRBs in the Federal Reserve Act of 1913 to "leave governance of money and credit, at least in part, in private hands[,]" *see* ER-33 (quoting *Kraus*, 943 F.3d at 597), the fact that FRBs have "private or quasi-private" characteristics do not make them immune from judicial review under the APA. *See Public Citizen*, 449 F. Supp. at 940. As a general matter, "[t]he authority to act with the sanction of government behind it determines whether or not a governmental agency exists. The form the agency takes, or the function it performs are not determinative of the question." *Kam Koon Wan*, 188 F.2d at 561 (interpreting meaning of "agency" under Portal-to-Portal Act).

Reserve Banks qualify as APA agencies because they wield significant, independent federal regulatory powers. Congress tasked Reserve Banks with implementing federal monetary policy and empowered the Board to "delegate . . . *subject to the [APA]*, any of its functions, other than those relating to rulemaking or pertaining principally to monetary and credit policies, to . . . Federal Reserve banks."

29

12 U.S.C. § 248(k). Indeed, the Guidelines indicate that the Board states that they were issued based on the Board's authority to generally supervise Reserve Banks under 12 U.S.C. § 248(j). *Guidelines*, 87 Fed. Reg. at 51106.

Multiple courts that have considered the question have deemed Reserve Banks agencies for APA purposes; no case holds otherwise. *See Flight Int'l Grp., Inc. v. Fed. Rsrv. Bank of Chi.*, 583 F. Supp. 674 (N.D. Ga. 1984), *vacated on other grounds*, 597 F. Supp. 462 (N.D. Ga. 1984); *Lee Constr. Co. v. Fed. Rsrv. Bank of Richmond*, 558 F. Supp. 165 (D. Md. 1982); *Jet Courier Servs., Inc. v. Fed. Rsrv. Bank of Atlanta*, 713 F.2d 1221, 1228 & n.1 (6th Cir. 1983). The cases rejecting the Reserve Banks' status as "agencies" involved definitions that differ from the APA and did not involve assertions of Reserve Banks' putative final decision-making authority.[16]

---

[16] *See Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971, 976 (Fed. Cir. 2020) (Reserve Banks are "distinct from the government" under America Invents Act, not other statutes); *United States v. Wells Fargo & Co.*, 943 F.3d 588, 597-98 (2d Cir. 2019) (False Claims Act); *Scott v. Fed. Rsrv. Bank of Kan. City*, 406 F.3d 532, 534 (8th Cir. 2005) (28 U.S.C. § 451 definition); *Fed. Rsrv. Bank of St. Louis v. Metrocentre Imp. Dist. No. 1*, 657 F.2d 183, 186 (8th Cir. 1981) (not addressing Reserve Banks' agency status), *aff'd*, 455 U.S. 955 (1982); *Katsiavelos v. Fed. Rsrv. Bank of Chi.*, 859 F. Supp. 1183, 1185 (N.D. Ill. 1994) ("Plaintiff does not contend that the FRBC is an executive agency as that term is used in Title VII."); *In re Hoag Ranches*, 846 F.2d 1225, 1227 (9th Cir. 1988) (citing Fed. R. App. P. 4(a)(1)); *Lewis v. United States*, 680 F.2d 1239, 1240 (9th Cir. 1982) ("critical factor" for Federal Tort Claims Act "is the existence of federal government control over the detailed physical performance and day to day operation of that entity") (internal quotation marks omitted).

30

Indeed, the reasoning in *Lee Construction* is particularly applicable here. The district court explained: "[D]espite the ostensibly private ownership of Federal Reserve Banks and despite the private election of six of the nine members of the board of directors of each Bank, the affairs of each Federal Reserve Bank are conducted under the close supervision and ultimate control of the Board, an independent federal regulatory agency." *Lee Constr.*, 558 F. Supp. at 177. Among various provisions that demonstrate the Federal Reserve System Board of Governors' oversight of the Reserve Banks, it refers to the authority "[t]o exercise general supervision over [the] Federal reserve banks" at 12 U.S.C. § 248(j). *Id*. In August 2022, the Board issued the Guidelines, citing its general supervisory authority to do so under Section 248(j). *Guidelines*, 87 Fed. Reg. at 51106.

At a minimum, the president of a Where Congress chooses to specify that a private corporation it has established by law is not an "agency" within the meaning of the APA or the Mandamus and Venue Act, it has chosen to use specific language to do so. *See, e.g.*, 47 U.S.C. § 396(b) (providing that the Corporation for Public Broadcasting "will not be an agency or establishment of the United States Government"); *Network Project v. Corp. for Pub. Broad.*, 398 F. Supp. 1332, 1339 (D.D.C. 1975), *aff'd in part, rev'd in part on other grounds and remanded*, 561 F.2d 963 (D.C. Cir. 1977) (citing 47 U.S.C. § 396(b) to justify rejection of request for mandamus relief). The district court has cited no such provision in the Federal

31

Reserve Act or any other relevant authority granting the Reserve Bank such an exception and this Court should not recognize such a sweeping departure from principles of judicial review here.

## II.   FRBSF LACKED THE STATUTORY AUTHORITY TO DENY PAYSERVICES A MASTER ACCOUNT.

The district court has effectively concurred with FRBSF's account of a history in which deposit accounts with Reserve Banks were limited to the U.S. government and Federal Reserve 'member' banks" and that, even after the passage of the MCA, the Reserve Banks have complete discretion to deny master account applications by eligible depository institutions because they "may receive from any of its member banks, or other depository institutions, . . . deposits" on certain terms. 12 U.S.C. § 342. ER-23-24. This rendition of the history of the Federal Reserve Act and description of the structure of the Federal Reserve System is inconsistent with the history and structure of the underlying statutes.

Until 1980, Federal Reserve accounts "were for the most part . . . available only to banks that were members of the Federal Reserve System." In 1980, Congress passed the MCA to open up access to the U.S. payment system – not to increase Reserve Banks' power to keep eligible institutions out.[17] The district court held that,

---

[17] *See* Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. 453, 455 (2023) (analyzing authority and finding that MCA "[gave] all depository institutions access to Federal Reserve accounts.").

32

under 12 U.S.C. § 342 provides Reserve Banks with discretion to deny master accounts. *See* ER-27. The only appeals court that has ruled directly on the question of the right to a master account has reached the opposition conclusion to the district court in this case. The ruling came from Judge Robert Bachrach on the U.S. Court of Appeals for the Tenth Circuit in a published opinion. *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017).

As an initial matter, it must be noted that Section 342 does not address master account access. Section 342 states that Reserve Banks "may receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items." A "deposit[]" and an "account" are two different things. A Federal Reserve bank may reject every deposit that comes from a bank subject to the limits in the language. But that tells one nothing about whether they have the authority to deny "accounts" that hold the deposits. Section 342 thus presupposes that various entities *already* have master accounts, which are prerequisites to receive deposits. Section 342 merely describes "types of monetary instruments that Federal Reserve Banks may receive for deposit or collection" from entities possessing master accounts. *Fourth Corner*, 861 F.3d at 1074 (Bacharach, J.). Section 342 does not prescribe conditions for obtaining master accounts.

33

The district court relies improperly on *Farmers' and Merchants' Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649 (1923), to support the conclusion that 12 U.S.C. § 342 gives Reserve Banks discretion to deny master accounts. ER-23. *Farmers* largely reinforces the position that Section 342 confers some discretion over what types of monetary instruments Reserve Banks may accept – not discretion over the question of whether to grant master accounts in the first place. *Farmers* held that "neither section 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation to receive checks for collection. The act merely confers authority to do so." 262 U.S. at 655, 662. The fact that Reserve Banks need not accept every method of deposit is irrelevant to whether they have discretion to deny master account applications. *See Fourth Corner*, 861 F.3d at 1074 (Bacharach, J.) (rejecting Appellee's interpretation).

Multiple courts of appeals have concluded that 12 U.S.C. § 248a requires open access to Federal Reserve services for eligible depository institutions. Despite the district court's acceptance of the proposition that section 248a is a "anti-price discrimination provision[,]" ER-30, in *Fourth Corner*, Judge Bachrach determined that 12 U.S.C. § 248a requires Federal Reserve Banks to issue master accounts to eligible depository institutions that apply for them. That section (part of the MCA) requires that all Federal Reserve Bank services covered by a pricing fee schedule which Congress directed the Federal Reserve System Board of Governors to adopt

"shall be available to nonmember depository institutions" on the same terms as are offered to nonmember banks with certain exceptions. 12 U.S.C. § 248a(c)(2). Judge Bacharach reasoned that the only way the "Federal Reserve bank services covered by the fee schedule" can be made available to nonmember depository institutions is by granting them a master account. *See Fourth Corner*, 861 F.3d at 1071 (Bacharach, J.) ("The plain text of § 248a(c)(2) indicates that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks. To purchase these services, a master account is required. Thus, nonmember depository institutions, such as Fourth Corner, are entitled to master accounts.").

Judge Bachrach distinguished between Sections 342 and 248a, the statutes at issue here:

> Section 342 addresses the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection…. But § 342 does not address which institutions can access Federal Reserve services; that subject is governed instead by § 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember depository institutions. As a result, § 342 does not affect Fourth Corner's entitlement to a master account.

> *Fourth Corner*, 861 F.3d at 1074.

"[T]his discretion does not encompass the issuance of master accounts." *Id.* at 1073-74. Based on this authority, this Court should reject the district court's determination that the FRBSF has the absolute discretion to deny master account applications as a basis to dismiss Appellant's complaint.

35

With this limitation on the FRBSF's authority, the sky will not fall and the parade of horribles trotted out by the FRBSF will not come to pass. The Federal Reserve Bank's authority, however, to administer master accounts and protect the U.S. payment system remains strong. The Federal Reserve Act establishes that Reserve Banks like FRBSF have an obligation to determine whether the entity seeking an application meets the eligibility requirements to operate a financial institution. Once it determines that the entity is eligible, it has an obligation to allow the entity to open an account.

An analogy to the First Amendment is appropriate here. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak . . . ." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Yet "[e]ven protected speech is not equally permissible in all places and at all times." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (citation omitted). Speech is "subject to reasonable time, place, or manner restrictions[.]" *Id.* (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293 (1984)). In the same way, the Federal Reserve Act provides that every eligible depository institution has a right to access Federal Reserve services on the same terms as member banks, and those services require a master account to use them. Still, the Reserve Banks do not have to accept every deposit into that account. *See* 12 U.S.C. § 342. They have the authority to reasonably regulate the use of the account. The account cannot be used for money laundering or

36

other illegal purposes. All of these restrictions are permissible and consistent with the Federal Reserve Act – but the one thing that is not permissible is totally denying an account to a depository institution that is eligible under the Act. The Federal Reserve Act provides the right to "[a]ll Federal Reserve services" in the fee schedule to an eligible depository institution, which must carry a right to the account that is necessary to access those services. *See* 12 U.S.C. § 248a(c)(2); 12 U.S.C. § 248c(a)(3)(B). Without this account, PayServices has no voice. It has no ability to participate in its own right in the U.S. payment system and provide authorized services to customers. This kind of blanket blockade must meet a high bar before it survives judicial scrutiny.

The bank's activity with the account is also subject to the regulation of a network of other state and federal agencies which monitors and controls risks to the U.S. payment system. But the Reserve Bank does not have the authority to deny access to an account on this basis.

### A.    This Court may exercise its mandamus authority to compel the granting of PayServices' request for a master account.

Appellant has sufficiently alleged that Appellee failed to perform a nondiscretionary duty, namely to issue a master account to PayServices, where it is undisputed that Appellant is an eligible depository institution. A writ of mandamus compelling action from the FRBSF arises under 28 U.S.C. § 1361, which provides: "The district courts shall have original jurisdiction of any action in the nature of

mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Mandamus relief applies whether or not the Court determines that FRBSF is an agency under 28 U.S.C. § 1361 because Mary Daly, the president of the Federal Reserve Bank of San Francisco, is an "officer" of the United States. *See Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 640 F. Supp. 3d 1169, 1191-92 (D. Wyo. 2022) (holding that plaintiff plausibly alleged that president of Federal Reserve Bank of Kansas City is an inferior "officer of the United States"); 12 U.S.C. § 341 ("The president [of a Federal reserve bank] shall be the chief executive officer of the bank and shall be appointed by the Class B [representatives of the public, *see* 12 U.S.C. §§ 302 & 304] and Class C directors of the bank [directors appointed by the Board, *see id*.], with the approval of the Board of Governors of the Federal Reserve System, for a term of 5 years[.]"). Thus, she may be compelled to grant an account by mandamus.

The U.S. Supreme Court indicated in 1875 that "it has been well settled, that, when a plain official duty, requiring no exercise of discretion, is to be performed, and performance is refused, any person who will sustain personal injury by such refusal may have a mandamus to compel its performance." *Bd. of Liquidation v. McComb*, 92 U.S. 531, 541 (1875). To obtain mandamus relief, the plaintiff must show that "(1) [its] claim is clear and certain; (2) the official's duty is nondiscretionary, ministerial, and so plainly prescribed as to be free from doubt; and

38

(3) no other adequate remedy is available." *Patel v. Reno*, 134 F.3d 929, 931 (9th Cir. 1997). In this case, Appellee has "failed to discharge a duty owed to plaintiffs which Congress has directed them to perform." *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 640 F. Supp. 3d 1169, 1177 (D. Wyo. 2022)The issuance of master accounts to eligible depository institutions is a nondiscretionary duty under Section 248a.

"For relief pursuant to Section 1331 and the APA, plaintiffs must show unreasonable delay in the processing of their applications." *Singh v. Still*, 470 F. Supp. 2d 1064, 1067–68 (N.D. Cal. 2007); 5 U.S.C. § 555(b) ("[W]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it."); *see also id.*, 5 U.S.C. § 706(1) (providing that courts shall "compel agency action unlawfully withheld or unreasonably delayed"). Under the reasonable time standard, the Court has discretion to determine whether the agency's delay is unreasonable. *Independence Mining Co., Inc. v. Babbitt*, 105 F.3d 502, 506-07 (9th Cir. 1997).

In this case, FRBSF took more than nine months to complete an application process that has historically taken 5-7 business days.[18] PayServices alleges that, at an April 2022, at the beginning of the application process, FRBSF officials

---

[18] *See* Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. 453, 456 (2023).

concluded that the company's business model involved minimal risk because the "likelihood of a bank failure at PayServices is not possible" because keeps all customer deposits in reserve. ER-53. Appellant alleged that David Xu, representing the FRBSF, concluded that "PayServices' business model is no different than an ATM card . . . and for this reason, the only requirement – from an operational risk assessment – for the FRBSF" was that overdrafts would not be permitted, which PayServices does not allow under its operating procedures. ER-53. Wallace Young, the most senior official representing the FRBSF on the review of the application, concluded that "PayServices will be eligible to apply to request approval of a Master Account for PayServices to be connected to the U.S. payment system and that the FRBSF would be in a position to approve the request for a Master Account based on the business plan and business model that PayServices presented." ER-53. After obtaining a preliminary approval for a charter from Idaho, PayServices formally submitted its master account application based on the April 2022 meeting. ER-53-54. For more than nine months, PayServices repeatedly inquired about the status of its application and was told that the "review continues" and that FRBSF is "not sharing our process with you." ER-54. FRBSF never identified and informed PayServices about any aspect of PayServices' compliance and risk management framework that required improvement. ER-56. PayServices asked multiple times

and in multiple ways if any changes were required to the application to obtain approval; FRBSF said no. *See* ER-56-57.

On May 17, 2023, PayServices contacted the office of U.S. Senator Marco Rubio for assistance in obtaining information regarding the excessive delay in processing the application. ER-57. Sen. Rubio's office contacted FRBSF the next day, asking FRBSF to take action on the application. That same day, Wallace Young finally sent an email claiming that FRBSF was "wrapping everything up" and provided a timeframe for completion – within two weeks. ER-58. On May 31, 2023, FRBSF issued essentially a one-page denial letter. ER-58. FRBSF concluded the application review that it could have completed much sooner only after a U.S. senator's office placed a spotlight on their failure to timely complete the review. Taken together, the allegations establish a plausible cause of action for unreasonable delay against Appellee. Mandamus relief is available to remedy these failures.

## III. FRBSF'S DECISION TO DENY PAYSERVICES A MASTER ACCOUNT WAS ARBITRARY AND CAPRICIOUS UNDER THE APA.

### A. FRBSF did not have the authority to apply the Guidelines to PayServices's application for a master account.

PayServices alleges that it applied to the FRBSF for a master account on August 10, 2022.[19] *See* ER-19, 50 & 54. The Board issued the Guidelines nine days

---

[19] From the FRBSF's point of the view, the date may be even earlier. The Master Accounts Requests for Access Database indicates that Appellant requested

41

later, on August 19, 2022. *Guidelines*, 87 Fed. Reg. 51099, 51106 (Aug. 19, 2022).
On May 31, 2023, FRBSF justified its decision to deny Appellant's application for
a master account based on "the standards outlined in the [Guidelines]." ER-19 & 79.
The district court dismissed PayServices' APA claim based on FRBSF's application
of the Guidelines, even though Appellant did not allege that the denial was based on
the Guidelines because the Guidelines were issued after PayServices submitted its
application. *See* ER-37 ("Absent any allegation that FRBSF failed to follow the
Guidelines, there is nothing anchoring PayServices' APA claim").

"It is axiomatic that an administrative agency's power to promulgate
legislative regulations is limited to the authority delegated by Congress." *Bowen v.
Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *Solar Energy Indus. Ass'n v.
FERC*, 80 F.4th 956, 981 (9th Cir. 2023) (citing *Bowen*). "Retroactivity is not
favored in the law. Thus, congressional enactments and administrative rules will not
be construed to have retroactive effect unless their language requires this result."
*Bowen*, 488 U.S. at 208. Likewise, "a statutory grant of legislative rulemaking
authority will not, as a general matter, be understood to encompass the power to
promulgate retroactive rules unless that power is conveyed by Congress in express

---

an account on August 8, 2022. *See Master Account and Services Database: Requests
for Access*, Bd. of Governors of the Fed. Rsrv. Sys.,
https://www.federalreserve.gov/paymentsystems/master-account-and-services-database-access-requests.htm (last visited May 26, 2024).

terms." *Id.* "Whether a statute or agency decision applies retroactively is a question of law that [the Ninth Circuit] review[s] de novo." *Valiente v. Swift Transp. Co. of Ariz.*, LLC, 54 F.4th 581, 584 (9th Cir. 2022).

"A provision operates retroactively when it would 'impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" *Solar Energy*, 80 F.4th at 981 (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). "To assess whether a change in law applies retroactively to a pending lawsuit, *Landgraf* directs that [this Court] appl[ies] a two-step test. First, [this Court] determine[s] 'whether Congress has expressly prescribed the statute's proper reach.' If the relevant change in law is the result of an agency action, [this Court] must find both congressional authorization for the agency to impose retroactive rules and agency intent for the rules in question to apply retroactively." *Valiente*, 54 F.4th at 585 (quoting *Landgraf*, 511 U.S. at 280).

The Federal Reserve Act does not provide the Board with the express authority to engage in "retroactive" rulemaking. Likewise, the Guidelines do not express any intent to apply the terms retroactively. In fact, the Original Proposal upon which the Guidelines are based indicates that the Board stated that "the Proposed Guidelines would be intended primarily to apply to *new access requests*," but they may also apply "to existing account and services relationships where

43

appropriate" with a Reserve Bank's current account holders. *See id.*, 87 Fed. Reg. at 51100 (emphasis added); *see also In re Perkins*, 106 B.R. 863, 872 (Bankr. E.D. Pa. 1989) (refusing to apply Federal Reserve Commentary published in Federal Register retroactively "provide[d] no indication that its terms should be applied retroactively").

As a matter of fairness, it is improper to apply the Guidelines to Appellant's application, which were filed prior to the publication of the Guidelines and prepared in consultation with FRBSF months in advance. *See* ER-52-54. The Board provided that the Guidelines were issued in part to "establish a transparent and equitable framework for Reserve Banks to apply consistently to access requests." *Guidelines*, 87 Fed. Reg. at 51101. It also indicated that it had not even completed a plan to implement the Guidelines as of the date of publication. *See id.* ("To promote consistency, the Reserve Banks are working together, in consultation with the Board, to expeditiously develop an implementation plan for the final Guidelines."). The developing plan is further evidence that the Guidelines were not meant to be applied to pending requests like that of PayServices.

**B.    FRBSF's denial of PayServices's application for a master account was arbitrary and capricious even if the Guidelines are applicable.**

The district court concluded that FRBSF's decision was not arbitrary and capricious under the APA based on its conclusion that section 342, rather than section 248a(c)(2), applies to master account requests. ER-37. It further reasoned

44

that PayServices has not pled any facts showing that the FRBSF's decision was inconsistent with the Guidelines. According to the court, "Absent any allegation that FRBSF failed to follow the Guidelines, there is nothing anchoring PayServices' APA claim." ER-37. Thus, it suggests that PayServices's claim is based on a "disagreement with FRBSF's decision" when it may only be based on an opposition "to the process involved." ER-37.

The APA allows courts to set aside agency actions that are "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In the seminal case on which the district court relies, the Supreme Court has reasoned that:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ctr. for*

45

*Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018). The Ninth Circuit has ruled that, "[e]ven when an agency is acting within its area of expertise," courts "need not defer to the agency when the agency's decision is without substantial basis in fact." *Id.*

To the extent that the court determined that there was a lack of an allegation that the denial of Appellant's application violated the Guidelines, the district court should have provided an opportunity to amend the complaint rather than dismiss the case with prejudice and without leave to amend. The Ninth Circuit's longstanding rule is that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 926 (9th Cir. 2012) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). In this case, the district court made no such finding. It simply granted Appellee's motion to dismiss and on the same day, March 30, 2024, issued a judgment in favor of the FRBSF and dismissed the case with prejudice. ER-12. The district court's ruling is inconsistent with the Ninth Circuit's "general practice" in the context of dismissals under Rule. 12(b)(6). *Lacey*, 693 F.3d at 927. A dismissal is meant to be "a dismissal to be of the claims and not a final judgment on the complaint[.]" *Id.* (citing *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1135 (9th Cir. 1997)). Consistent

46

with this practice, this Court should reverse the dismissal of Appellant's complaint and remand with directions to grant Appellant leave to amend the complaint.

## IV. PAYSERVICES PROPERLY ALLEGED A DENIAL OF PROCEDURAL DUE PROCESS.

The district court rejected PayServices's allegations that it has a property interest in a master account and that the denial of the master account violates its right to procedural and substantive due process under the Fifth Amendment to the U.S. Constitution. U.S. Const., amend. V. ER-38-39. The district court based its conclusion that there was no protected property interest at issue on its flawed analysis that PayServices "does not have a legitimate claim of entitlement to a master account." ER-38. Likewise, it ruled that there was no substantive due process right at issue. *See* ER-38.

To prevail on either a procedural or substantive due process claim, a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectible property interest. *Johnson v. Ryan*, 55 F.4th 1167, 1179 (9th Cir. 2022); *Olson v. California*, 62 F.4th 1206, 1220 (9th Cir. 2023). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Blantz v. Calif. Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 922 (9th Cir. 2013) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Given that Section 248a

47

requires the issuance of master accounts to eligible depository institutions, PayServices has a legitimate property interest in a master account.

Furthermore, FRBSF has denied PayServices procedural due process. FRBSF's denial letter, which it attaches to the Motion to Dismiss in its declaration, does not indicate any means by which PayServices could seek administrative review or an appeal of the decision. It does not describe specific information that PayServices can provide that would show it complies with the Guidelines that FRBSF claims it followed in making the decision. It grants no opportunity to correct the record and still protect its right to an account as an eligible depository institution. Accordingly, PayServices has stated a claim for violation of its procedural and substantive due process rights.

## V. THE DISTRICT COURT ERRED IN STRIKING THE DECLARATION OF LIONEL DANENBERG.

The district court suggested that "PayServices attempts to 'add meat to the bone[,]'" presumably to "anchor" its APA claim "by attaching the Declaration of Lionel Danenberg" to its response in opposition to the Motion to Dismiss. ER-37. The court relied on the "general rule" that courts 'may not consider material beyond the complaint in ruling on a Rule 12(b)(6) motion.'" ER-37 (quoting *Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007)).

The district court's order indicates that it did not adhere to the restriction it set in this case on considering documents outside of the four corners of the complaint.

48

The district court relied on an exhibit to the Declaration of Meredith Karp, counsel for FRBSF, that Appellee filed as an attachment to its Motion to Dismiss. *See* ER-19 (claiming that "[t]he proposed, novel, monoline business model and focus on transactions that are largely foreign in nature or involve mostly foreign participants presents undue risk.") (citing Ex. A to Karp Declaration, ER-79) The exhibit was FRBSF's denial letter sent to PayServices, which was not an exhibit to the complaint. PayServices filed a declaration by its incorporator and proposed director, Lionel Danenberg, to counter the statements in FRBSF's exhibit. ER-81-88. Yet the district court relied Appellee's declaration and refused to consider – indeed, it struck – Appellant's declaration filed in response to that declaration.

Once FRBSF submitted evidence that opposed the allegations in PayServices' complaint, PayServices was obligated to offer its own controverting evidence. *See Data Disc, Inc. v. Systems Tech. Assoc., Inc.*, 557 F.2d 1280, 1284 (9th Cir.1977) (finding that court "may not assume the truth of allegations in a pleading which are controverted by affidavit"). Mr. Danenberg's testimony about the contents of the documents was also proper because the documents referenced in the Declaration are all discussed in the Complaint. On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "[t]he court may consider all materials incorporated into the complaint by reference, as well as evidence properly subject to judicial notice" without converting the motion to one for summary judgment. *See Weston Fam. P'ship LLLP v. Twitter, Inc.*,

49

29 F.4th 611, 617 (9th Cir. 2022); *Tellabs, Inc. v. Makar Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference . . . ."). *See* ER-81-86, 88; *cf.* ER-49-66, ¶¶ 3, 17, 19, 20-22, 24, 27, 35-36, 44, 64. Therefore, Appellant requests that this Court reverse the district court's order striking the Danenberg Declaration.

## CONCLUSION

Appellant PayServices respectfully requests that this Court reverse the U.S. District Court for the District of Idaho's decision to dismiss Appellant's complaint and remand for proceedings consistent with its opinion.

Date: May 28, 2024

Jade A. Craig, P.A.

*/s/ Jade A. Craig*_____
Jade A. Craig

*Attorney for Appellant PayServices Bank*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** _____

The undersigned attorney or self-represented party states the following:

[   ] I am unaware of any related cases currently pending in this court.

[   ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[   ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** s/Jade A. Craig_____ **Date** 5/28/2024_____

51

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**: 24-2355_____

I am the attorney.

**This brief contains __12,438_____ words,** excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),

Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select*

[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Jade A. Craig_____ **Date** 5/28/2024_____

52