No. 24-2355

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

---

PAYSERVICES BANK,

*Plaintiff-Appellant,*

v.

FEDERAL RESERVE BANK OF SAN FRANCISCO,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Idaho
No. 1:23-cv-00305-REP
Hon. Raymond E. Patricco, Jr.

---

### APPELLEE'S ANSWERING BRIEF

---

Jonathan K. Youngwood
Meredith Karp
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
jyoungwood@stblaw.com
Meredith.Karp@stblaw.com

*Attorneys for Defendant-Appellee Federal
Reserve Bank of San Francisco*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee Federal Reserve Bank of San Francisco discloses that it is a federally chartered corporation chartered under the laws of the United States pursuant to the Federal Reserve Act of 1913, 12 U.S.C. § 221 et seq., and that it has no parent corporation(s). The stock of the Bank is held by the member commercial banks within its Federal Reserve District; ownership of Federal Reserve Bank stock is a condition of commercial banks' membership in the Federal Reserve System. *See* 12 U.S.C. § 222-223, 282, 287, 321, 327-328, 333. Bank stockholders do not possess a residual equity interest in Bank assets. *Id.* § 288.

Date: July 29, 2024

Jonathan K. Youngwood

/s/ *Jonathan K. Youngwood*
Jonathan K. Youngwood

*Attorney for Defendant-Appellee Federal Reserve Bank of San Francisco*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ....................................................5

STATUTORY AND REGULATORY AUTHORITIES .........................5

STATEMENT OF THE ISSUES.........................................................6

STATEMENT OF THE CASE ............................................................7

I.    Statutory and Regulatory Background ...........................................7

      A.    The Federal Reserve System ................................................7

      B.    Reserve Bank Master Accounts ..........................................9

      C.    Monetary Control Act .......................................................11

      D.    The Board's Guidelines for Evaluating Account and Service Requests......................................................................12

      E.    Congress's December 2022 Amendment to the FRA .......13

      F.    PayServices' Master Account Request ...............................14

II.    Procedural Background ...............................................................15

      A.    PayServices' Complaint .....................................................15

      B.    The District Court Dismisses the Complaint on Multiple, Incurable Grounds ...........................................................17

SUMMARY OF THE ARGUMENT ..................................................18

STANDARD OF REVIEW ...............................................................20

ARGUMENT ....................................................................................21

I.    The District Court Properly Ruled That FRBSF Had Discretion to Deny PayServices' Request for a Master Account .......................21

A.    The District Court Correctly Ruled That Section 342 Entrusts FRBSF with Discretion to Accept Deposits and Maintain Master Accounts ................................................................22

B.    The District Court Correctly Ruled That Section 248a Does Not Entitle PayServices to a Master Account ............................................25

    1.    The Plain Text of Section 248a Does Not Provide an Affirmative Right to a Master Account ...................................25

    2.    The Purpose of the FRA and the MCA Confirm Discretion ..................................................................................29

C.    Discretion Is Consistent With Longstanding Practice ......................30

D.    The December 2022 Amendment Confirms Discretion ....................33

E.    Judge Bacharach's Opinion in *Fourth Corner* Is Neither Binding Nor Persuasive...................................................................35

II.    The District Court Properly Ruled that FRBSF Is Not a Federal Agency for Purposes of PayServices' Claims ................................................37

A.    Reserve Banks Are Not the Center of Gravity By Express Congressional Design...............................................................38

B.    The District Court Correctly Held That Master Accounts Are Not a Substantial Governmental Power ............................................41

C.    The Issuance of Master Accounts Is Not a Delegated Power............43

D.    PayServices' Authorities Do Not Support Its Argument That FRBSF Is a Federal Agency...............................................................44

III.    PayServices' Mandamus Claim Is Moot, Waived, and Meritless................47

IV.    The District Court Properly Dismissed the APA Claim with Prejudice .......50

V.    PayServices' Due Process Claim Fails as a Matter of Law ..........................52

VI.    The District Court Did Not Abuse Its Discretion in Striking the Danenberg Declaration ...................................................................................54

CONCLUSION .................................................................................................56

# TABLE OF AUTHORITIES

## Cases

*Abagninin v. AMVAC Chem. Corp.*,
    545 F.3d 733 (9th Cir. 2008) ................................................................20

*AK Futures Ltd. Liab. Co. v. Boyd St. Distro, Ltd. Liab. Co.*,
    35 F.4th 682 (9th Cir. 2022) ................................................................25

*Am. Bankers Ass'n v. United States*,
    932 F.3d 1375 (Fed. Cir. 2019) ........................................................7, 8

*Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*,
    75 F.3d 1401 (9th Cir. 1996) ................................................................40

*Armstrong v. Reynolds*,
    22 F.4th 1058 (9th Cir. 2022) ..............................................................52

*Banco San Juan Internacional, Inc. v. FRB of N.Y.*,
    2023 U.S. Dist. LEXIS 193296 (S.D.N.Y. Oct. 27, 2023) ........................ passim

*Bateman v. Am. Multi-Cinema, Inc.*,
    623 F.3d 708 (9th Cir. 2010) ................................................................33

*Bd. of Governors of Fed. Res. Sys. v. First Lincolnwood Corp.*,
    439 U.S. 234 (1978) ..............................................................................29

*Bell Atlantic v. Twombly*,
    550 U.S. 544 (2007) ..............................................................................20

*Biden v. Texas*,
    142 S. Ct. 2528 (2022) ..........................................................................22

*Bloomberg L.P. v. Bd. of Governors of the Fed. Res. Sys.*,
    649 F. Supp. 2d 262 (S.D.N.Y. 2009) ..................................................30

*Bobka v. Toyota Motor Credit Corp.*,
    968 F.3d 946 (9th Cir. 2020) ................................................................26

*Browning-Ferris Indus. of S. Jersey, Inc. v. Muszynski*,
    899 F.2d 151 (2d Cir. 1990) ................................................................52

*Bruesewitz v. Wyeth LLC*,
 562 U.S. 223 (2011) ................................................................. 35

*Burlington N. Santa Fe Ry. Co. v. Feit*,
 663 F. App'x 504 (9th Cir. 2016) ............................................. 20

*C.R. v. Eugene Sch. Dist. 4J*,
 835 F.3d 1142 (9th Cir. 2016) .................................................. 52

*Canup v. Chipman-Union, Inc.*,
 123 F.3d 1440 (11th Cir. 1997) ................................................ 28

*City & Cty. of S.F. v. United States DOT*,
 796 F.3d 993 (9th Cir. 2015) .................................................... 50

*Cohen v. NVIDIA Corp. (In re NVIDIA Corp. Sec. Litig.)*,
 768 F.3d 1046 (9th Cir. 2014) .................................................. 14

*Cty. of Maui v. Haw. Wildlife Fund*,
 590 U.S. 165 (2020) ................................................................. 28

*Custodia Bank, Inc. v. Federal Reserve Board of Governors*,
 2024 U.S. Dist. LEXIS 76822 (D. Wyo. Mar. 29, 2024) ............................ passim

*CVS Health Corp. v. Vividus, LLC*,
 878 F.3d 703 (9th Cir. 2017) .................................................... 30

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*,
 557 F.2d 1280 (9th Cir. 1977) .................................................. 55

*Dong v. Smithsonian Inst.*,
 125 F.3d 877 (D.C. Cir. 1997) .............................................. 37, 41

*Dubin v. United States*,
 599 U.S. 110 (2023) ................................................................. 45

*Emergency Fleet Corp. v. W. Union Tel. Co.*,
 275 U.S. 415 (1928) ............................................................. 7, 38

*Entergy Corp. v. Riverkeeper, Inc.*,
 556 U.S. 208 (2009) ................................................................. 24

*Farmers & Merchs. Bank v. Fed. Rsrv. Bank of Richmond*,
    262 U.S. 649 (1923) ........................................................ 22, 28

*Farmers Educ. & Coop. Union Of Am., N.D. Div. v. Wday*,
    360 U.S. 525 (1959) ................................................................33

*Fed. Rsrv. Bank of Boston v. Comm'r of Corps. & Tax'n*,
    499 F.2d 60 (1st Cir. 1974) .....................................................29

*Firestone Tire & Rubber Co. v. Risjord*,
    449 U.S. 368 (1981) .................................................................5

*Flight Int'l Grp. v. Fed. Res. Bank*,
    583 F. Supp. 674 (N.D. Ga. 1984) ..........................................46

*Fourth Corner Credit Union v. FRB of Kan. City*,
    154 F. Supp. 3d 1185 (D. Colo. 2016) ....................................47

*Fox News Network, LLC v. Bd. of Governors of the Fed. Res. Sys.*,
    601 F.3d 158 (2d Cir. 2010) ............................................. 40, 44

*Fox TV Stations, Inc. v. Aereokiller, LLC*,
    851 F.3d 1002 (9th Cir. 2017) ................................................35

*Fulfillment Servs. v. UPS*,
    528 F.3d 614 (9th Cir. 2008) ..................................................28

*Graham-Sult v. Clainos*,
    756 F.3d 724 (9th Cir. 2014) ..................................................20

*Indep. Mining Co. v. Babbitt*,
    105 F.3d 502 (9th Cir. 1997) ..................................................49

*In re Hoag Ranches*,
    846 F.2d 1225 (9th Cir. 1988) ......................................... 44, 46

*In re International Union, United Mine Workers of Am.*,
    231 F.3d 51 (D.C. Cir. 2000) ..................................................48

*Irwin Mem'l Blood Bank of S.F. Med. Soc'y v. Am. Nat'l Red Cross*,
    640 F.2d 1051 (9th Cir. 1981) ......................... 37, 40, 42, 45

*Jet Courier Servs., Inc. v. Fed. Res. Bank*,
    713 F.2d 1221 (6th Cir. 1983) ....................................................... 26, 46

*Khoja v. Orexigen Therapeutics, Inc*.,
    899 F.3d 988 (9th Cir. 2018) ..............................................................55

*King v. Burwell*,
    576 U.S. 473 (2015)..........................................................................29

*Kuzova v. United States Dep't of Homeland Sec.*,
    686 F. App'x 506 (9th Cir. 2017) ......................................................48

*Lee Construction Co., Inc. v. Federal Reserve Bank of Richmond*,
    558 F. Supp. 165 (D. Md. 1982)........................................................47

*Lewis v. United States*,
    680 F.2d 1239 (9th Cir. 1982) ..................................................... passim

*Lombardo v. Handler*,
    397 F. Supp. 792 (9th Cir. 1975) ................................................. 39, 42

*Loughrin v. United States*,
    573 U.S. 351 (2014)................................................................... 27-28

*McCaughn v. Hershey Chocolate Co*.,
    283 U.S. 488 (1931)..........................................................................33

*McKinley v. Bd. of Governors of the Fed. Res. Sys*.,
    647 F.3d 331 (D.C. Cir. 2011) ........................................................7, 8

*Meritage Homes of Nev., Inc. v. FDIC*,
    753 F.3d 819 (9th Cir. 2014) ............................................................22

*Multnomah Legal Servs. Workers Union v. Legal Servs. Corp*.,
    936 F.2d 1547 (9th Cir. 1991) ..........................................................42

*New York v. Atl. States Marine Fisheries Comm'n*,
    609 F.3d 524 (2d Cir. 2010) .............................................................37

*Opati v. Republic of Sudan*,
    140 S. Ct. 1601 (2020)......................................................................22

*Or. Nat. Res. Council v. Thomas*,
  92 F.3d 792 (9th Cir. 1996) ................................................................50

*Owens v. Kaiser Found. Health Plan Inc.*,
  244 F.3d 708 (9th Cir. 2001) ............................................................20

*Pinnacle Armor, Inc. v. United States*,
  648 F.3d 708 (9th Cir. 2011) ..................................................... 53, 54

*Robinson v. Am. Home Mortg. Servicing, Inc. (In re Mortg. Elec.
  Registration Sys.)*,
  754 F.3d 772 (9th Cir. 2014) ............................................................48

*Schneider v. Cal. Dep't of Corr.*,
  151 F.3d 1194 (9th Cir. 1998) ..........................................................54

*Scott v. FRB of Kan. City*,
  406 F.3d 532 (8th Cir. 2005) ..................................................... 38, 39

*Shame On You Productions, Inc. v. Banks*,
  893 F.3d 661 (9th Cir. 2018) ............................................................49

*Starz Ent., LLC v. MGM Dom. Television Distrib., LLC*,
  39 F.4th 1236 (9th Cir. 2022) ..........................................................19

*Texas Dep't of Hous. and Cmty. Affairs v. Inclusive Communities Project*,
  135 S. Ct. 2507 (2015) .....................................................................23

*Thornton v. City of St. Helens*,
  425 F.3d 1158 (9th Cir. 2005) ..........................................................53

*Trout Unlimited v. Pirzadeh*,
  1 F.4th 738 (9th Cir. 2021) ..............................................................51

*U.S. Fidelity & Guar. Co. v. Fed. Rsv. Bank of N.Y.*,
  590 F. Supp. 486 (S.D.N.Y. 1984) ..................................................10

*United States ex rel. Kraus v. Wells Fargo & Co.*,
  943 F.3d 588 (2d Cir. 2019) ............................................................38

*United States v. McNinch*,
  356 U.S. 595 (1958) .........................................................................45

*United States v. Randall*,
    34 F.4th 867 (9th Cir. 2022) ....................................................................35

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ....................................................................54

*United States v. Rutherford*,
    442 U.S. 544 (1979) ................................................................................33

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ................................................................................27

## Status and Regulations

12 C.F.R. § 265.20 ......................................................................................43

12 U.S.C. § 1457(e) ....................................................................................39

12 U.S.C. § 1820(k) ....................................................................................39

12 U.S.C. § 1831j .......................................................................................39

12 U.S.C. § 241 .....................................................................................7, 27

12 U.S.C. § 248(k) ......................................................................................39

12 U.S.C. § 248a ................................................................................ passim

12 U.S.C. § 248c ................................................................................. 13, 35

12 U.S.C. § 301 .......................................................................................9, 43

12 U.S.C. § 302 .......................................................................................8, 39

12 U.S.C. § 304 ..........................................................................................39

12 U.S.C. § 341 .................................................................................5, 8, 9, 43

12 U.S.C. § 342 .................................................................................. passim

12 U.S.C. § 343(3) ......................................................................................27

12 U.S.C. § 632 ............................................................................................5

12 U.S.C. § 635(a) ......................................................................................39

22 U.S.C. § 285d .................................................................. 24, 27

22 U.S.C. § 290f(a) ...................................................................39

28 U.S.C. § 1291 .........................................................................5

28 U.S.C. § 1361 .........................................................................5

5 U.S.C. § 701(a) ......................................................................50

5 U.S.C. § 701(b) ......................................................................37

5 U.S.C. § 702(b) ......................................................................45

5 U.S.C. § 706(2) .........................................................................5

7 U.S.C. § 941-50b......................................................................39

Monetary Control Act of 1980, Publ. L. No. 96-221, 94 Stat. 132 ........... 11, 22, 30

## Regulatory Materials

86 Fed. Reg. 25,865 (May 11, 2021) ......................................12

86 Fed. Reg. 29,225 (Aug. 6, 1987)........................................31

87 Fed. Reg. 51,099 (Aug. 19, 2022)................................ passim

## Secondary Authorities

50 Cong. Rec. H.4643 (Sept. 13, 1913)....................................38

95 Cong., 1st Sess. 3 (Statement of Sen. Proxmire) ................11

Act of June 21, 1917, Publ. L. No. 65-25, 40 Stat. 232.................9

FINRA Rule 3100, Anti-Money Laundering Compliance Program, 31
   C.F.R. § 1023.210 ...............................................................15

Bd. of Governors of the Fed. Rsrv. Sys., FED. RSRV. BULL., Vol. 50,
   *Domestic Branches of Foreign Banks and Private Banks as "Banks*,"
   168 (1964)......................................................................... 23, 31

Cynthia Lummis, *The Fed Battles Wyoming on Cryptocurrency*, Wall
   Street Journal (Nov. 30, 2021)..............................................34

Gary C. Zimmerman, *The Pricing of Federal Services under the MCA*,
  FED. RSRV. BANK OF S.F., ECON. REVIEW (WINTER 1981) ..........................11

Minutes of the Board of Governors of the Federal Reserve System
  Meeting, Washington, July 26, 1945, Vol. 32 ......................................................11

Nathaniel Popper, *Banking for Pot Industry Hits a Roadblock*, N.Y. TIMES
  (Jul. 30, 2015) ...........................................................................................................34

*Nomination of Jerome H. Powell, of Maryland, to be Chairman of the
  Board of Governors of the Federal Reserve System: Hearing Before the
  S. Comm. on Banking, Hous., & Urb. Affs.*, S. Hrg. 117-335 before the
  S. Comm. on Banking, Hous., & Urb. Affs., 117th Cong. 33-34 (Jan.
  11, 2022) ....................................................................................................................34

*Nomination of Sarah Bloom Raskin, of Maryland, to be Vice Chairman
  for Supervision and a Member of the Board of Governors of the Federal
  Reserve System: Hearing Before the S. Comm. on Banking, Hous., and
  Urb. Affs.*, S. Hrg. 117-340 before the  S. Comm. on Banking, Hous., &
  Urb. Affs., 117th Cong. 28-30 (Feb. 2, 2022) ......................................................34

Federal Reserve Banks *Operating Circular 1*, Account Relationships,
  (Jan. 2, 1998) ............................................................................................................31

## INTRODUCTION

PayServices Bank ("PayServices") seeks to strip the Federal Reserve Bank of San Francisco ("FRBSF") of its ability to protect itself and the financial system from exposure to unacceptable levels of risk. PayServices, whose founder resides in Florida, is an online-only bank with no physical branch in Idaho (or anywhere in this country) that purportedly wants to process high-risk cross-border transactions between domestic exporters and foreign governments and merchants in unspecified countries (Br. at 3). To facilitate these transactions, PayServices requested a deposit account at FRBSF, known as a "master account." If granted, PayServices could access discounted financial services directly from the Federal Reserve System, instead of relying on a private bank as an intermediary. After a nine-month review and investigation, FRBSF determined—consistent with its duty to safeguard the U.S. financial system—that granting PayServices' account access request would pose undue risk, including risk of money laundering and terrorism financing.

PayServices thinks risk is irrelevant. Although it spills much ink contrasting "safe banking" from terrorism, PayServices says none of that matters: in its view, FRBSF is *required* by statute to grant master accounts regardless of the risks. Three federal courts, including the court below, have rejected that argument and confirmed that Reserve Banks have discretion under Section 342 of the Federal Reserve Act to

deny master account requests. No court has held otherwise. The District Court's opinion should be affirmed.

For most of their 110-year history, Reserve Banks primarily offered deposit accounts and financial services to member banks (*i.e.*, those subscribed to stock in their regional Reserve Bank) although Reserve Banks had discretion to offer accounts and services to nonmember banks for certain purposes. Beginning in 1980, Congress broadly authorized Reserve Banks to offer deposit accounts and services to nonmember depository institutions, which were largely traditional banks, and required the Reserve Banks to offer such services to nonmember and member banks at the same price. Recently, a growing number of novel institutions—some with little to no U.S. footprint—have requested Federal Reserve deposit accounts and services. Recognizing the emerging risks these novel institutions present, the Board of Governors of the Federal Reserve System promulgated Guidelines in 2022 to serve as a consistent framework guiding the individual Reserve Banks' review of account requests.

FRBSF reviewed PayServices' request in accordance with the Guidelines. It concluded that PayServices' high-risk business model and inadequate risk management controls posed unacceptable risk of illicit financial activity. PayServices commenced this action because it disagreed with that decision. But the merits of the decision are not at issue. Instead, PayServices argues that Congress

2

implicitly granted it the unfettered right to a master account that no risk assessment or discretion could ever infringe. It asked the District Court, through three alternative claims, to enforce that as-of-yet unrecognized right and compel FRBSF to enter into a master account relationship with PayServices.

The District Court dismissed PayServices' claims with prejudice, on multiple independent grounds. Two of the District Court's holdings are essential to each of PayServices' claims.

First, the District Court correctly held that FRBSF has discretion to deny master accounts. Section 342 of the Federal Reserve Act ("FRA")—the only statutory provision that governs FRBSF's administration of master accounts—provides FRBSF with discretion to deny master account requests. Section 248a—the sole statutory provision on which PayServices relies—is a price discrimination provision directed to the Board of Governors that neither entitles PayServices to a master account nor imposes any duty on FRBSF. Moreover, the statutory scheme of the FRA taken as a whole, Reserve Banks' longstanding practice, and Congress's recent amendment to the FRA confirm that FRBSF has discretion (and in fact, an obligation) to deny master account requests from institutions that pose undue risk to the Federal Reserve System.

Second, the District Court correctly held that Reserve Banks are not governmental agencies when they exercise their discretion to grant or deny master

accounts.   Instead, maintaining a depository account, like all routine banking operations of the Reserve Banks, is by express Congressional design separate from the sovereign.

Although PayServices raises a variety of additional (and meritless) arguments, none would save its case unless this Court reverses both of those holdings.  For these reasons and those set forth below, FRBSF respectfully requests that this Court affirm the District Court's ruling.

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant, PayServices, brought claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2); the Mandamus Act, 28 U.S.C. § 1361; and the Due Process Clause of the Fifth Amendment to the U.S. Constitution. Although the District Court concluded that FRBSF was not a "federal agency" for purposes of PayServices' claims, the District Court had subject matter jurisdiction pursuant to 12 U.S.C. § 632 ("[A]ll suits of a civil nature at common law or in equity to which any Federal Reserve bank shall be a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits.") and 12 U.S.C. § 341 (authorizing FRBSF to "sue and be sued").

This Court has jurisdiction pursuant to 28 U.S.C. § 1291, which provides that the federal courts of appeals have jurisdiction over "all final decisions of the district courts … except where a direct review may be had in the Supreme Court." *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 373 (1981).

## STATUTORY AND REGULATORY AUTHORITIES

All relevant statutory and regulatory authorities appear in the Addendum to Appellant's principal brief.

## STATEMENT OF THE ISSUES

1.     Did the District Court correctly rule that FRBSF has discretion to deny requests for master accounts under Section 342 of the FRA?

2.     Did the District Court correctly rule that FRBSF does not act as a federal agency when it acts in its capacity to issue, or deny, a Reserve Bank master account?

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Background

#### A.    The Federal Reserve System

In 1913, Congress created the Federal Reserve System "to oversee banking operations and promote [] greater economic stability." *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1378 (Fed. Cir. 2019). The Federal Reserve System is "not a single entity but rather a composite of several parts, both public and private, organized on a regional basis with a central governmental supervisory authority." *McKinley v. Bd. of Governors of the Fed. Res. Sys.*, 647 F.3d 331, 332 (D.C. Cir. 2011) (citation omitted). As relevant here, the Federal Reserve System includes the Board of Governors (the "Board") and the twelve regional Reserve Banks.[1] The Board, as the name suggests, "is the central governing body of the Federal Reserve System." ER-14. It is a federal agency, "directly accountable to Congress," whose seven members are appointed by the President and confirmed by the Senate. ER-15; *see* 12 U.S.C. § 241.

By contrast, the regional Reserve Banks are corporations chartered pursuant to the FRA which serve governmental interests but stand apart from the sovereign. *See Emergency Fleet Corp. v. W. Union Tel. Co.*, 275 U.S. 415, 425-26 (1928)

---

[1]    The Federal Reserve System also includes the Federal Open Market Committee. *See* ER-16, at n.3.

("Instrumentalities like . . . the federal reserve banks, in which there are private interests, are not departments of the government."); 12 U.S.C. § 341 (Reserve Banks are "a body corporate"). They serve as the Federal Reserve System's operating arms, subject to the general supervision of the Board. *See id.* § 341 *et seq.*; *Am. Bankers Ass'n*, 932 F.3d at 1378. In effect, Reserve Banks operate as "bankers' banks to much of the banking industry." ER-15. They carry out banking functions, including collecting and clearing checks, making advances to commercial entities, and holding reserves for depository institutions. 12 U.S.C. §§ 341-361; *Lewis v. United States*, 680 F.2d 1239, 1241 (9th Cir. 1982) (describing operations of the Reserve Banks).

From the inception of the Federal Reserve System, the Reserve Banks were empowered to perform "the routine operations and banking" in a manner utilizing the "detailed knowledge of local and individual" factors relevant to their respective regions. *Lewis*, 680 F.2d at 1241 (quoting H.R. Report No. 69, 63 Cong. 1st Sess., at 18-19 (1913)). Reserve Bank stock is "owned by the member commercial banks within their districts." *McKinley*, 647 F.3d at 333. Member banks elect six of the nine directors for their respective Reserve Bank—three directors which represent the member banks, and three which represent the business and consumer interests of the region. *See* 12 U.S.C. § 302 (describing the structure of the board of directors). Congress empowered these directors to "perform the duties usually appertaining to the office of directors of banking associations and all such duties as are prescribed

by law." *See id.* § 301. This includes the authority to appoint the "president," "vice presidents," and other "officers and employees," *id.* § 341 (Fifth), and to regulate the "manner in which its general business may be conducted, *id.* § 341 (Sixth).

## B. Reserve Bank Master Accounts

Since 1913, Reserve Banks have been authorized, but not required, to accept deposits from the institutions designated by Congress in Section 342. *See* 12 U.S.C. § 342. Initially, Reserve Banks received deposits from member banks. Starting in 1917, Congress authorized Reserve Banks to accept deposits "from any nonmember bank and trust company" for the "purposes of exchange or collection." *See* Act of June 21, 1917, c. 32, § 4, 40 Stat. 232, 235 (12 U.S.C. § 342).

Reserve Banks maintain deposits in "master accounts," which "reflect the financial rights and obligations of an account holder and of the Reserve Bank with respect to each other," and serve as "the place where the opening and closing balances are determined." ER-16. Through these accounts, account holders are permitted to obtain certain financial services directly from their respective Reserve Bank. Accepting deposits from, and providing financial services to, a financial institution exposes Reserve Banks and the financial system to risk. *See* 87 Fed. Reg. 51,099, 51,100 (Aug. 19, 2022) (financial institution's access to an account and

financial services "pose[s]" "risks . . . ranging from narrow risks (*e.g.*, to an individual Reserve Bank) to broader risks (*e.g.*, to the overall economy)").

Reserve Banks manage this risk in at least two ways. First, Reserve Banks exercise discretion to limit, or deny, access to master accounts and financial services where necessary. *Id.* at 51,102 ("[A] Reserve Bank may implement risk mitigants . . . if necessary to mitigate risks . . . . Reserve Banks also retain the discretion to deny a request for access to accounts and services where . . . access. . . would pose risks that cannot be sufficiently mitigated.").

Second, Reserve Banks monitor the risks posed by active account holders and, in their discretion, may restrict or revoke account access. To that end, the account relationship between a Reserve Bank and a master account holder is governed by Reserve Bank Operating Circulars. *U.S. Fidelity & Guar. Co. v. Fed. Rsv. Bank of N.Y.*, 590 F. Supp. 486, 492 (S.D.N.Y. 1984) (Operating Circulars are binding contracts). For example, Operating Circular 1 set forth the "terms by which a depository institution may request to open, maintain, and terminate a Master Account." ER-26.

C.    **Monetary Control Act**

Historically, Reserve Banks would provide financial services to member banks free of charge.[2]  Given concerns about the anticompetitive effect of the "discriminatory pricing system"[3] of certain financial services as between member and nonmember banks, Congress in concert with the Board began discussing the pricing and availability of Reserve Bank services in the late 1970s.  *See, e.g.*, 95 Cong., 1st Sess. 3 (Statement of Sen. Proxmire) (noting that the Reserve Banks should "begin charging for the services . . . which it provides free of charge to member banks").

In 1980, Congress passed the Monetary Control Act of 1980 ("MCA"), Pub. L. No. 96, to "facilitate the implementation of monetary policy."  94 Stat. 132.  As relevant here, the MCA amended Section 342 to authorize Reserve Banks to offer accounts and services to eligible nonmember depository institutions, in addition to members.  *See* 12 U.S.C. § 342 (adding "other depository institutions" to the list of entities from which Federal Reserve Banks "may receive" deposits).  To prevent price discrimination in the provision of those services, Congress required the Board to establish a schedule of fees for

---

[2]    *See* Gary C. Zimmerman, Economist, *The Pricing of Federal Services under the MCA*, FED. RSRV. BANK OF S.F., ECON. REVIEW, (WINTER 1981), https://www.frbsf.org/wp-content/uploads/81-1_22-40.pdf.

[3]    *Id.*

certain enumerated services that applied to both member and nonmember banks.

*See* 12 U.S.C. § 248a.

### D. The Board's Guidelines for Evaluating Account and Service Requests

In light of the rapidly changing landscape of novel financial institution charters and increased master account requests from a variety of institutions, the Board published for notice and comment Proposed Guidelines for Evaluating Account and Services Requests in May 2021. The Proposed Guidelines recognized that "[w]hile decisions regarding individual access requests remain at the discretion of the individual Reserve Banks," "it is important that the Reserve Banks apply a consistent set of guidelines when reviewing such access requests to promote consistent outcomes across Reserve Banks and to facilitate equitable treatment across institutions." 86 Fed. Reg. 25,865, 25,867 (May 2021).

On August 19, 2022, the final Guidelines for Evaluating Account and Services Requests ("Guidelines") became effective after two rounds of notice and comment. 87 Fed. Reg. 51,099. The Guidelines reiterated that "[d]ecisions on individual requests for access to accounts and services are made by the Reserve Bank." *Id.* at 51,106.

The Guidelines set forth six principles for Reserve Banks to use in evaluating access requests. *Id.* at 51,106-109. They established a three-tiered review framework "to serve as a guide to the level of due diligence and scrutiny to be

applied by Reserve Banks to different types of institutions," with "institutions in a higher tier [] on average fac[ing] greater due diligence and scrutiny."  *Id.* at 51,109. As relevant here, Tier 3 institutions are "not federally insured" and not "subject (by statute) to prudential supervision by a federal banking agency," and therefore "will generally receive the strictest level of review."  *Id.* at 51,110.  The Guidelines state that "a Reserve Bank has the authority to grant or deny an access request by an institution in any of the three proposed tiers . . . on a case-by-case, risk-focused basis[.]"  *Id.* at 51,109.

### E.    Congress's December 2022 Amendment to the FRA

On December 23, 2022, the President signed into law the National Defense Authorization Act.  Section 5708 of Title LVII of this act amends the FRA by inserting a provision entitled "Master Account and Services Database" (the "December 2022 Amendment").  The December 2022 Amendment requires the Board to "create and maintain a public, online, and searchable database" that includes "a list of every entity that submits an access request for a reserve bank master account and services . . . including whether . . . a request was approved, rejected, pending, or withdrawn[.]" 12 U.S.C. § 248c(b)(1), Pub. Law No. 117-263 tit. LVII, § 5708 (2022).

## F.   PayServices' Master Account Request[4]

PayServices is an exclusively online bank, "operates no physical branches," and does not carry FDIC insurance.  ER-58, ¶ 46.  Its business model "focuses almost exclusively on facilitating trade of commodities for the small to medium enterprises from and to the United States."  ER-58, ¶ 44; ER-79 ("[PayServices'] business model [focuses] almost entirely on . . . foreign import and export merchants and buyers, and foreign governments.").  On August 3, 2022, PayServices—whose founder resides in Florida—received a preliminary approval to establish a state-chartered bank in Idaho.  ER-50, ¶ 3; ER-56, ¶ 40.  On August 10, 2022, PayServices requested a master account from FRBSF.  ER-54, ¶ 23.  FRBSF reviewed PayServices' request for a master account in accordance with the Guidelines.  ER-86, ¶ 85.

On May 31, 2023, FRBSF denied PayServices' request after determining it did "not meet the standards outlined in the [Guidelines]."  ER-79 ("Denial Letter");[5] ER-86, ¶ 85.  In the Denial Letter, FRBSF found that PayServices' "novel, monoline business model and focus on transactions that are largely foreign in nature or involve

---

[4]    As is appropriate during the appeal of a dismissal on Rule 12(b)(6) grounds, factual allegations taken from the Complaint and documents incorporated by reference therein are assumed to be true solely for the purpose of this appeal.  *See Cohen v. NVIDIA Corp. (In re NVIDIA Corp. Sec. Litig.)*, 768 F.3d 1046, 1051 (9th Cir. 2014).

[5]    Although not attached to the Complaint, the District Court properly held that the Denial Letter was incorporated by reference into the Complaint.  ER-19-20.

mostly foreign participants present[ed] undue risks." *Id.* Specifically, FRBSF found that PayServices' "unproven risk management framework" was insufficient "to mitigate money laundering and terrorism financing risks." *Id*. FRBSF identified multiple specific concerns, including "[Bank Secrecy Act, Anti-Money Laundering, and Office of Foreign Assets Control][6] risk management," "the limited banking and bank-specific risk management experience among management," and the possibility that the master account could be used to "fund or facilitate illicit activity." *Id.*

## II.     Procedural Background

### A.     PayServices' Complaint

On June 27, 2023, PayServices filed this lawsuit against FRBSF in the U.S. District Court for the District of Idaho. ER-73. PayServices asserted causes of action under (1) the Administrative Procedure Act ("APA") (Count I), (2) the Mandamus Act (Count II) and (3) the Due Process clause (Count III). *See* ER-66-68. Each claim asserted that Section 248a's price discrimination provision required Reserve Banks to grant PayServices—and *all* eligible nonmember depository institutions—a master account regardless of the risks to FRBSF or the Federal

---

[6]     Bank Secrecy Act and Anti-Money Laundering controls serve to "detect and report suspicious activity," including money laundering, terrorist financing, and securities fraud. *See* FINRA Rule 3100, Anti-Money Laundering Compliance Program, 31 C.F.R. § 1023.210 . In the absence of effective controls, the master account could be used to facilitate illicit activity, causing significant financial and reputational risk.

Reserve System posed by the institution. *See* ER-68, ¶ 81 (APA) ("As an agency, FRBSF has a non-discretionary duty to make available Federal Reserve Bank services through master accounts"); ER-70, ¶ 95 (Mandamus Act) ("PayServices has a clear and certain claim to have its master account granted"); ER-72, ¶ 100 (Due Process Clause) ("Section 248a requires the issuance of master accounts"). PayServices sought the same relief for each claim—an order "compelling the FRBSF to rescind the denial of PayServices' master account application and instead grant the application." ER-72, ¶ 98(b); ER-73, ¶ 103(c).

On August 14, 2023, FRBSF filed its Motion to Dismiss the Complaint ("Motion") pursuant to Federal Rule of Civil Procedure 12(b)(6). In support of its Motion, Defendant submitted a copy of the Denial Letter, ER-79, which was incorporated by reference into the complaint by Plaintiff's reliance on the document. *See* ER-58; Section V, *infra.*

On August 31, 2023, Plaintiff opposed FRBSF's Motion and attached a Declaration of Lionel Danenberg ("Danenberg Declaration") (ER-75) with new, unsupported factual allegations. On September 14, 2023, Defendants moved to strike the Danenberg Declaration, which was not incorporated by reference in the Complaint.

**B.    The District Court Dismisses the Complaint on Multiple, Incurable Grounds**

On March 30, 2024, the District Court dismissed the Complaint with prejudice and granted Defendant's Motion to Strike.  ER-13–39.

*First*, the District Court dismissed each of PayServices' claims because FRBSF had no duty to grant PayServices a master account "regardless of its risk profile."  ER-22.  In so doing, the court held that the plain text of Section 342 "makes clear that Federal Reserve Banks are authorized"—but not required—"to accept deposits, and thus open master accounts."  ER-31.  The court found that PayServices cited "precious little" authority to the contrary.  ER-26.  The District Court also rejected PayServices' argument that Section 248a implicitly entitled PayServices to a master account.  ER-22–23; ER-28–29.  It reasoned that when "read in context," Section 248a is a "fee schedule," not a "mandate."  ER-30.

*Second*, the District Court dismissed all three of PayServices' claims because FRBSF is not a federal agency "for the purposes of PayServices' claims against FRBSF."  ER-31, 34-35.  The court reasoned that, although Reserve Banks are an "integral" part of the Federal Reserve System, "Congress has gone out of its way to formally separate the [Federal Reserve Banks] from the government."  ER-32.  Applying this Court's precedent in *Lewis*, the District Court emphasized the "unique statutory authorizations" in the FRA and the "intentional detachment" of the Reserve Banks "from the federal government itself."  ER-35 (citing *Lewis*, F.2d at 1241).

17

*Third*, the District Court ruled that, to the extent PayServices alleged that FRBSF's denial was arbitrary and capricious in violation of the APA, PayServices had failed to plead any facts supporting such a claim.  ER-37.

*Fourth*, the District Court held that Appellant's Due Process claim further failed because, even if PayServices did have a protected interest in a master account, it had been afforded procedural protections that satisfy the Due Process Clause.  ER-38.

*Fifth*, the District Court granted FRBSF's Motion to Strike the Danenberg Declaration because, "as a general rule," courts may not consider materials beyond the complaint in ruling on a Rule 12(b)(6) motion.  ER-37.

On May 28, 2024, Appellant filed a notice of appeal, initiating this action.

## SUMMARY OF THE ARGUMENT

The District Court's ruling should be affirmed.  First, the District Court properly ruled that the plain text of Section 342 of the FRA entrusts FRBSF with discretion to deny PayServices' request for a master account.  *See* Section I.A, *infra*.  The District Court also properly rejected PayServices' argument that Section 248a—a price discrimination provision directed to the Board—requires the Reserve Banks to grant master accounts to all eligible institutions.  *See* Section I.B, *infra*.  Even if the plain text of the FRA were ambiguous (it is not), Reserve Bank discretion over master account access is consistent with the purpose of the FRA as a whole, long-

standing Reserve Bank practice, and the 2022 amendment to the FRA. *See* Sections I.C-D, *infra*. Two other federal courts have reached the same conclusion. No court has held otherwise.

Second, the District Court's decision should also be affirmed because FRBSF is not a federal agency for purposes of PayServices' claims. *See* Section II. For over a century, Congress has repeatedly and intentionally separated the Reserve Banks' routine banking activities, like maintaining a master account, from the sovereign. *See* Section II.A, *infra*. Contrary to PayServices' contention, the denial of a master account request is not a substantial power of the government or a power delegated to the Reserve Banks by the Board. *See* Sections II.B-C, *infra*.

PayServices' other arguments cannot save its claims. PayServices' mandamus claim is moot, waived, and meritless. *See* Section III. The District Court properly dismissed PayServices' APA claim with prejudice because both the FRA and the Guidelines entrust the merits of individual account access requests to FRBSF's discretion. *See* Section IV, *infr*a. PayServices' Due Process claim fails as a matter of law because PayServices admits that it received notice and opportunity to be heard. Finally, the District Court did not abuse its discretion in striking the unsupported factual declaration PayServices attached to its Opposition to Defendants' Motion. *See* Section IV, *infra*.

## STANDARD OF REVIEW

This Court's review of the District Court's decision to grant FRBSF's Motion to Dismiss is *de novo*. *Starz Ent., LLC v. MGM Dom. Television Distrib., LLC*, 39 F.4th 1236, 1239 (9th Cir. 2022). Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) is appropriate where a cause of action fails to state a claim upon which relief can be granted. *Id.* A complaint must include "facts to state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 545 (2007).

The District Court's dismissal with prejudice and without leave to amend is reviewed for abuse of discretion. *Graham-Sult v. Clainos*, 756 F.3d 724, 748 (9th Cir. 2014). Generally, courts in this circuit permit leave to amend following the dismissal of a complaint "when justice so requires." *Owens v. Kaiser Found. Health Plan Inc.*, 244 F.3d 708, 712 (9th Cir. 2001). But where a dismissal is premised upon the court's analysis of an issue as a matter of law, and the plaintiff could not allege additional facts to cure deficiencies that are "consistent with the challenged pleading," dismissal with prejudice is appropriate. *See Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008).

The District Court's ruling on a motion to strike is reviewed only for an abuse of discretion. *Burlington N. Santa Fe Ry. Co. v. Feit*, 663 F. App'x 504, 508 (9th Cir. 2016).

## ARGUMENT

### I.    The District Court Properly Ruled That FRBSF Had Discretion to Deny PayServices' Request for a Master Account

The District Court held—and PayServices does not dispute on appeal—that its claims must be dismissed if FRBSF had discretion to deny its request for a master account.  ER-21.[7]  The District Court properly ruled that the plain text of the FRA entrusts FRBSF with discretion to deny master account requests.

This case "rises and falls," *id.* at 22, with the interpretation of two provisions of the FRA: Section 342 and Section 248a.  The District Court correctly held that Section 342 entrusts Reserve Banks with the discretion, but not the duty, to grant master account requests from all eligible institutions.  *Id.* at 27.  The District Court also correctly held that Section 248a does not implicitly establish any rights upending that discretion.  *Id.*  Two other federal courts have reached the same conclusion.  In *Banco San Juan Internacional, Inc. v. FRB of N.Y.* ("*BSJI*"), the United States District Court for the Southern District of New York held that a depository institution, which had its master account revoked, had no statutory right under Section 248a to a master account.  2023 U.S. Dist. LEXIS 193296, at *27 (S.D.N.Y. Oct. 27, 2023).  In *Custodia Bank, Inc. v. Federal Reserve Board of*

---

[7]    PayServices appeals the District Court's dismissal with prejudice of its APA claim.  *See* Section IV, *infra.*  It does not dispute that, if FRBSF had discretion, the Complaint as pled fails to state a claim under the APA.

*Governors*, the United States District Court for the District of Wyoming similarly held that a depository institution, which alleged improper denial of its master account request, had no statutory entitlement to a master account.  2024 U.S. Dist. LEXIS 76822, at *32-36 (D. Wyo. Mar. 29, 2024) ("[T]he plain language of the relevant statutes can only reasonably be read to give the Federal Reserve Banks discretion in granting or denying requests for a master account.").

### A. The District Court Correctly Ruled That Section 342 Entrusts FRBSF with Discretion to Accept Deposits and Maintain Master Accounts

Section 342 provides that a Reserve Bank "*may* receive from any of its member banks, or other depository institutions, . . . deposits . . . ."  12 U.S.C. § 342 (emphasis added).  "'[M]ay' does not just suggest discretion, 'it clearly connotes it.'"  *Biden v. Texas*, 142 S. Ct. 2528, 2541 (2022) (citation omitted) (emphasis in original); *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1604 (2020) (same); *Meritage Homes of Nev., Inc. v. FDIC*, 753 F.3d 819, 826 (9th Cir. 2014) ("'may,' when used in a statute, usually implies some degree of discretion").

The Reserve Banks' discretion to receive deposits includes the discretion to decline deposits.  In 1923, the Supreme Court confirmed that Section 342 does not "impose[] upon reserve banks any obligation to receive" deposits; it merely "confers authority to do so."  *Farmers & Merchs. Bank v. Fed. Rsrv. Bank of Richmond*, 262 U.S. 649, 662 (1923).  Although Congress has amended the FRA multiple times in

the past century—including in the MCA on which PayServices relies—Congress never altered the permissive "may" to a mandatory "shall." *Id.* (noting that although Section 342 had been amended multiple times, "in each amendment . . . the words used were 'may receive'—words of authorization merely"); *see* 94 Stat. 132, 139. Congress can therefore be presumed to have "accepted and ratified" the Supreme Court's reading of "may receive" as discretionary in nature. *Texas Dep't of Hous. and Cmty. Affairs v. Inclusive Communities Project*, 135 S. Ct. 2507, 2520 (2015).

As the District Court properly found, the authority—and corresponding discretion—to open a depository account necessarily flow from the authority to accept deposits. ER-31. This is not only "commonsensical" as the District Court found, *id.* at 24; it is borne out in history. Prior to the MCA, the Reserve Banks and the Board looked to Section 342 to determine the institutions "for which a Federal Reserve Bank may open and maintain a nonmember [] account."[8] If a nonmember bank fit the definition set by Congress, accounts and services to these institutions were to "be made available in the *discretion* of the Federal Reserve Bank . . . pursuant to [Section 342]."[9] The MCA did not supplant Section 342 or alter the

---

[8] Bd. of Governors of the Fed. Rsrv. Sys., FED. RSRV. BULL. VOL. 50, *Domestic Branches of Foreign Banks and Private Banks as "Banks*," 168, 168-69 (1964).

[9] *Id.*

23

discretionary "may."  Instead, as PayServices concedes, it simply "expand[ed] the list of institutions eligible for master accounts."  *See* Br. at 10.

Although PayServices briefly argues that "Section 342 does not prescribe conditions" for opening a deposit account (*id*. at 33), that does not prohibit the Reserve Banks from imposing reasonable conditions to account access.  *See Entergy Corp. v. Riverkeeper, Inc*., 556 U.S. 208, 222 (2009) (Scalia, J.) ("[S]ilence is meant to convey nothing more than a refusal to tie the agency's hands").  By contrast, where Congress intended to impose an affirmative duty to accept deposits, or grant depository accounts, Congress did so expressly.  *Cf.* 22 U.S.C. § 285d ("Any Federal Reserve bank which is requested to do so by the [Asian Development] Bank shall act as its depository").

"Master accounts are governed by [Section] 342."  *BSJI*, 2023 U.S. Dist. LEXIS 193296, at *17.  The only reasonable reading of Section 342 grants Reserve Banks discretion to deny depository account requests, just as they have discretion to deny deposits.  Otherwise, Reserve Banks would be forced to maintain master accounts yet be permitted (as PayServices concedes) to "reject every deposit that comes from a bank" into that account.  Br. at 33.  As the District Court reasoned, that interpretation "makes little sense."  ER-31.

24

**B.    The District Court Correctly Ruled That Section 248a Does Not Entitle PayServices to a Master Account**

The District Court correctly held that Section 248a does not "upend[]" the 110-year history of Reserve Bank discretion over deposit accounts.  ER-31.  This holding comports with the plain text and the statutory structure of the FRA.

**1.    The Plain Text of Section 248a Does Not Provide an Affirmative Right to a Master Account**

"When engaging in statutory interpretation, 'we start where we always do: with the text.'" *AK Futures Ltd. Liab. Co. v. Boyd St. Distro, Ltd. Liab. Co*., 35 F.4th 682, 690 (9th Cir. 2022).  Section 248a, entitled "Pricing of services," instructs the Board "to put into effect a schedule of fees" for "Federal Reserve bank services." 12 U.S.C. § 248a(a).  Thereafter, "[a]ll Federal Reserve bank services covered by the fee schedule shall be priced explicitly," *id*. § 248a(c)(1) and "[a]ll Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks." *Id.* § 248a(c)(2).  The Board can condition access to the services "to any other terms," including a "a requirement of balances," as long as the Board does not discriminate between member and nonmember banks. *Id.* § 248a(c)(2).

The meaning of this provision is clear on its face.  As the District Court and two other federal courts have held, Section 248a is a term and price discrimination

25

provision. *Custodia*, 2024 U.S. Dist. LEXIS 76822, at *28-30 ("Congress was instructing the Board of Governors to create a non-discriminatory pricing schedule, not instructing the Federal Reserve Banks that they must provide master accounts to all eligible depository institutions."). First, the Board shall "price[] explicitly" "all" of the enumerated Federal Reserve Bank services—which, before the MCA, were free and generally provided only to member banks. *See Jet Courier Servs., Inc. v. Fed. Res. Bank*, 713 F.2d 1221, 1222 (6th Cir. 1983) ("For many years prior to 1980, the Federal Reserve Banks performed check collection services for member banks without charge."). Second, those services "shall be available" to nonmember banks "at the same price" and according to "any other terms" applicable to member banks. *Id*. at 1227 ("What is clear is that the covered services offered by Federal Reserve Banks are to be priced explicitly, are to be made available to nonmember depository institutions at the same fees charged member banks."). Congress even titled it "pricing of services" to be clear. *See Bobka v. Toyota Motor Credit Corp*., 968 F.3d 946, 954 (9th Cir. 2020) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.").

The plain text of Section 248a does not, however, establish a duty for Reserve Banks to provide the enumerated services to each and every eligible nonmember institution. Section 248a—contained in subchapter of the FRA titled "Board of Governors of the Federal System"—applies only to the Board, not Reserve Banks.

*Compare* 12 U.S.C. §§ 241-52 *with id.* §§ 341-64 (subchapter titled "Powers and Duties of Federal Reserve Banks"); *see id.* § 248a(a) ("the *Board* shall publish for public comment a set of pricing principles"); *id.* § 248a(d) ("The *Board* shall require reductions in the operating budgets of the Federal Reserve banks"). By contrast, when Congress imposes mandatory duties on the Reserve Banks, it does so expressly. *See, e.g.*, *id.* § 343(3)(A) ("[T]he *Federal reserve bank shall* obtain evidence…"); 22 U.S.C. § 285d ("Any Federal Reserve bank which is requested to do so by the [Asian Development] Bank *shall act as its depository*"). It would be anomalous for Congress to hide a requirement that Reserve Banks grant direct master accounts to all depository institutions in a provision that is not even addressed to the Reserve Banks. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

Moreover, Section 248a provides that **"[a]ll** Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions." Notably, "Congress chose to include the word 'all' before 'Federal Reserve bank services covered by the fee schedule, but not before 'nonmember depository institutions." *Custodia*, 2024 U.S. Dist. LEXIS 76822, at *30. And where Congress referred to "all" depository institutions elsewhere in Section 248a, it did so expressly. 12 U.S.C. § 248a(e) ("*All* depository institutions"). The distinction is presumed to have a difference. *Loughrin v. United* States, 573 U.S.

27

351, 358 (2014) (When "Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—this Court 'presume[s]' that Congress intended a difference in meaning") (citation omitted). To accept PayServices' theory, one must assume that Congress clarified that Section 248a covers "all" *seven* separately enumerated services, but forgot to clarify that Section 248a entitles "all" of the "*40,000* depository institutions" to accounts and services. Br. at 11 (emphasis added). That omission is striking in a statute otherwise "drawn with great care." *Farmers*, 262 U.S. at 663.

If Congress intended to grant all institutions with an unfettered right to accounts and services, Section 248a is a "surprisingly indirect route" to convey "an important and easily expressed message." *Cty. of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 180-81 (2020)—Congress omitted the word "all," used no language suggestive of a right, and provided no mechanism to enforce the right. It directed the "duty" at the wrong entity in the wrong section of the FRA. Indeed, Congress did not even identify the entitlement in the statutory purposes of the MCA. Courts "expect Congress to speak more clearly if it intended such a radical change in the application of its [] statutes." *Canup v. Chipman-Union, Inc*., 123 F.3d 1440, 1443 (11th Cir. 1997); *Fulfillment Servs. v. UPS*, 528 F.3d 614, 624 (9th Cir. 2008) ("Had Congress aspired to such a radical departure, it no doubt would have so indicated with explicit language to that effect."). In the absence of explicit Congressional

intent to depart from the plain text of the statute and upend decades of accepted practice, PayServices' argument falls flat.

### 2.    The Purpose of the FRA and the MCA Confirm Discretion

Construing Section 248a as granting an unconditional right of access to Reserve Bank master accounts would undermine the purpose of the FRA, in derogation of basic principles of statutory construction. *See King v. Burwell*, 576 U.S. 473, 492 (2015) (statutes should be construed in light of the "remainder of the statutory scheme [to favor readings with] a substantive effect that is compatible with the rest of the law").

Congress charged Reserve Banks with oversight of the nation's payment system "in furtherance of the national fiscal policy." *See Fed. Rsrv. Bank of Boston v. Comm'r of Corps. & Tax'n*, 499 F.2d 60, 62 (1st Cir. 1974); *cf. Bd. of Governors of Fed. Res. Sys. v. First Lincolnwood Corp*., 439 U.S. 234, 250 (1978) ("Congress has evinced substantial concern for the financial soundness of the banking system."). Permitting every single state and territory to dictate which entities can obtain master accounts—with *no* say for the Reserve Bank —would leave Reserve Banks unable to guard against risks to the payment system like money laundering, cybersecurity breaches, and myriad other risks. "[I]n that scenario, one can readily foresee a 'race to the bottom' among states and politicians to attract business by reducing state chartering burdens through lax legislation, allowing minimally regulated institutions

to gain ready access to the central bank's balance sheet and Federal Reserve services." *Custodia*, 2024 U.S. Dist. LEXIS 76822, at *35 ("States lack not only the mission but also the resources to protect national interests.") (citation omitted). Nothing in the text or history of the FRA suggests that Congress intended to substitute the judgment of an individual state for that of Reserve Banks to maintain the "stability of financial systems and markets." *Bloomberg L.P. v. Bd. of Governors of the Fed. Res. Sys.*, 649 F. Supp. 2d 262, 265 (S.D.N.Y. 2009). Indeed, the purpose of the MCA, in which Section 248a was first enacted, is to "facilitate the implementation of monetary policy." 94 Stat. 132.

In all, the plain text of Section 342 affords Reserve Banks with discretion, and the plain text of Section 248a affords PayServices' no countervailing entitlement. As a result, the statutory interpretation analysis ends where it begins: the plain text. *See CVS Health Corp. v. Vividus*, *LLC*, 878 F.3d 703, 706 (9th Cir. 2017) ("If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there.").

## C.    Discretion Is Consistent With Longstanding Practice

Eliminating Reserve Bank discretion regarding the availability of accounts and services would upend longstanding practice. Prior to the MCA, Reserve Banks, "in their discretion," could offer accounts and services to certain eligible nonmember

institutions for limited purposes.[10]  *See also* Minutes of the Board of Governors of the Federal Reserve System Meeting, Washington, July 26, 1945, Vol. 32, Pt, 32, 1255-1257 at https://fraser.stlouisfed.org/files/docs/historical/nara/bog_minutes/ 19450726_Minutes.pdf ("Accordingly, if a Federal Reserve Bank *in its discretion* accepts such a[ nonmember] account it may prescribe such requirements and conditions consistent with the law as *in its judgment are advisable*.") (emphasis added).

The MCA did not change that longstanding discretion.  To the contrary, the Board and Reserve Banks have repeatedly emphasized Reserve Banks' role in overseeing the risk posed by allowing access to Reserve Bank services.  Shortly after the MCA was enacted, the Board confirmed that a "Reserve Bank, of course, retains the right to protect its risk exposure from individual institutions."  *Interim Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems*, 52 Fed. Reg. 29,255, 29,260 (Aug. 6, 1987).  Consistent with the Reserve Banks' discretion to limit the risk posed by providing accounts and services to specific institutions, master account agreements with Reserve Banks have always been terminable at will.[11]  Specifically, each agreement provides that Reserve Banks "may close [the]

---

[10]  Bd. of Governors of the Fed. Rsrv. Sys., FED. RSRV. BULL. VOL. 50, *supra* note 8.

[11]  *See* Federal Reserve Banks *Operating Circular 1*, Account Relationships, (Jan. 2, 1998),

master account . . . at any time."  *Id.* at 3; *BSJI*, 2023 U.S. Dist. LEXIS 193296, at *21-22 ("BSJI had a Master Account and specifically agreed that the FRBNY had the right to terminate that account.").

PayServices cites out-of-context statements on the Board's website describing the MCA as providing "access" to services for "all depository institutions."  Br. at 11-12.  These non-statutory statements are consistent with Reserve Banks' undisputed post-MCA ability to provide accounts and services to nonmember banks *as a class*, subject to equitable pricing conditions, rather than a *mandate* to provide accounts and services to every individual bank regardless of risk.  None of the statements speaks of eliminating the Reserve Banks' longstanding discretion over access to master accounts and financial services to institutions that pose risk to the Federal Reserve System.

Moreover, PayServices concedes, as it must, that the phrase "all depository institutions" comes with an asterisk.  It incorporates limitations like legal eligibility, the price set by the Board, and the terms and conditions set by the Board.  *See id.* at 21 ("To be sure, FRBSF may deny accounts to ineligible institutions, refuse to take certain deposits, and reasonably regulate use of the account.").  Consistent with the

---

http://web.archive.org/web/20010612051504/http://www.frbservices.org/Industry/pdf/Oc1.pdf.

plain text of Section 342 and longstanding practice, it also incorporates the discretion to refuse access to institutions that pose risk to the Reserve System.

### D.    The December 2022 Amendment Confirms Discretion

The December 2022 Amendment to the FRA confirmed that Reserve Banks have discretion over individual account access requests, consistent with the Board's Guidelines and the Reserve Banks' longstanding practice.  An interpretation which Congress has failed to amend is "at least persuasive of a legislative recognition and approval of the statute as construed."  *McCaughn v. Hershey Chocolate Co*., 283 U.S. 488, 492-93 (1931).  This long-standing canon of statutory interpretation applies when with "full knowledge of the [entity's] interpretation Congress has since made significant additions to that section without amending it to depart from the Commission's view." *Farmers Educ. & Coop. Union Of Am., N.D. Div. v. Wday*, 360 U.S. 525, 533 (1959).  This doctrine "is particularly appropriate" where, as here, the "interpretation involves issues of considerable public controversy, and Congress has not acted to correct any misperception of its statutory objectives." *United States v. Rutherford*, 442 U.S. 544, 554 (1979); *Bateman v. Am. Multi-Cinema, Inc*., 623 F.3d 708, 720 (9th Cir. 2010) ("[I]n the midst of this disagreement, Congress stepped in to amend [the Fair and Accurate Credit Transactions Act], and yet did nothing to limit the availability of class relief or the amount of aggregate damages.")

When Congress amended the FRA in December 2022, it was indisputably aware that Reserve Banks were exercising discretion over master account requests. As early as 2015, the New York Times reported on Reserve Bank's "discretion" in "deciding which master accounts to open."[12]  In November 2021, Senator Lummis wrote an Op-Ed in the Wall Street Journal about master accounts.[13]  Master account access was discussed in the Senate in January 2022,[14] February 2022,[15] and again in June 2022.  In August 2022, the Board promulgated the Guidelines after two rounds of public notice and comment, repeatedly clarifying that "decisions regarding individual access requests remain at the discretion of the individual Reserve Banks." 87 Fed. Reg. 51,106.

---

[12]     "[T]he president of the Kansas City Fed . . . wrote that the Fed had 'discretion' in deciding which master accounts to open."  *See* Nathaniel Popper, *Banking for Pot Industry Hits a Roadblock*, N.Y. TIMES (July 30, 2015), https://www.nytimes.com/2015/07/31/business/dealbook/federal-reserve-denies-credit-union-for-cannabis.html.

[13]     Cynthia Lummis, Opinion, *The Fed Battles Wyoming on Cryptocurrency*, Wall St. J. (Nov. 30, 2021), https://www.wsj.com/articles/the-fed-battles-wyoming-cryptocurrency-powell-brainard-bitcoin-digital-assets-spdi-fintech-11638308314.

[14]     *Nomination of Jerome H. Powell, of Maryland, to be Chairman of the Board of Governors of the Federal Reserve System*, S. Hrg. 117-335 before the S. Comm. on Banking, Hous., & Urb. Affs., 117th Cong. 33-34 (Jan. 11, 2022) (statement of Sen. Cynthia Lummis).

[15]     *Nomination of Sarah Bloom Raskin, of Maryland, to be Vice Chairman for Supervision and a Member of the Board of Governors of the Federal Reserve System,* S. Hrg. 117-340 before the  S. Comm. on Banking, Hous., & Urb. Affs., 117th Cong. 28-30 (Feb. 2, 2022) (questioning by Sen. Cynthia Lummis).

Against that backdrop, Congress amended the FRA to require the Board to create a "database" that includes "a list of every entity that submits an access request for a reserve bank master account and services . . . including whether . . . a request was approved, *rejected*, pending, or withdrawn." 12 U.S.C. § 248c(b)(1) (emphasis added).  For each request, the database must track which category of eligible institution issued the request. *Id.* § 248c(c).  The fact that Congress affirmed Reserve Banks' ability to reject master account applications without placing any limitations on their well-publicized, decades-long discretion thus "provide[s] further evidence . . . that Congress intended [the existing] interpretation, or at least understood the interpretation as statutorily permissible."  *Fox TV Stations, Inc. v. Aereokiller, LLC*, 851 F.3d 1002, 1014 (9th Cir. 2017).[16]

### E.    Judge Bacharach's Opinion in *Fourth Corner* Is Neither Binding Nor Persuasive

The District Court concluded that PayServices cited "precious little" authority for its interpretation of the FRA, ER-27, ER-31, and it criticized PayServices' "wholesale reliance" on a single opinion in a three-way split decision of the Tenth

---

[16]    Senator Toomey filed an amicus brief in *Custodia* arguing that he personally did not intend the December 2022 Amendment to bolster Reserve Bank discretion over master account requests.  *See Custodia Bank v. Federal Reserve Board of Governors, et al*, Case No. 24-8024, ECF No. 11102675 at 3 (10th Cir., Jul. 28, 2024).  But, as this Court recently held,"'[p]ost-enactment legislative history (a contradiction in terms)'" is "a questionable tool of statutory interpretation." *United States v. Randall*, 34 F.4th 867, 877 (9th Cir. 2022) (quoting *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011)).

Circuit in *Fourth Corner*, ER-30. PayServices repeats that strategy here, characterizing a single judge's opinion as a "ruling," and characterizing Judge Bacharach both as "an appeals court," Br. at 33, and "[m]ultiple courts of appeals," *id.* at 34. As the District Court explained, Judge Bacharach's opinion was issued seven years ago—before the Guidelines were first posted, before Congress's recent amendment, and before any other court had considered this specific legal theory. ER-31. Now three federal courts—including one in the Tenth Circuit—have reached a different conclusion. *See BSJI,* 2023 U.S. Dist. LEXIS 193296, at *20-21 ("Judge Bacharach's opinion is neither controlling (even in the Tenth Circuit), nor persuasive."); *Custodia,* 2024 U.S. Dist. LEXIS 76822, at *27 ("The Court respectfully deviates from Judge Bacharach's opinion in *Fourth Corner*.").

*       *       *

In all, the District Court correctly held that Reserve Banks have discretion under Section 342 to grant or decline a master account request and that Section 248a does not entitle PayServices to a master account. As a result, PayServices' APA, Due Process, and Mandamus claims fail as a matter of law. ER-21. PayServices does not (and cannot) dispute that its Due Process and Mandamus claims are subject to dismissal with prejudice on these grounds. Nor does it dispute that, as pled, its APA claim was properly dismissed. As discussed in Section II and Section IV, no new facts could render FRBSF's discretion to deny PayServices' account reviewable

under the APA. Accordingly, the District Court's opinion should be affirmed, and PayServices' Complaint dismissed with prejudice.

## II. The District Court Properly Ruled that FRBSF Is Not a Federal Agency for Purposes of PayServices' Claims

The District Court correctly dismissed all of PayServices' claims for the separate and independent reason that the APA, Mandamus Act, and Due Process Clause rely on PayServices' incorrect assertion that FRBSF is a federal agency here. ER-36; *cf. BSJI*, 2023 U.S. Dist. LEXIS 193296, at \*23 ("Federal reserve banks are not part of any executive department or agency.").

The District Court assessed whether FRBSF is an agency under the well-established test under the APA.[17]  ER-36.  An "agency" is "an authority of the Government of the United States."  5 U.S.C. § 701(b)(1).  The "focal point of analysis" is whether the entity exercises "*substantial* independent authority" of the government.  *Irwin Mem'l Blood Bank of S.F. Med. Soc'y v. Am. Nat'l Red Cross*, 640 F.2d 1051, 1053 (9th Cir. 1981) (emphasis added).  It is not enough for an entity to have "authority in law" to make decisions; it must exercise sufficient "governmental" authority such that it is the "center of gravity in the exercise of administrative power."  *Dong v. Smithsonian Inst.*, 125 F.3d 877, 882 (D.C. Cir.

---

[17]  For the first time on appeal, PayServices asserts that it can pursue its mandamus claim regardless of whether FRBSF is an agency.  *See* Br. at 38.  That argument is both waived and meritless.  *See* Section III, *infra*.

37

1997); *see also New York v. Atl. States Marine Fisheries Comm'n*, 609 F.3d 524, 532 (2d Cir. 2010) ("The wording of section 701(b)(1) indicates that we should not give the definition of 'agency' a more expansive reading" than what is present in the text).

Applying this standard, the District Court correctly ruled that FRBSF is not a federal agency "for the purposes of PayServices' claims."  ER-36.  This is not "astonishing" (Br. at 23)—it is the plain intent of Congress.  This ruling should be affirmed.

## A.    Reserve Banks Are Not the Center of Gravity By Express Congressional Design

For over a century, "Congress has gone out of its way to formally separate the [Reserve Banks] from the government."  *United States ex rel. Kraus v. Wells Fargo & Co.*, 943 F.3d 588, 597 (2d Cir. 2019); 50 Cong. Rec. H.4643 (Sept. 13, 1913) ("[T]he regional bank is given independent status").  As early as 1929, the Supreme Court recognized that "the federal reserve banks . . . are not departments of the Government."  *Emergency Fleet*, 275 U.S. at 425-26.  Over the past century, "Congress has considered the status of the [Reserve Banks] on multiple occasions," and it has repeatedly "decided not to convert them formally into government agencies."  *Kraus*, 943 F.3d at 598 (holding that Reserve Banks are not agencies under the False Claims Act).  Indeed, "no statute designates Federal Reserve Banks as federal agencies."  *Scott v. FRB of Kan. City*, 406 F.3d 532, 537 (8th Cir. 2005).

By contrast, Congress has designated the Board, the FDIC, and the Comptroller of the Currency to be "federal banking agencies," *see*, *e.g.*, 12 U.S.C. § 1831j (designating the Board "federal banking agency"); and distinguished between a "banking agency or reserve bank." *See id.* § 1820(k)(1)(A).[18]

As the District Court correctly held, the twelve independently managed Reserve Banks are not each the "center of gravity" of administrative power for the Federal Reserve System. ER-34. The Reserve Banks bear none of the traditional hallmarks of a federal agency: they cannot "promulgate regulations having the force and effect of law," *Scott*, 406 F.3d at 536; they cannot publish in the Federal Register, *cf. Lombardo v. Handler*, 397 F. Supp. 792, 793-96 (9th Cir. 1975) ("[T]he Federal Register only publishes notices for Federal agencies"); they "receive no appropriated funds from Congress," *Lewis*, 680 F.2d at 1242; they issue stock owned by member banks, and the government appoints only a minority of their directors, 12 U.S.C. §§ 302; 304.

Instead, Congress vested all rulemaking and adjudicatory authority in the Board, which is indisputably a federal agency. To further separate the Reserve

---

[18]    For over a century, Congress has never designated a Reserve Bank as an agency. *Cf.* 12 U.S.C. § 1457(e) (designating the Federal Home Loan Mortgage Corporation as an agency); 12 U.S.C. § 635(a)(1) (designating the Export-Import Bank as an "agency of the United States."); 22 U.S.C. § 290f(a) (1988) (the Inter-American Foundation); 7 U.S.C. § 941-50b (1988) (Rural Telephone Bank pre-privatization).

Banks from the center of administrative power, Congress forbade the Board from delegating the authority to promulgate rules. *See* 12 U.S.C. § 248(k). The only "authority" identified by PayServices is, ironically, the ability not to enter into a master account relationship (Br. 23, 29-30)—the same "authority" PayServices claims the Reserve Banks lack. That is not a "'final and binding action' affecting the rights and obligations of individuals, particularly by the characteristic procedures of rule-making and adjudication." *Irwin*, 640 F.2d at 1053; *cf. Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 75 F.3d 1401, 1410 (9th Cir. 1996) ("The powers exercised by Freddie Mac in participating in the secondary market for mortgages and improving access to home loans for low- and moderate-income families hardly qualify as powers.").

As PayServices notes, Reserve Banks must be "examined in [their] own context." Br. at 26 (quoting *Pub. Citizen Health Rsch. Grp. v. Dep't of Health, Ed., & Welfare*, 449 F. Supp. 937, 940 (D.D.C. 1978)). That is exactly what the District Court did. *See, e.g.*, ER-34 (discussing FRA's "unique statutory authorizations"). Congress structured the Federal Reserve System to incorporate regional, private, and public components with federal oversight, not to place the twelve Reserve Banks (let alone just one of them) as the "center of gravity." *See, e.g.*, *Fox News Network, LLC v. Bd. of Governors of the Fed. Res. Sys.*, 601 F.3d 158, 161 (2d Cir. 2010) ("Congress divided the powers of the Federal Reserve System between the Board,

40

which is a federal agency, and the [Reserve Banks], which were established as regional banks. . . .").

Recognizing this intentional separation, this Court held that Reserve Banks are not federal agencies under the Federal Torts Claims Act.  *See Lewis*, 680 F.2d at 1241; *Dong*, 125 at 882-83 (noting that agency under the FTCA is defined "broadly" compared to the APA).  As this Court explained, "Congress did not intend to give the federal government direction over the daily operation of the Reserve Banks." *Lewis,* 680 F.2d at 1241.  Although *Lewis* arose in a different context, the principles are just as, if not more, relevant here.  Subjecting the Reserve Banks to all suits under the APA would involve more governmental intrusion in the day-to-day affairs of the Reserve Banks than any tort claim could.  As the District Court correctly found, designating FRBSF as an agency for all purposes and all suits would upset this "historically intentional detachment from the federal government."  ER-35.

## B.    The District Court Correctly Held That Master Accounts Are Not a Substantial Governmental Power

As the District Court correctly held, the issuance and maintenance of master accounts is not "substantial independent authority" of the Government.  ER-34.  PayServices does not meaningfully contend otherwise.  Indeed, according to PayServices, FRBSF is required to rubber-stamp every request from an eligible institution in "5-7 business days" with "no exercise of discretion."  Br. at 38-39.

Issuing a master account cannot be both a "ministerial" and "plain" duty (*id.*) and a "substantial power[] to act . . . as a discrete, decision-producing layer" (*id.* at 28).  In any event, issuing master accounts is not substantial authority.  *See Lombardo*, 397 F. Supp. at 794-96 (holding that authority to veto EPA auto-emission standards was not substantial authority).  At most, PayServices suggests (although has not pled with any facts) that FRBSF's denial of its request is financially significant to PayServices.  But to accept that as sufficient would be to render every decision on a job application an agency action.  That is not the standard.  *Irwin*, 640 F.2d at 1053 (Substantial independent authority is the authority "to take final and binding action' affecting the rights and obligations of individuals, particularly by the characteristic procedures of rule-making and adjudication.").

Moreover, FRBSF does not act as the Government in this context.  PayServices seeks a contractual relationship for its financial benefit.  *BSJI*, 2023 U.S. Dist. LEXIS 193296, at *22 (the "agreement governing the Master Account []" allowed the FRBNY to close the account"); *Cf. Multnomah Legal Servs. Workers Union v. Legal Servs. Corp.*, 936 F.2d 1547, 1556 (9th Cir. 1991) ("Where the LSC's authority derives from the existence of such a consensual relationship, it is inappropriate to review its actions as we might those of an administrative agency.").

As this Court held, "[i]t is evident from the legislative history of the Federal Reserve Act that Congress did not intend to give the federal government direction

over the daily operation of the Reserve Banks." *Lewis*, 680 F.2d at 1241 (citing H.R. Report No. 69, 63 Cong. 1st Sess., at 18-19 (1913)). Instead, Congress empowered the Reserve Banks to perform the routine operations of banking "without day to day direction from the federal government." *Id.* These operations "include collecting and clearing checks, making advances to private and commercial entities, holding reserves for member banks, discounting the notes of member banks, and buying and selling securities on the open market." *Id.*; 12 U.S.C. §§ 301; 341; 342. For that reason, the District Court correctly recognized that certain "prescribed function[s] of Federal Reserve Banks within the Federal Reserve System" are not governmental powers. ER-34.

### C.    The Issuance of Master Accounts Is Not a Delegated Power

PayServices incorrectly argues that the maintenance of master accounts is not a power of the Reserve Banks at all. Br. at 27. Rather, PayServices claims, it is a power that the Board delegated to the Reserve Banks in August 2022—a century after the FRA was enacted and *after* PayServices itself applied for a master account. The District Court properly rejected this argument. ER-34.

The Board did not delegate to the Reserve Banks the authority to accept deposits or maintain master accounts. *See* 12 C.F.R. § 265.20 (listing the delegated powers of the Reserve Banks). Nor could it. The Board does "not have the statutory authority to receive deposits, open or close Master Accounts, or perform other

banking services." *BSJI*, 2023 U.S. Dist. LEXIS 193296, at \*31-32. The Second Circuit's decision in *Fox News Network, LLC v. Bd. of Governors of the Fed. Res. Sys*. is instructive. 601 F.3d at 160. There, the Second Circuit addressed whether the Board had to search for, and disclose, Reserve Bank lending documents. As relevant here, the Board's duties to disclose Reserve Bank documents depended on whether the Reserve Bank was acting pursuant to "delegated" authority from the Board. *See id.* at 161. The Second Circuit held that:

> [I]t seems clear from the statutory scheme that enacted the Federal Reserve System that the lending activities of the Federal Reserve Banks do not take place "on behalf of" or under the "delegated authority" of the Board. *The Board itself has no power to make a loan to any bank*, and does not authorize each loan made by the Federal Reserve Banks. *The power to make loans is explicitly granted by statute only to the Federal Reserve Banks themselves*.

*Id.* at 161 (emphasis added). So too here. The power to issue master accounts is granted to the Reserve Banks through Section 342.

### D. PayServices' Authorities Do Not Support Its Argument That FRBSF Is a Federal Agency

Although PayServices claims that every federal instrumentality needs to be examined in its own "context," Br. at 26, it also argues that all federal instrumentalities are *per se* agencies, *id.* at 26, 29 ("FRBSF is subject to the APA as an instrumentality"). But as this Court has held, "[m]any financial institutions . . . are considered federal instrumentalities, without attaining the status of government agencies within the meaning of federal procedural rules." *See In re Hoag Ranches*,

846 F.2d 1225, 1227 (9th Cir. 1988). Moreover, this Court has specifically held that an instrumentality is not a *per se* federal agency as defined by the APA. *See Irwin*, 640 F.2d at 1052 (holding that instrumentality status did not render American Red Cross an agency under FOIA and APA).[19]

PayServices argues that the APA creates a presumption of agency status for federal entities "related to banks and banking." Br. at 24-25. Congress exempted eight entities from the APA, including itself, the "courts," and "military authority." 5 U.S.C. § 701(b)(1). Among those exemptions, Congress also included certain actions taken by the Federal Housing Administration. *Id.* § 701(b)(1)(H). PayServices claims that, via *expressio unius*, the exemption of FHA from the APA implies that the inclusion of the Reserve Banks in the APA. Br. at 24.

But another Latin phrase is more appropriate: *noscitur a sociis*—"a word is known by the company it keeps." "This canon is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Dubin v. United States*, 599 U.S. 110, 110 (2023) (citations omitted). Here, Congress, the courts, and military authority are undoubtedly "authorities" of the U.S. Government under the APA. Likewise, the "FHA is about as much a part of the Government as any agency can be." *United States v. McNinch*,

---

[19]    Indeed, this Court has held that instrumentality status may vary by statute. *See Lewis*, 680 F.2d at 1242.

356 U.S. 595, 598 (1958). Congress exempted entities that would clearly fall under APA's ambit; it was not a creating an unspoken presumption of agency status for any other entity.

PayServices relies on three forty-year-old cases which purportedly held that Reserve Banks were agencies under the APA. Br. at 30. None are persuasive, or applicable to these facts. Indeed, in *Jet Courier Servs*, the court did not even analyze whether Reserve Banks were agencies. 713 F.2d at 1228. The "plaintiffs did not cite the Administrative Procedure Act," the plaintiffs had named the *entire* Federal Reserve System as Defendants, and the court dismissed the claim for lack of standing with no discussion of agency status. *Id.* at 1224 n.1, 1225.[20]

The two district court cases cited by PayServices fare no better. In *Flight Int'l Grp. v. Fed. Res. Bank*, 583 F. Supp. 674, 678 (N.D. Ga. 1984)—a since-vacated decision—the court held that the Federal Reserve Bank of Chicago was an agency "because other courts found that Federal reserve banks operated as instrumentalities of the government." *BSJI*, 2023 U.S. Dist. LEXIS 193296, at *24 (holding that *Flight Int'l* was not persuasive precedent as to Reserve Bank status on those grounds). As noted above, that is inconsistent with this Court's precedent. *See In re Hoag*, 846 F.2d at 1227.

---

[20]    The Sixth Circuit stated "Federal Reserve System" was an agency under the Sherman Act because the "Board" was engaged in "governmental action" with respect to the challenged to conduct. *Jet Courier Servs*., 713 F.2d at 1228.

*Lee Construction Co., Inc. v. Federal Reserve Bank of Richmond* is inapposite because the challenged agency action was a power that the Board delegated to the Reserve Bank—it was *not* an inherent banking activity of the Reserve Bank. 558 F. Supp. 165, 177-78 (D. Md. 1982). As discussed above, see supra II.C, this case does not involve a Board-delegated function. Moreover, the *Lee* court also held that the plaintiffs lacked standing and failed to state an arbitrary and capricious claim. *Lee*, 558 F. Supp. at 188.

In all, PayServices identified only one case in which a plaintiff stated an APA claim against a Reserve Bank. Even the *Fourth Corner* opinion was not an APA case, with the district court noting that a Reserve Bank is "not a federal agency." *See Fourth Corner Credit Union v. FRB of Kan. City*, 154 F. Supp. 3d 1185, 1187 (D. Colo. 2016). The lack of authority undermines PayServices' claim that the twelve Reserve Banks are *per se* federal agencies. *See* Br. at 10-11.

\*    \*    \*

In sum, the District Court properly held that FRBSF is not an "agency" for the purposes of PayServices' claims. As a result, the District Court properly dismissed each of PayServices' claims with prejudice.

## III. PayServices' Mandamus Claim Is Moot, Waived, and Meritless

PayServices' mandamus claim fails for multiple, independent reasons. First, PayServices' claim is moot. PayServices argues that it is entitled to mandamus

47

because "[t]aken together, the allegations establish a plausible cause of action for unreasonable delay against Defendant."  Br. at 40.  But petitions for mandamus alleging unreasonable delay of an agency action are moot if the agency has already acted.  *See In re International Union, United Mine Workers of Am*., 231 F.3d 51, 54 (D.C. Cir. 2000) (petition for mandamus based on unreasonable delay in initiating rulemaking denied as moot after agency issued proposed rules); *Kuzova v. United States Dep't of Homeland Sec*., 686 F. App'x 506, 508 (9th Cir. 2017) (holding that a claim for "unreasonable delay" under the APA is moot when plaintiffs' "applications have been adjudicated").  Here, PayServices expressly pleads that it has received a formal decision on its application for a master account.  ER ¶ 85.  In so doing, PayServices expressly pleads its claim is moot.

Second, PayServices has waived its new argument that Reserve Bank presidents are inferior officers of the United States who are subject to mandamus claims.  As this Court has held, "arguments not raised in the district court will not be considered for the first time on appeal."  *Robinson v. Am. Home Mortg. Servicing, Inc. (In re Mortg. Elec. Registration Sys.)*, 754 F.3d 772, 780 (9th Cir. 2014).  Here, FRBSF moved to dismiss the mandamus claim because FRBSF was not a "department[] of the government" or "agency."  SER-03, 13.  In Opposition, PayServices never briefed this indirect "inferior officer" theory, nor did it even mention the word "president."  *See* SER-40.  PayServices did, however, mention

the *Custodia* decision—the case underlying this new theory—nine separate times. SER-42, 45, 47-48. Indeed, PayServices quotes *Custodia* in its mandamus argument for a different proposition. *See also* SER-51. Rather than raising the "inferior officer" argument (of which it should have been aware), PayServices instead briefed the APA, Mandamus Act, and Due Process clause arguments as if they rose and fell together for purposes of agency. SER-48-51. It has waived any right to argue otherwise now.

Even if this argument were procedurally proper (it is not), mandamus is only proper where the act at issue is "ministerial and so plainly prescribed as to be free from doubt." *Id.* at 392 (citations omitted). For the reasons described above, *see* Section I, *supra*, Reserve Banks have discretion to grant or deny master account requests.

The District Court likewise had discretion to deny mandamus relief. *Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 505 (9th Cir. 1997) ("The extraordinary remedy of mandamus traditionally lies within the court's discretion."). In holding that "on balance" and "in this setting" FRBSF was not the Government "for the purposes of PayServices' claims," ER-35, the District Court properly exercised its discretion to dismiss PayServices' mandamus claim with prejudice.

## IV.   The District Court Properly Dismissed the APA Claim with Prejudice

It is blackletter law that a court can deny leave to amend—and accordingly dismiss a Complaint with prejudice—if the claim suffers from an "incurable" legal defect. *Shame On You Productions, Inc. v. Banks*, 893 F.3d 661, 665 (9th Cir. 2018). Here, two threshold defects bar PayServices' APA claim as a matter of law. First, as discussed above, FRBSF is not an "agency" or performing an "agency action." *See* Section II, *supra.* Second, even if FRBSF were an agency, the APA expressly precludes review of agency action which is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Here, as discussed above, *see* Section I, *supra*, the denial of an account access request is committed to FRBSF's discretion under Section 342 of the FRA.

It is "well-settled that the touchstone of reviewability under [the APA] is whether there's 'law to apply.'" *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 798-99 (9th Cir. 1996) (no APA claim when the "statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"). *Id*. at 798 (citation omitted). As discussed above, Section 248a does not provide "law to apply" because it is a price discrimination statute directed to the Board, not the Reserve Banks. *See supra* I.B. And PayServices effectively concedes that there is "no law" to apply under Section 342. Br. at 33 ("Section 342 does not prescribe conditions"); *City & Cty. of S.F. v. United States DOT*, 796 F.3d 993, 1002

50

(9th Cir. 2015) ("[T]he text of the statute provides no indication that Congress intended to restrict agency discretion").

Nor do the Guidelines provide a "law to apply" for PayServices' APA claim. *See Trout Unlimited v. Pirzadeh*, 1 F.4th 738, 759 (9th Cir. 2021) (holding that a regulation provides "law to apply" when "the agency intended the mandatory legal standard to apply specifically and directly to" the challenged action) (emphasis added). The "Guidelines" are just that—guidelines that entrust the merits of "individual access requests" to the discretion of the Reserve Banks. 87 Fed. Reg. at 51,106. They do not "provide assurance that any specific institution will be granted an account." *Id.* at 51,104.

Rather, they are "principles" that "broadly outline considerations for evaluating account access requests." 87 Fed. Reg. at 51,106. The considerations include whether the account would "present or create undue credit, operational, settlement, cyber, or other risks to the overall payment system;" (*id.* at 51,100 (Principle 3)); whether "access to an account and services by an institution . . . could introduce financial stability risk to the U.S. financial system" (*id.* at 51,108 (Principle 4(b)); and whether account access would "adversely affect the Federal Reserve's ability to implement monetary police" (*id.* at 51,109 (Principle 6)). Together, the considerations provide a framework for the exercise of Reserve Banks' accumulated expertise after decades of experience analyzing such requests. *Cf.*

*Browning-Ferris Indus. of S. Jersey, Inc. v. Muszynski*, 899 F.2d 151, 160 (2d Cir. 1990) ("Courts should be particularly reluctant to second-guess agency choices involving scientific disputes that are in the agency's province of expertise.").[21]

No fact that PayServices could plead would turn FRBSF into an agency or demonstrate that the denial of PayServices' master account application violated a mandatory legal standard. As a result, the District Court's dismissal of the APA claim with prejudice should be affirmed.

## V. PayServices' Due Process Claim Fails as a Matter of Law

The District Court properly ruled that PayServices' did not state either a substantive or procedural Due Process claim.

First, the District Court properly held that the substantive due process claim failed as a matter of law because PayServices has not identified a fundamental right violated by FRBSF's decision. ER-38. "[S]ubstantive due process protects an individual's fundamental rights to liberty and bodily autonomy." *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1154 (9th Cir. 2016). As the Ninth Circuit has held, "substantive due process rights are created *only* by the Constitution." *Armstrong v. Reynolds*, 22 F.4th 1058, 1079 (9th Cir. 2022) (quotation omitted) (emphasis added).

---

[21]    Notably, PayServices asks this Court not to apply the Guidelines to its application. *See* Br. At 41-42 ("It is improper to apply the Guidelines to PayServices' application."). The Guidelines cannot be *both* inapplicable *and* a binding legal standard.

Here, PayServices does not allege, nor could it plausibly argue, that its claimed right to a master account is a "fundamental" right created by the Constitution.  Indeed, its claimed right is not even in the text of the statute on which it relies.  The Constitution may have penumbras, but federal statutes like the Monetary Control Act do not.  Moreover, PayServices concedes in its Complaint that without a master account from FRBSF, it can still access the Federal Reserve System through an "intermediary bank."  Compl. ¶¶ 1; 98.

PayServices' procedural Due Process claim is similarly flawed.  A procedural Due Process claim requires "(1) a protect[ed] liberty or property interest . . . and (2) a denial of adequate procedural protections." *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 717 (9th Cir. 2011).  Here, the District Court correctly found that PayServices satisfies neither element.  First, PayServices does not have a property interest in a master account because FRBSF has discretion to deny the request. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005) ("[A] statute that grants the reviewing body unfettered discretion to approve or deny an application does not create a property right.").

Second, PayServices has not identified any procedural protections which it was denied.  Critically, the Due Process Clause does not require a "formal hearing" as long as the Plaintiff had a "full and fair opportunity to be heard." *Id.*  Plaintiff expressly pleads that it received two opportunities to meet with FRBSF.  ER-50, ¶¶

16; 23. PayServices admits that it was permitted to submit written evidence supporting its application. ER-50, ¶¶ 24; 25. And it admits that it received a written decision explaining the basis for FRBSF's decision. *Id.* ¶ 43. PayServices cites no basis for its proposition that a denial letter needs to state a way to appeal. Br. at 48. On this record, PayServies has not been denied any procedural protections, and thus its Due Process claim must be dismissed. *Pinnacle Armor*, 648 F.3d at 717. ("Considering that [Plaintiff] had ample opportunities to submit evidence both before and after the Notice was revoked, and considering that [Defendant] explained its decision, we believe that the [Defendant] afforded [Plaintiff] an adequate opportunity to be heard, even if no formal administrative hearings took place.").

## VI. The District Court Did Not Abuse Its Discretion in Striking the Danenberg Declaration

In response to Defendant's 12(B)(6) motion to dismiss, PayServices attached a declaration of facts it drafted while preparing its Opposition. The District Court did not abuse its discretion in striking the Danenberg Declaration because it was not, and could not have been, incorporated by reference in the Complaint. ER-81-88.

It is well-settled that "[i]n determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998); *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) ("[I]t would have been improper for the

court to consider the declaration and exhibits attached to the government's opposition without converting the motion to dismiss into a motion for summary judgment[.]").

First, the Declaration did not attach documents identified in the Complaint. It was nothing more than a self-serving description of documents allegedly referenced in the Complaint, drafted *after* the Complaint. *See* ER-81. That is exactly the conduct that the doctrine of "incorporation by reference" seeks to prevent. As this Court has explained, the doctrine "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken or doom their claims." *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1002 (9th Cir. 2018).

The only document attached to the Declaration was a June 15, 2023, letter from the Board of Governors of the Federal Reserve to Senator Marco Rubio—both non-parties to this action. This letter is not referenced in the Complaint and has no bearing on whether FRBSF had the right to safeguard the U.S. payment system by denying PayServices' request for a master account.

Second, FRBSF's Declaration did not give PayServices' a right to "offer controverting evidence." Br. at 49. The case on which PayServices relies does not provide otherwise. Br. at 48. It stands for the indisputable, but irrelevant, position that parties can submit declarations when contesting the court's jurisdiction. *Data*

*Disc, Inc. v. Sys. Tech. Assocs., Inc*., 557 F.2d 1280, 1284 (9th Cir. 1977) ("The parties' dispute pertain[s] to whether the district court could properly exercise in personam jurisdiction").  FRBSF, however, only challenged PayServices' motion for failure to state a claim; it did not dispute the court's jurisdiction.  The Denial Letter, unlike the Danenberg declaration, was deemed incorporated by reference in the Complaint and properly admitted on that basis.  PayServices' alleged entitlement to submit "controverting evidence"—like its alleged entitlement to a master account—is not grounded in any legal authority.  As a result, the District Court's decision should be affirmed.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's Order dismissing PayServices' Complaint with prejudice.

/s/ *Jonathan K. Youngwood*
Jonathan K. Youngwood
Meredith Karp
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
jyoungwood@stblaw.com
Meredith.Karp@stblaw.com

*Attorneys for Defendant-Appellee*
*Federal Reserve Bank of San*
*Francisco*

56

**UNITED STATES COURT OF APPEALS**
          **FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** ___24-2355_____

I am the attorney or self-represented party.

**This brief contains** ____12,674_____ **words,** including _____ words manually

counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type

size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or
    Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** _/s/ Jonathan K. Youngwood_____ **Date** ___07/29/2024_____