No. 24-2355

IN THE
# United States Court of Appeals for the Ninth Circuit

PAYSERVICES BANK,

*Plaintiff-Appellant*,

v.

FEDERAL RESERVE BANK OF SAN FRANCISCO,

*Defendant-Appellee*.

On Appeal from the United States District Court for the District of Idaho
Case No. 1:23-cv-00305-REP, Hon. Raymond E. Patricco, Jr.

## BRIEF FOR *AMICI CURIAE* INDEPENDENT COMMUNITY BANKERS OF AMERICA AND CONSUMER BANKERS ASSOCIATION IN SUPPORT OF APPELLEE AND AFFIRMANCE

JENNA BURKE
INDEPENDENT COMMUNITY
  BANKERS OF AMERICA
1615 L Street, NW, Suite 900
Washington, DC 20036
(202) 821-4380

DAVID POMMEREHN
CONSUMER BANKERS ASSOCIATION
1225 I Street, N.W., #550
Washington, D.C. 20005
(202) 552-6368

August 5, 2024

JONATHAN S. FRANKLIN
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, DC 20001
(202) 662-0466

CHARLOTTE KELLY
NORTON ROSE FULBRIGHT US LLP
Frost Tower
111 W. Houston Street, Suite 1800
San Antonio, TX 78205
(210) 270-9329

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae*, by and through their undersigned counsel, hereby certify the following:

1.      The Independent Community Bankers of America certifies that it has no parent corporation and that no publicly traded company owns 10% or more of its stock.

2.      The Consumer Bankers Association certifies that it has no parent corporation and that no publicly traded company owns 10% or more of its stock.

Respectfully submitted,

/s/ *Jonathan S. Franklin*
Jonathan S. Franklin
NORTON ROSE FULBRIGHT US LLP
799 9th Street, N.W., Suite 1000
Washington, D.C. 20001
(202) 662-0466

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ....................................................................... iii

IDENTITY AND INTEREST OF *AMICI CURIAE* ..................................1

SUMMARY OF ARGUMENT ...................................................................3

ARGUMENT ..............................................................................................6

    I.     WHETHER TO GRANT OR DENY A MASTER ACCOUNT
           IS WITHIN FEDERAL RESERVE BANKS' STATUTORY
           DISCRETION. ..............................................................................6

    II.    STRIPPING FEDERAL RESERVE BANKS OF THEIR
           DISCRETION REGARDING MASTER ACCOUNTS
           WOULD UNDERMINE THE SAFETY AND INTEGRITY
           OF FEDERAL RESERVE SERVICES AND THE FEDERAL
           RESERVE SYSTEM. ..................................................................11

         A.    Mandating The Provision Of Master Accounts To Every
               "Novel" State-Chartered Institution Would Strip Reserve
               Banks Of Their Ability To Ensure That Such Institutions
               Do Not Pose A Threat To The Safety And Integrity Of
               The Federal Banking System. ..................................................11

         B.    Novel State-Chartered Institutions Are Not Subject To
               The Comprehensive Regulation Applicable To Federally
               Regulated Banks. ....................................................................15

         C.    Allowing Automatic Access To Master Accounts Will
               Undermine The Integrity And Carefully Crafted
               Protections Of Our Financial System. ....................................21

CONCLUSION ........................................................................................29

CERTIFICATE OF COMPLIANCE .......................................................30

CERTIFICATE OF FILING AND SERVICE .........................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, 700 F.
    Supp. 3d 86 (S.D.N.Y. 2023).................................................................9

*Biden v. Texas*, 597 U.S. 785 (2022) ............................................................7

*Farmers' & Merchants' Bank of Monroe v. Fed. Rsrv. Bank of
    Richmond*, 262 U.S. 649 (1923) .............................................................7

*Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kansas City*, 861
    F.3d 1052 (10th Cir. 2017) ....................................................................10

**Statutes, Regulations, and Rules:**

12 C.F.R. § 3.1(a)........................................................................................24

12 C.F.R. § 3.10...........................................................................................24

12 C.F.R. § 4.6(a)........................................................................................16

12 C.F.R. § 4.6(c)........................................................................................16

12 C.F.R. §§ 6.1-.25....................................................................................24

12 C.F.R. § 21.11(a)....................................................................................26

12 C.F.R. § 21.11(c)....................................................................................26

12 C.F.R. § 21.21(c)....................................................................................25

12 C.F.R. §§ 30.1-.6....................................................................................26

12 C.F.R. § 50.10.........................................................................................23

12 C.F.R. § 50.40(a)....................................................................................23

12 C.F.R. § 50.40(c)....................................................................................23

12 C.F.R. § 208.3(d)(1)...............................................................................26

12 C.F.R. §§ 208.40-.45 ................................................................................24

12 C.F.R. § 208.62(a) ...................................................................................26

12 C.F.R. § 208.62(c) ...................................................................................26

12 C.F.R. § 208.63(b) ...................................................................................25

12 C.F.R. § 208.64(a) ...................................................................................18

12 C.F.R. § 211.24(j) ....................................................................................25

12 C.F.R. § 217.1(a) .....................................................................................24

12 C.F.R. § 217.10 ........................................................................................24

12 C.F.R. § 225.4(f) ......................................................................................26

12 C.F.R. § 249.10 ........................................................................................23

12 C.F.R. § 249.40(a) ...................................................................................23

12 C.F.R. § 249.40(c) ...................................................................................23

12 C.F.R. § 324.1(a) .....................................................................................24

12 C.F.R. § 324.10 ........................................................................................24

12 C.F.R. §§ 324.401-.405 ...........................................................................24

12 C.F.R. § 326.8(b) .....................................................................................25

12 C.F.R. § 329.10 ........................................................................................23

12 C.F.R. § 329.40(a) ...................................................................................23

12 C.F.R. § 329.40(c) ...................................................................................23

12 C.F.R. § 353.3(a) .....................................................................................26

12 C.F.R. §§ 364.100-.101 ...........................................................................26

31 C.F.R. § 1010.100(r) ................................................................................26

31 C.F.R. § 1020.210(b) ...............................................................................26

12 U.S.C. § 222 ................................................................................16

12 U.S.C. § 248a(c) ..........................................................................9

12 U.S.C. § 248a(c)(2) ..............................................................*passim*

12 U.S.C. § 248c(a)(3)(A) ................................................................8

12 U.S.C. § 248c(b)(1)(B)(ii) ...............................................3, 10, 13

12 U.S.C. § 321 ................................................................................17

12 U.S.C. § 325 ................................................................................18

12 U.S.C. § 342 ........................................................................*passim*

12 U.S.C. § 481 ................................................................................16

12 U.S.C. § 1813(a)(1) ....................................................................11

12 U.S.C. § 1813(c)(1) .....................................................................11

12 U.S.C. § 1818 ..............................................................................27

12 U.S.C. § 1820(d) ...................................................................16, 17

12 U.S.C. § 1831o .............................................................................24

12 U.S.C. § 1831o(h)(3) ..................................................................27

12 U.S.C. § 1831p-1 ........................................................................26

12 U.S.C. § 1841(c)(1) ....................................................................20

12 U.S.C. § 1844(c)(2)(A)(ii) .........................................................19

15 U.S.C. § 6801(b) .........................................................................26

15 U.S.C. § 6805 ..............................................................................26

31 U.S.C. § 5311(2) .........................................................................25

31 U.S.C. § 5318(g) .........................................................................26

Federal Reserve Act, 38 Stat. 251 (1913) ......................................7

Fed. R. App. P. 29(a)(4)(E) ....................................................................1

Monetary Control Act of 1980, 94 Stat. 132 (1980)................................7

**Other Authorities:**

Bank Pol'y Inst., *Fed Account Access for Nonbanks: An Analysis of the Policy Implications and Potential Risks to the U.S. Financial System* (June 2021) (https://tinyurl.com/yzr9arau)............................................26

Bank Pol'y Inst., *FinTech Access to Fed Accounts and the Nation's Payments Systems: A Primer* (May 11, 2021) (https://tinyurl.com/y85tchje) ...........................................................4

Bd. of Govs. of Fed. Rsrv. Sys., *Bank Holding Company Supervision Manual* (Feb. 2023) ................................................................27

Bd. of Govs. of Fed. Rsrv. Sys., *Commercial Bank Examination Manual* (Oct. 2023)..............................................................27

Bd. of Govs. of Fed. Rsrv. Sys. et al., *Joint Statement on Risk-Focused Bank Secrecy Act/Anti-Money Laundering Supervision* (July 22, 2019) (https://tinyurl.com/mr4692nn) .................................25

FDIC, *Basic Examination Concepts and Guidelines* (Mar. 2022) ..........................18

FDIC, *Formal and Informal Enforcement Actions Manual* (July 2022).................27

Fed. Rsrv. Banks, Operating Circular No. 1 (Account Relationships) (eff. Sept. 1, 2023) ..........................................................13

Fed. Rsrv. Board, *New Account Structure Will Support Interstate Branching* (May 2, 1996) (https://tinyurl.com/5n6z9d72) ...................8

Fed. Rsrv. Sys., *The Fed Explained: What the Central Bank Does* (Aug. 2021) (https://tinyurl.com/pnxbzn2x) ..............................18, 19

Raj Gnanarajah, Cong. Rsch. Serv., IF10055, *Bank Failures and the FDIC* (Mar. 23, 2023)..................................................22, 23

Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099 (Aug. 19, 2022) .................................................*passim*

Michael J. Hsu, Acting Comptroller of the Currency, *Preventing the Next Great Blurring* (Feb. 21, 2024) (https://tinyurl.com/dujxzw76)...............20

Marc Labonte, Cong. Rsch. Serv., IN12031, *Federal Reserve: Master Accounts and the Payment System* (Dec. 8, 2022) ...............................12

Marc Labonte & David W. Perkins, Cong. Rsch. Serv., IF11055, *Introduction to Bank Regulation: Supervision* (2018) ......................15

Marc Labonte, Cong. Rsch. Serv., R44918, *Who Regulates Whom? An Overview of the U.S. Financial Regulatory Framework* (2023) ............16, 17, 19

Adam J. Levitin, Consumer Finance: Markets and Regulation (2018)...................18

Liquidity Coverage Ratio: Liquidity Risk Measurement Standards, 79 Fed. Reg. 61,440 (Oct. 10, 2014) ....................................................23

OCC, *Comptroller's Handbook*, *Examination Process*, *Bank Supervision Process* (Sept. 2019) (https://tinyurl.com/ydmderuk) .............16, 27

OCC, *Comptroller's Handbook*, *Safety and Soundness*, *Liquidity* (May 25, 2023) (https://tinyurl.com/yckysd9m) .................................22

OCC, PPM 5310-3, *Bank Enforcement Actions and Related Matters* (May 25, 2023) (https://tinyurl.com/2jwvv9m4).........................17, 27

Christopher K. Odinet, *Predatory Fintech and the Politics of Banking*, 106 Iowa L. Rev. 1739 (2021)......................................................17, 18

David W. Perkins, Cong. Rsch. Serv., IF10809, *Introduction to Bank Regulation: Leverage and Capital Ratio Requirements* (2019)........................23

David W. Perkins, Cong. Rsch. Serv., R46648, *Bank Supervision by Federal Regulators: Overview and Policy Issues* (Dec. 28, 2020) .....................2

Andrew P. Scott, Cong. Rsch. Serv., R47014, *An Analysis of Bank Charters and Selected Policy Issues* (2022) .................................16, 17

## IDENTITY AND INTEREST OF *AMICI CURIAE*

The Independent Community Bankers of America ("ICBA") has one mission: to create and promote an environment where community banks flourish. ICBA is a national trade association that powers the potential of the nation's community banks through effective advocacy, education, and innovation. As local and trusted sources of credit, America's community banks leverage their relationship-based business model and innovative offerings to channel deposits into the neighborhoods they serve, creating jobs, fostering economic prosperity, and fueling their customers' financial goals and dreams.[1]

The Consumer Bankers Association ("CBA") is the only national financial trade group focused exclusively on retail banking and personal financial services— banking services geared toward consumers and small businesses. As the recognized voice on retail banking issues, CBA provides leadership, education, research, and federal representation for its members. CBA members include the nation's largest bank holding companies as well as regional and super-community banks that collectively hold two-thirds of the total assets of depository institutions.

---

[1]    *Amici curiae* state that no counsel for a party authored this brief in whole or in part and that no person other than *amici*, their members, or their counsel has made any monetary contributions intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E).

1

*Amici* have a strong interest in this case, which asks whether Federal Reserve Banks have discretion to consider the safety or soundness of a depository institution before providing that entity a "master account" that effectively gives it direct access to the Nation's banking system. *Amici* believe that Reserve Banks have the statutory discretion to evaluate any applicant's business model and financial soundness and security before providing master account access. The banks *amici* represent are subject to a plethora of federal regulation and oversight that, under the guidelines promulgated by the Federal Reserve System (the "Fed"), facilitate a more streamlined master account application process. *See* Guidelines for Evaluating Account and Services Requests, 87 Fed. Reg. 51,099, 51,100 (Aug. 19, 2022). But institutions like appellant, which are not federally insured and not subject to the supervision of a "federal prudential regulator,"[2] are not generally subject to that extensive regulation and oversight. As a result, appellant's argument that it—and any depository institution chartered under any state law—is automatically entitled to a master account on a no-questions-asked basis would, in *amici*'s view and that of the Fed, potentially subject the federal banking system to undue risk, and negate the purpose of an application process or "access request,"

---

[2]    The federal prudential regulators are the Fed, the Office of the Comptroller of the Currency ("OCC"), and the Federal Deposit Insurance Corporation ("FDIC"). David W. Perkins, Cong. Rsch. Serv., R46648, *Bank Supervision by Federal Regulators: Overview and Policy Issues* 1 (Dec. 28, 2020).

12 U.S.C. § 248c(b)(1)(B)(ii), which is to petition a Federal Reserve Bank to review the request.

## SUMMARY OF ARGUMENT

The U.S. federal banking system is the largest, most reliable, and most trusted financial system in the world. Businesses and individuals alike depend on that system each day to safely and efficiently hold trillions of dollars in assets and process billions of dollars' worth of transactions. In turn, the reliability, safety and soundness of that banking system is preserved by an vast overlapping web of federal laws, regulation, and agency oversight. The "master accounts" at issue here are a critical part of that network, as they are the way banks and other depository institutions are able to directly access the myriad financial services that allow the federal banking system to operate. Access to such accounts is controlled by the twelve Federal Reserve Banks under guidelines issued by the Fed of which they form a part, which is controlled by its Board of Governors ("Board"). The Reserve Banks seek to ensure that such accounts are given only to institutions that are found, on an ongoing basis, to have the financial and operational ability to safely and securely have direct access to the federal banking network.

*Amici* are pre-eminent banking associations whose thousands of members— including both federally and state-chartered institutions—are subject to that extensive federal regulation and oversight because of their charters, federal deposit

3

insurance coverage, holding company structure, or other reasons. Appellant PayServices, Inc. ("PayServices"), by contrast, is subject to no direct federal prudential examination or oversight. It is a "novel" depository institution— meaning an institution whose charter "authorizes [it] to engage in some, but typically not all, of the[] core banking activities" of deposit-taking, lending, and payments[3]—chartered by the State of Idaho that is not federally insured and has no federal agency overseeing its structure, operations, finances, or soundness.

Amici take no position on whether appellee the Federal Reserve Bank of San Francisco ("FRBSF") correctly exercised its discretion to deny PayServices' application for a master account, or whether other novel institutions should or should not receive such access depending on their individual characteristics, which are not issues presented in this appeal. But amici believe, as the district court correctly held, that the Reserve Banks have statutory discretion to grant or deny master account access and are not mandated to automatically grant such access— no-questions-asked—to any novel, state-chartered depository institution that applies for one. Not only does the statutory language unambiguously preserve such discretion, but the soundness of the Nation's unparalleled banking system would be compromised if PayServices' contrary view were accepted. Under the

---

[3]    Bank Pol'y Inst., *FinTech Access to Fed Accounts and the Nation's Payments Systems: A Primer* at 1 (May 11, 2021) (https://tinyurl.com/y85tchje).

4

Fed's guidelines, no institution is automatically entitled to master account access. Federally insured and regulated banks, such as *amici's* members, are subject to a streamlined application process because the comprehensive, ongoing, and in some cases continuous federal regulation and oversight to which they are subject gives the Fed assurance that these banks will not compromise the safety or integrity of the federal banking system. But with novel institutions such as PayServices, the Fed has no such assurance, and its Reserve Banks must therefore be able to carefully scrutinize such institutions' business models, along with their underlying soundness, safety, and security, before effectively giving them the keys to the palace that is our banking system.

If PayServices desires a more streamlined process for master account access, it can become a federally-insured bank (as *amici*'s members have done) and accept the accompanying comprehensive federal regulatory oversight. But until PayServices does so, the Federal Reserve Banks must have the discretion to ensure the safety and soundness of PayServices and other "novel" institutions before giving them the benefits of being a full-service bank. For these reasons, *amici* urge the Court to affirm the well-reasoned decision of the district court that FRBSF was

5

not statutorily mandated to provide PayServices with automatic access to a master

account on a no-questions-asked basis.[4]

## ARGUMENT

### I.    WHETHER TO GRANT OR DENY A MASTER ACCOUNT IS WITHIN FEDERAL RESERVE BANKS' STATUTORY DISCRETION.

The district court correctly determined that Federal Reserve Banks are under

no statutory obligation to "grant master accounts to an otherwise eligible

depository institution regardless of its risk profile," ER-22, and that FRBSF had

discretion to deny PayServices a master account, ER-31.

At issue in this case are two provisions of the Federal Reserve Act ("FRA").

The first provides that "[a]ny Federal reserve bank *may* receive from any of its

member banks, or other depository institutions, . . . deposits of current funds in

lawful money[.]"  12 U.S.C. § 342 ("Section 342") (emphasis added).  The second

provides that "[a]ll Federal Reserve bank services" covered by a Board-created fee

schedule "shall be available to nonmember depository institutions," and, subject to

certain exceptions, "such services shall be priced at the same fee schedule

applicable to member banks."  12 U.S.C. § 248a(c)(2).

---

[4]     *Amici* do not address whether the FRBSF is a federal "agency."  *See* Appellant's Br. 23-32.

6

Section 342 makes clear that Federal Reserve Banks have the discretion—not obligation—to issue master accounts. Under that section, a Federal Reserve Bank "**may** receive" deposits. 12 U.S.C. § 342 (emphasis added). It is well-established that "the word may **clearly** connotes discretion." *Biden v. Texas*, 597 U.S. 785, 802 (2022) (internal quotation marks and citation omitted). And, as the Supreme Court explained in *Farmers' & Merchants' Bank of Monroe v. Federal Reserve Bank of Richmond*, 262 U.S. 649, 662 (1923) ("*FMBM*"), Section 342 does not "impose[] upon reserve banks any obligation to receive checks for collection" but "merely confers authority to do so."

Notably, Section 342's discretionary language existed when the FRA was enacted, *see* ch. 6, § 13, 38 Stat. 251, 263 (1913), and went untouched by Congress even after the U.S. Supreme Court decided *FMBM* in 1923, *see, e.g.*, Monetary Control Act of 1980, § 105, 94 Stat. 132, 139-40 (1980). As the district court correctly observed, "Congress can therefore be presumed to have 'accepted and ratified' this same position within the [Monetary Control Act]." ER-23.

Even PayServices has acknowledged that, under Section 342, "[a] Federal Reserve bank **may reject every deposit** that comes from a bank subject to the limits in the [statute's] language." Appellant's Br. 33 (emphasis added). Thus, under PayServices' interpretation, a Federal Reserve Bank is obligated to provide it with a master account but may nevertheless reject any deposits into that account. That

7

interpretation makes no sense. The plain language of Section 342 provides Federal Reserve Banks with the discretion to deny (or grant) master accounts and does not require them to carry out their important mission of ensuring the security and soundness of the federal banking system by attempting the impossible task of individually scrutinizing every deposit made by every bank.

That Section 342 does not expressly mention "master accounts" is immaterial. *Cf.* Appellant's Br. 33. Master accounts did not exist when the FRA was enacted,[5] but they are the means through which Federal Reserve Banks currently accept deposits, *see, e.g.*, 12 U.S.C. § 248c(a)(3)(A); SER-15. Because, as even PayServices acknowledges, Federal Reserve Banks have discretion regarding whether to accept deposits, they must have discretion regarding issuance of the master accounts through which those deposits are accepted.

The district court likewise correctly determined that Section 248a, an anti-price discrimination provision directed at the Board, does not require Federal Reserve Banks to issue master accounts to nonmember depository institutions. *See* ER-27-31. PayServices insists that Section 248a "requires open access to Federal Reserve services" for any entity that is an "eligible depository institution."

---

[5]     *See, e.g.*, Fed. Rsrv. Board, *New Account Structure Will Support Interstate Branching* (May 2, 1996) (https://tinyurl.com/5n6z9d72) (discussing "new reserve account structure" under which "depository institutions will be able to consolidate their multiple reserve accounts into a single, master account").

Appellant's Br. 34.  But Section 248a(c)(2) is "best read as a clause preventing price discrimination in favor of banks that are members of the Federal Reserve System."  *Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, 700 F. Supp. 3d 86, 99 (S.D.N.Y. 2023).  It is also directed to the Board—not the Federal Reserve Banks that control master account access.  *See id.* at 100 ("If Congress intended to require Federal reserve banks to provide specific services, the direction would reasonably have been found in the section dealing with the duties and powers of Federal reserve banks and not in the section dealing with fee schedules set by the Board.").

And unlike Section 342, which grants Reserve Banks discretion to deny depository access to "any" institution—Section 248a(c)(2) nowhere says that "all" or "any" depository institution must be allowed to access the listed services.  Rather, it merely states that those services will generally be "available" to "nonmember depository institutions" under the "the same fee schedule applicable to member banks."  12 U.S.C. § 248a(c)(2).  When read in context together with Section 342, Section 248a(c)(2) merely states that nonmember entities that are otherwise allowed to access the listed services through the discretionary authority granted to Reserve Banks under Section 342 will be charged the same fees that apply to member banks.  And Section 248a(c)(2) is merely one of four "principles" on which the Board's fee schedule is based.  *See id.* § 248a(c).

9

Further, in 2022, Congress amended the FRA to specifically require the Fed to maintain a publicly searchable database of every institution that has submitted an "access request" for a master account and whether that request was approved, withdrawn or "rejected[.]" 12 U.S.C. § 248c(b)(1)(B)(ii). *See* ER-31; Appellee's Br. 33-35. These statutory terms run counter to PayServices' automatic-access interpretation, as Congress clearly contemplated that there must always be a "request" for such access—which itself indicates discretion—and also that Reserve Banks have the authority to deny such requests.

PayServices relies on the portion of Judge Bacharach's non-binding opinion in *Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017), which was not joined by either of his colleagues in that case, asserting that, because Section 248a(c)(2) "indicates that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks," and because a "master account is required" to purchase those services, nonmember depository institutions must be entitled to master accounts on a mandatory basis. Appellant's Br. 35. But this interpretation overreads Section 248a(c)(2), which merely entitles nonmember institutions to purchase Federal Reserve Bank services ***at the same price*** as that given to member banks. Further, Judge Bacharach's opinion predated (1) the Board's August 19, 2022 "Guidelines

10

for Evaluating Account and Services Requests," 87 Fed. Reg. at 51,099, and

(2) Congress's December 2022 amendment to the FRA.

Accordingly, the Court should affirm the district court's holding that Section 248a(c)(2) does not override the discretion expressly granted by Section 342 and does not require Federal Reserve Banks to automatically grant master account access to any depository institution on a no-questions-asked basis.

## II. STRIPPING FEDERAL RESERVE BANKS OF THEIR DISCRETION REGARDING MASTER ACCOUNTS WOULD UNDERMINE THE SAFETY AND INTEGRITY OF FEDERAL RESERVE SERVICES AND THE FEDERAL RESERVE SYSTEM.

### A. Mandating The Provision Of Master Accounts To Every "Novel" State-Chartered Institution Would Strip Reserve Banks Of Their Ability To Ensure That Such Institutions Do Not Pose A Threat To The Safety And Integrity Of The Federal Banking System.

Not only do Federal Reserve Banks have statutory discretion to grant or deny master accounts, but there are sound policy reasons why this is so. If PayServices' argument is accepted, then every Federal Reserve Bank would be obligated to automatically—without any prior review—grant master accounts to any entity that any state has chartered as a "bank" that receives deposits, no matter how novel its business and without any understanding or consideration given to its safety or soundness. *Cf.* 12 U.S.C. § 1813(a)(1) (defining "bank"), (c)(1) (defining "depository institution"). Under this view, despite its member Reserve Banks being compelled to issue entities like PayServices a master account, the Fed and its

11

Reserve Banks would at no point have the ability to assess whether these entities pose safety and soundness risks that threaten the nation's financial system, rendering an application process or "access request" moot. *See, e.g.*, Marc Labonte, Cong. Rsch. Serv., IN12031, *Federal Reserve: Master Accounts and the Payment System* 2 (Dec. 8, 2022).

This position is contrary not only to the governing statute, but also to the fundamental policies that underlie the entire system of federal banking regulation. Our Nation's federal banking system is the largest and most trusted in the world because federal law and supervisory agencies carefully regulate, on an ongoing basis, every institution that has access to that system to ensure that it does not, and will not, pose any appreciable threat to the soundness, safety, and integrity of a financial system that must efficiently and reliably process billions of transactions every day. Master accounts are critical to that system, as they are the means through which entities holding them are able to access all of the Fed's services, including electronic payments. *E.g.*, ER-16.

Under the Fed's guidelines, no institution is automatically entitled to or guaranteed master account access. *See* 87 Fed. Reg. at 51,106-07. Institutions supervised by federal agencies under federal law—such as *amici*'s members— generally receive a streamlined review because the comprehensive federal regulations and oversight that they are subject to assures the Fed that they will not

12

pose an undue threat to the safety or integrity of the banking system. *See id.* at 51,109. Most state-chartered banks fall into that category as well, as they are subject to federal regulation by virtue of their participation in the federal deposit insurance system or for other reasons. *See id.* ("Tier 1" banks, which consist of "federally insured" banks, are subject to "a less intensive and more streamlined" master-account review because they are "already subject to a standard, strict, and comprehensive set of federal banking regulations," and "detailed regulatory and financial information would in most cases be readily available").

Like every other company in the country, PayServices can efficiently access the Nation's banking system through an intermediary, or "correspondent" bank that itself has master account access. *See, e.g.*, Fed. Rsrv. Banks, Operating Circular No. 1 (Account Relationships) § 2.7 (eff. Sept. 1, 2023). Alternatively, PayServices can submit an application or "access request" for a master account, *see* 12 U.S.C. § 248c(b)(1)(B)(ii)—which it unsuccessfully did—a process that inherently and, under an ordinary meaning of these words, involves a review to determine whether the application should be granted or denied. Yet PayServices now argues that it must automatically be granted direct access to a master account merely because it has convinced a state (Idaho) to give it a "novel" charter. *Cf.* Appellant's Br. 17 (PayServices noting its ability to garner "political intervention" to advance its interests). That cannot be sufficient. PayServices may have

13

received "preliminary approval" from a single state for a "novel" state charter, ER-19, but it is not otherwise subject to **any** direct, ongoing, or continuous federal prudential regulation, supervision or oversight.  And because institutions like PayServices are not subject to such federal prudential oversight, the Fed and its Reserve Banks cannot have the confidence, without evaluating their business models and fundamental soundness, that they will not pose risks to the world's largest and most trusted banking system.  As the Fed has explained, these "Tier 3" institutions, which "are not federally insured and not subject to prudential supervision by a federal banking agency" may have "a supervisory or regulatory framework that is substantially different from, and possibly weaker than, the supervisory and regulatory framework that applies to federally-insured institutions, and as a result may pose the highest level of risk."  87 Fed. Reg. at 51,101.  Indeed, "[d]etailed regulatory and financial information regarding Tier 3 institutions may not exist or may be unavailable."  *Id*.  Accordingly, these institutions "will generally receive the strictest level of review."  *Id*. at 51,110.

While *amici* take no position on whether Federal Reserve Banks should or should not grant PayServices, or any other novel state-chartered depository institution, a master account, *amici* believe that the Reserve Banks must have the ability to scrutinize such institutions before granting such access, and must have the ability to deny it to institutions that they believe pose undue risk to the financial

14

system.  If these less regulated companies are to have the same direct access to the federal banking system that *amici*'s prudentially regulated and federally insured members have, then they should demonstrate, through an application and review process, that they do not pose undue risk to the financial system or the thousands of banks operating in it that are subject to the full panoply of federal prudential regulation and supervision.  Granting every such institution automatic, no-questions-asked access would pose intolerable risks to the entire banking system upon which all of us rely every day and render the purpose of an application or "access request" meaningless, as no petition or review would ever be necessary to gain access to the Nation's unparalleled payments system.

**B.      Novel State-Chartered Institutions Are Not Subject To The Comprehensive Regulation Applicable To Federally Regulated Banks.**

PayServices' desired outcome would leave the carefully constructed banking regulatory system at the mercy of novel institutions that have little to no federal oversight.  "Banks are supervised by a primary regulator, which is determined by a bank's charter type and whether the bank is a member of the Federal Reserve System."  Marc Labonte & David W. Perkins, Cong. Rsch. Serv., IF11055, *Introduction to Bank Regulation: Supervision* 1 (2018).  For federally insured banks, the primary regulators are: (1) the Fed; (2) the OCC; and (3) the FDIC.  *Id.*

15

Under our "dual banking system," the regulation a depository institution (such as a bank) is subject to depends on whether the institution is state or federally chartered. *See* Marc Labonte, Cong. Rsch. Serv., R44918, *Who Regulates Whom? An Overview of the U.S. Financial Regulatory Framework* 12-13 (2023). Banks chartered under federal law (specifically, the National Bank Act of 1864) are "national banks." Andrew P. Scott, Cong. Rsch. Serv., R47014, *An Analysis of Bank Charters and Selected Policy Issues* 3 & n.4 (2022). National banks are regulated and supervised by the OCC, *id.* at 3, and they must become members of the Federal Reserve System, *id.*; *see also* 12 U.S.C. § 222 ("Every national bank in any State shall . . . become a member bank of the Federal Reserve System . . . ."). National banks' deposits generally must be FDIC-insured. Scott, *supra*, at 3.

For OCC-supervised banks, the OCC must conduct a "full-scope, on-site examination of every national bank . . . at least once during each 12-month period," but it can conduct more frequent examinations if necessary. 12 C.F.R. § 4.6(a), (c); *see also* 12 U.S.C. §§ 481 (requiring Comptroller of Currency to appoint examiners of national banks), 1820(d) (requiring examinations of insured depository institutions). This 12-month period (or 18-month period, in some cases) is referred to as a "supervisory cycle." OCC, *Comptroller's Handbook*, *Examination Process*, *Bank Supervision Process* at 12 (Sept. 2019) (https://tinyurl.com/ydmderuk) ("*Bank Supervision Process*"). Examinations of

16

"specialty areas," including, *inter alia*, IT, asset management, the Bank Secrecy Act, anti-money laundering, and the Community Reinvestment Act, are "integrated within supervisory cycles of all banks." *Id.* at 16; *see also id.* at 16-21 (discussing specialty areas). The OCC uses "matters requiring attention," or MRAs, to "communicate concerns about a bank's deficient practices." *Id.* at 46. Additionally, the OCC "uses enforcement actions to require a bank's board and management to take timely actions to correct a bank's deficiencies." *Id.* at 49; *see also, e.g.*, OCC, PPM 5310-3, *Bank Enforcement Actions and Related Matters* at 4-6, 18-24 (May 25, 2023) (https://tinyurl.com/2jwvv9m4) (setting forth formal and informal bank enforcement actions).

A state-chartered bank is, as its name suggests, a bank chartered under an individual state's law. *See Scott, supra*, at 2-3. State-chartered banks may apply to become members of the Federal Reserve System, but they are not required to do so. *See* 12 U.S.C. § 321; Labonte, *Who Regulates Whom?*, *supra*, at 16. State-chartered, FDIC-insured banks that are not members of the Federal Reserve System are primarily regulated by the FDIC. Christopher K. Odinet, *Predatory Fintech and the Politics of Banking*, 106 Iowa L. Rev. 1739, 1767 (2021). As with national banks, and state-chartered Federal Reserve member banks, state-chartered, FDIC-insured nonmember banks are subject to rigorous—and in some cases, continuous—examinations. *See, e.g.*, 12 U.S.C. § 1820(d); *see also* FDIC, *Basic*

17

*Examination Concepts and Guidelines* 1.1-6 (Mar. 2022) (describing requirements

of a full-scope examination).  An FDIC-insured, state-chartered bank that is a

Federal Reserve System member is also subject to examination by the Fed.  *See*

Odinet, 106 Iowa L. Rev. at 1767; 12 U.S.C. § 325; 12 C.F.R. § 208.64(a) (Fed

must "conduct a full-scope, on-site examination of every insured member bank at

least once during each 12-month period.").  But a state-chartered bank that is

neither a Federal Reserve System member nor FDIC-insured is a "novel" entity

regulated only by the relevant state authority, with no direct federal prudential

oversight.  *Cf.* Odinet, 106 Iowa L. Rev. at 1767 ("For a state bank that is a

member of neither [the Fed nor the FDIC], the state regulator is the uncontested

primary regulator.") (citing Adam J. Levitin, Consumer Finance: Markets and

Regulation 133-36 (2018)).

Finally, "[b]anks are often owned or controlled by another company, called a

bank holding company (BHC)."  Fed. Rsrv. Sys., *The Fed Explained: What the*

*Central Bank Does* at 64 (Aug. 2021) (https://tinyurl.com/pnxbzn2x).  And "[t]he

Federal Reserve has supervisory and regulatory authority for all BHCs, regardless

of whether subsidiary banks of the holding company are national banks, state

'member' banks, or state 'nonmember banks."  *Id.*  Pursuant to this authority, the

Board may "make examinations" of BHCs and their subsidiaries in order to, *inter*

18

*alia*, "monitor the compliance of the [BHC] and the subsidiary with" the relevant laws.  12 U.S.C. § 1844(c)(2)(A)(ii).

Accordingly, regardless of whether a bank is state or federally chartered, there is normally extensive federal prudential regulation and supervision by one or multiple federal prudential regulators.  This makes sense, given that these regulatory and supervisory systems are essential to the stability and safety of the financial system as a whole.  *See, e.g.*, Labonte, *Who Regulates Whom?*, *supra*, at 14 ("Banks also play a central role in the payment system, the financial system, and the broader economy.  As a result, banks are subject to safety and soundness (prudential) regulation that most other financial firms are not subject to at the federal level.").  Indeed, the Fed "was created in 1913 to promote greater financial stability and help avoid banking panics, such as those that had plunged the country into deep economic contractions in the late nineteenth and early twentieth centuries."  *The Fed Explained*, *supra*, at 47.

But some institutions—such as PayServices—utilize "novel" state charters that allow them to elude federal prudential supervision entirely.  *See, e.g.*, Michael J. Hsu, Acting Comptroller of the Currency, *Preventing the Next Great Blurring* at 13-14 (Feb. 21, 2024) (https://tinyurl.com/dujxzw76).  These "novel" institutions (of which there are only a few) are not subject to the same federal prudential oversight required of thousands of other national or state chartered banks because

19

they are neither insured depository institutions nor uninsured institutions that are part of a bank holding company and are not "banks" for purposes of the Bank Holding Company Act. *See* 12 U.S.C. § 1841(c)(1). Though these novel institutions may be subject to state regulations, the fact that they fall outside the purview of federal prudential supervision makes their safety and soundness effectively unknown to the Fed and its Reserve Banks where, as here, the novel institution seeks a master account in order to directly access the Nation's banking system. And, irrespective of whether the applicable state regulations are comparable to federal ones, it also remains the case that, despite the novel institution seeking access to the Nation's federal banking system, the Nation's federal banking system will have no control over the novel institution's use of that system—making the application or "access request" review necessary to understand short and long-term risks the institution may pose.[6]

---

[6] Below, PayServices asserted that when the Idaho Department of Finance ("IDF") gave its "preliminary approval" of PayServices' application to establish a state-chartered bank, it also provided that "PayServices must adhere to all federal regulations applicable to FDIC-insured financial institutions, unless the Director [of the IDF] explicitly waives this requirement for specific regulations that are not consistent with PayServices' business model." ER-64. But even if this were the case, PayServices would ultimately be responsible to the IDF—not the FDIC.

20

**C.     Allowing Automatic Access To Master Accounts Will Undermine The Integrity And Carefully Crafted Protections Of Our Financial System.**

As noted above, the federal examination process involves rigorous, and in some cases, continuous, measuring and monitoring of the risks associated with a particular bank and, if necessary, remedial enforcement to minimize or remove those risks.  Under PayServices' interpretation of the FRA, however, a Federal Reserve Bank would have to automatically issue a master account, without any prior review, to an institution regardless of the risks (such as insolvency or lack of security) that may be inherent in that institution.  *Cf.* Appellant's Br. at 36; *see also* ER-22.  This interpretation ignores the critical role the Federal Reserve Banks have in protecting the integrity of the nation's financial system.

Under the Fed's guidelines for master accounts, Federal Reserve Banks' analysis of an application for a master account is governed by six fundamental principles: (1) whether the applicant has "a well-founded, clear, transparent, and enforceable legal basis for its operations," and if it does, that provision of a master account and associated services should not create (2) "undue credit, operational, settlement, cyber or other risks to the Reserve Bank," (3) "undue credit, liquidity, operational, settlement, cyber or other risks to the overall payment system," (4) "undue risk to the stability of the U.S. financial system," (5) "undue risk to the overall economy by facilitating activities such as money laundering, terrorism

21

financing, fraud, cybercrimes, economic or trade sanctions violations, or other illicit activity," or (6) "adversely affect the Federal Reserve's ability to implement monetary policy." 87 Fed. Reg. at 51,107-09. Yet if PayServices' position were adopted, the Reserve Banks would be forced to provide a master account to a novel, state-chartered institution without evaluating any of these concerns. They would therefore be unable to assess, *inter alia*, (1) whether the novel institution could manage "liquidity, credit, and other risks that may arise in times of financial or economic stress"; (2) whether "liquidity or other strains at the institution [could] be transmitted to other segments of the financial system"; and (3) whether allowing that institution access to a master account and Fed services "could affect deposit balances across U.S. financial institutions more broadly and whether any resulting movements in deposit balances could have a deleterious effect on U.S. financial stability." *See* 87 Fed. Reg. at 51,108.

Most bank failures "trace back to the management of bank resources, resulting in a bank's inability to meet liquidity or capital requirements." Raj Gnanarajah, Cong. Rsch. Serv., IF10055, *Bank Failures and the FDIC* 1 (Mar. 23, 2023). "Liquidity is the ability of a bank to meet cash flow needs, including deposit withdrawals by its customers." *Id.* Because the "repercussions of inadequate liquidity risk management can be immediate and dire," *see* OCC, *Comptroller's Handbook*, *Safety and Soundness*, *Liquidity* at 3 (May 25, 2023)

22

(https://tinyurl.com/yckysd9m), there are numerous federal prudential regulations governing liquidity management—none of which directly apply to PayServices.

For example, the OCC, Board, and FDIC have adopted "liquidity coverage ratio" ("LCR") requirements for certain institutions within their purview. *See* Liquidity Coverage Ratio: Liquidity Risk Measurement Standards, 79 Fed. Reg. 61,440 (Oct. 10, 2014); *see also, e.g.*, 12 C.F.R. §§ 50.10 (LCR for OCC-regulated institutions), 249.10 (LCR for Board-regulated institutions), 329.10 (LCR for FDIC-regulated institutions). These institutions must notify their governing authority if the LCR falls short of the minimum requirement, 12 C.F.R. §§ 50.40(a), 249.40(a), 329.40(a), and the OCC, FDIC, and Board have the ability to "take additional supervisory or enforcement actions to address noncompliance," *id.* §§ 50.40(c), 249.40(c), 329.40(c).

Another area subject to comprehensive federal regulation is capital. "Capital (equity) is the difference between assets and liabilities." Gnanarajah, *supra*, at 1. Because capital instruments "generally do not require payment of a specified amount of money at a specified time[,] . . . capital gives the bank the ability to absorb losses while continuing to meet its rigid obligations on liabilities and avoid failure." David W. Perkins, Cong. Rsch. Serv., IF10809, *Introduction to Bank Regulation: Leverage and Capital Ratio Requirements* 1 (2019). The OCC, Board, and FDIC require certain institutions to satisfy "minimum capital requirements and

23

overall capital adequacy standards." 12 C.F.R. §§ 3.1(a), 3.10 (OCC), 217.1(a), 217.10 (Board), 324.1(a), 324.10 (FDIC). FDIC-insured banks are also subject to the "prompt corrective action" ("PCA") framework, which essentially increases restrictions on a bank's activities as the bank's capital level decreases. *See* 12 U.S.C. § 1831o; *see also* 12 C.F.R. §§ 6.1-.25 (OCC-regulated institutions), 208.40-.45 (Board-regulated institutions), 324.401-.405 (FDIC-regulated institutions).

Yet under PayServices' interpretation, Federal Reserve Banks would be statutorily mandated to bypass the application and "access" process that numerous other banks have navigated to date and instead provide master accounts to novel state-chartered entities without the ability to even inquire about any of these issues and then take action to deny access to institutions that pose undue risks. The potential risks to the Nation's banking system of such an interpretation are palpable. An institution that is not subject to capital requirements (as federally insured institutions are and all of *amici's* members are) could "more easily expand its balance sheet during times of stress," which would create a "particularly large" "potential for sudden and significant deposit inflows into that institution." 87 Fed. Reg. at 51,109. This, in turn, "could disintermediate other parts of the financial system, greatly amplifying stress." *Id.* Federal Reserve Banks manage risks like these by individually assessing applicants for them and rejecting applications from

24

high-risk entities. Requiring the Federal Reserve Banks to issue master accounts to any eligible institution, regardless of an institution's solvency, security, safety, or illicit-finance risk management, would deprive Reserve Banks of their ability to protect themselves, the payment systems they operate, the U.S. financial system, and the U.S. economy from undue risks posed by otherwise-eligible institutions. Additionally, this would allow a single state, like Idaho, to dictate the federal policies that govern access to the Nation's banking system. Fortunately, as explained above, Congress did not impose any such statutory requirement.

Further, because it is unclear what reporting obligations, if any, these novel entities are held to, the risk of illicit financing (or pursuing a novel charter specifically to evade anti-money laundering laws) increases. *See* 87 Fed. Reg. at 51,109. For example, to carry out the Bank Secrecy Act ("BSA's") objective of "prevent[ing] the laundering of money and the financing of terrorism," 31 U.S.C. § 5311(2), banks are required to establish and maintain BSA compliance programs, 12 C.F.R. §§ 21.21(c) (OCC-regulated institutions), 208.63(b) (Board-regulated institutions), 211.24(j) (Board-supervised U.S. branch offices of foreign banks), 326.8(b) (FDIC-regulated institutions).[7] Banks and BHCs are also required to file

---

[7] These compliance programs are also reviewed during examinations. *See, e.g.*, Board of Govs. of Fed. Rsrv. Sys. et al., *Joint Statement on Risk-Focused Bank Secrecy Act/Anti-Money Laundering Supervision* at 1 (July 22, 2019) (https://tinyurl.com/mr4692nn).

a "Suspicious Activity Report," or SAR, upon detecting a known or suspected violation of federal law, or a suspicious transaction related to a money laundering activity or violation of the BSA.  31 U.S.C. § 5318(g); 12 C.F.R. §§ 21.11(a), (c) (OCC-regulated institutions), 208.62(a), (c) (Board-regulated institutions), 353.3(a) (FDIC-regulated institutions), 225.4(f) (BHCs).[8]

Banks also must adhere to data privacy and information security standards, *see* 15 U.S.C. §§ 6801(b), 6805, and are required to comply with certain "safety and soundness" standards, *see* 12 U.S.C. § 1831p-1; *see also* 12 C.F.R. §§ 30.1-.6, 364.100-.101, 208.3(d)(1).  The safety and soundness standards address internal controls and information systems, internal audits, loan documentation, credit underwriting, interest rate exposure, asset growth, asset quality, earnings, compensation, fees and benefits.  Without supervision and regulation regarding IT systems and cybersecurity, it could be possible for bad actors to "disrupt the payment system either by denying service or destroying or disrupting data."  Bank Pol'y Inst., *Fed Account Access for Nonbanks: An Analysis of the Policy Implications and Potential Risks to the U.S. Financial System* 7 (June 2021)

---

[8]    Banks without a "federal functional regulator" like the OCC, Board, or FDIC (*see* 31 C.F.R. § 1010.100(r)) also must comply with certain anti-money laundering program requirements.  *See* 31 C.F.R. § 1020.210(b).  Even if PayServices were subject to these minimum requirements, however, it would not be subject to the same supervision, examination, and enforcement framework as federally supervised banks.

(https://tinyurl.com/yzr9arau); *see also Bank Supervision Process* at 16 (explaining governing sources for IT examinations of certain types of banks).

Finally, federal banking regulators have broad enforcement authority regarding the institutions they supervise. This authority includes the ability to: (1) issue matters requiring attention ("MRAs"); (2) issue matters requiring immediate attention ("MRIAs"); (3) issue cease-and-desist orders; (4) suspend, remove, and prohibit personnel; (5) assess civil money penalties; (6) suspend or terminate federal deposit insurance; (7) initiate civil litigation; and (8) initiate conservatorship and receivership. *See* 12 U.S.C. §§ 1818, 1831o(h)(3); *see also, e.g.*, OCC, PPM 5310-3 at 3-6, 18-24 (discussing MRAs and setting forth formal and informal bank enforcement actions by the OCC); FDIC, *Formal and Informal Enforcement Actions Manual* 1-5-6 (July 2022) (setting forth formal and informal enforcement actions by the FDIC); Bd. of Govs. of Fed. Rsrv. Sys., *Bank Holding Company Supervision Manual* §§ 1075.0.1-.7 (Feb. 2023) (setting forth corrective actions available to the Board for BHCs); Bd. of Govs. of Fed. Rsrv. Sys., *Commercial Bank Examination Manual* §§ 1001.1, 1050.1 (Oct. 2023) (discussing MRAs, MRIAs, and formal and informal supervisory actions) . Yet under PayServices' interpretation, Federal Reserve Banks would be required to provide any state-chartered, non-federally-insured institution automatic master account

access without even being able to assess that applicant institution's risk or protect the system by denying high-risk applications.

PayServices contends that such concerns are overblown because, under its particular business model (according to its allegations) it poses no liquidity risk because it retains 100% of depositor funds and does not make loans. Appellant's Br. 3-4. But that is no answer. First, under PayServices' interpretation, Federal Reserve Banks would be unable to even verify an applicant's business model before providing master account access. Second, and more broadly, PayServices' no-questions-asked interpretation would apply to *every* institution seeking a master account, including those that pose different and more concerning liquidity risks. And third, as explained above, the classic "run on the bank" is far from the only risk that the Fed and other federal bank supervisors are concerned with. Under PayServices' interpretation, Federal Reserve Banks would be precluded from even inquiring about any of those risks, including those relating to solvency, money laundering, and data privacy, before granting master account access.

Finally, PayServices alludes to "America's dual banking system, that shares power between the federal government and the states." Appellant's Br. 2-3. But as the Fed has cogently explained, where—as with PayServices—a state-chartered entity is not federally-insured and not otherwise subject to federal regulation or oversight, the mere fact that it may have some form of state regulation is

28

insufficient because it may have "a supervisory or regulatory framework that is substantially different from, and possibly weaker than, the supervisory and regulatory framework that applies to federally-insured institutions, and as a result may pose the highest level of risk."  87 Fed. Reg. at 51,101.  Thus, while it might be theoretically possible for a state, by itself, to provide the sort of robust regulatory oversight akin to the comprehensive federal regulation to which *amici*'s members are subject, Federal Reserve Banks must have the ability to ensure that that is so before providing direct access to the federal banking system.  Yet under PayServices' mandatory-access interpretation, that critical inquiry cannot occur.

## CONCLUSION

For the foregoing reasons, the judgment below should be affirmed.

Respectfully submitted,

*/s/ Jonathan S. Franklin*

| | |
|---|---|
| Jenna Burke | Jonathan S. Franklin |
| INDEPENDENT COMMUNITY | NORTON ROSE FULBRIGHT US LLP |
| BANKERS OF AMERICA | 799 9th Street, N.W., Suite 1000 |
| 1615 L Street, NW, Suite 900 | Washington, D.C.  20001 |
| Washington, DC 20036 | (202) 662-0466 |
| (202) 821-4380 | jonathan.franklin@nortonrosefulbright.com |
| | |
| David Pommerehn | Charlotte Kelly |
| CONSUMER BANKERS | NORTON ROSE FULBRIGHT US LLP |
| ASSOCIATION | Frost Tower |
| 1225 I Street, N.W., #550 | 111 W. Houston Street, Suite 1800 |
| Washington, D.C.  20005 | San Antonio, TX 78205 |
| (202) 552-6368 | (210) 270-9329 |
| | |
| August 5, 2024 | *Counsel for Amici Curiae* |

29

## CERTIFICATE OF COMPLIANCE

**9th Cir. Case Number:** 24-2355

I am the attorney or self-represented party.

**This brief contains 6486 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ *Jonathan S. Franklin*_____    **Date** August 5, 2024_____

30

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 5th day of August, 2024, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, and caused a copy of the foregoing to be electronically served on the following:

Jade A. Craig
Jade A. Craig, P.A.
1048 S. Clearview Avenue, #3
Tampa, Florida 33629
(813) 459-1309

Jonathan K. Youngwood
Meredith Karp
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-2000

*Counsel for Plaintiff-Appellant*

*Counsel for Defendant-Appellee*


/s/ *Jonathan S. Franklin*
Jonathan S. Franklin

*Counsel for Amici Curiae*

31