No. 24-2355

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

PAYSERVICES BANK,

*Plaintiff-Appellant*,

v.

FEDERAL RESERVE BANK OF SAN FRANCISCO,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Idaho
No. 1:23-cv-305

BRIEF FOR AMICUS CURIAE BOARD OF GOVERNORS
OF THE FEDERAL RESERVE SYSTEM

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel
Katherine Pomeroy, Senior Counsel
Board of Governors of the Federal Reserve System
20th Street & Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 912-4329

*Attorneys for Amicus Curiae Board of Governors of
the Federal Reserve System*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

INTEREST OF *AMICUS CURIAE* ........................................................ 1

ARGUMENT ................................................................................. 1

I.      THE BOARD DID NOT DELEGATE MASTER ACCOUNT
AUTHORITY TO RESERVE BANKS ............................................... 4

      A.    Congress granted the authority to open and manage
accounts held by depository institutions directly to
Reserve Banks ...................................................................... 4

      B.    The Board's master account Guidelines do not reflect a
delegation of Board authority ................................................ 7

II.     RESERVE BANKS HAVE ALWAYS ASSESSED RISKS
WHEN PROVIDING ACCOUNTS AND SERVICES TO
DEPOSITORY INSTITUTIONS ....................................................... 9

      A.    Reserve Banks consistently exercised discretion over
access to accounts and services between 1913 and
1980 ................................................................................... 10

      B.    Reserve Banks have continued to exercise discretion
over accounts and services for all institutions
between the enactment of the Monetary Control Act
in 1980 and the present ...................................................... 15

III.    ELIMINATING RESERVE BANK DISCRETION RISKS
SUBSTANTIAL NEGATIVE IMPACT TO THE FINANCIAL
SYSTEM ................................................................................. 22

CONCLUSION ............................................................................. 26

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## Cases

*Banco San Juan Internacional, Inc. v. Federal Reserve Bank of New York*, No. 23-cv-6414, 2023 WL 7111182 (S.D.N.Y. Oct. 27, 2023) ........................................ 2, 5, 21, 24, 25, 26

*Bank Stationers Association, Inc. v. Board of Governors of the Federal Reserve System,* 704 F.2d 1233 (11th Cir. 1983) ........................... 17

*Custodia Bank, Inc. v. Federal Reserve Board of Governors,* No. 1:22-cv-125, 2024 WL 1788900 (D. Wyo. Mar. 29, 2024) ........................................................ 2, 5, 22

*Farmers & Merchants Bank v. Federal Reserve Bank of Richmond,* 262 U.S. 649 (1923) ................................................................ 11, 12

*Federal Reserve Bank of St. Louis v. Metrocentre Improvement District,* 492 F. Supp. 353 (E.D. Ark. 1980) .................................................... 4

*In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litigation,* 1 F. Supp. 3d 34 (E.D.N.Y. 2014) ...................................................... 7

*In re TD Bank, N.A.,* 150 F. Supp. 3d 593 (D.S.C. 2015) .................................................... 6

*Jet Courier Services, Inc. v. Federal Reserve Bank of Atlanta,* 713 F.2d 1221 (6th Cir. 1983) ......................................................... 16

## Statutes

12 U.S.C. § 24(first)–(seventh cl. 1) ........................................................ 6

12 U.S.C. § 241-253 ............................................................................. 5

iii

12 U.S.C. § 248(j) ......................................................................... 7

12 U.S.C. § 248(k) ......................................................................... 7

12 U.S.C. § 248a .......................................................................... 22

12 U.S.C. § 248a(a) ....................................................................... 5

12 U.S.C. § 248c .......................................................................... 22

12 U.S.C. § 248c(b)(1) .................................................................. 21

12 U.S.C. § 248c(b)(1)(B)(ii) ......................................................... 22

12 U.S.C. § 248c(3) ....................................................................... 5

12 U.S.C. § 301 ............................................................................. 6

12 U.S.C. § 321 ........................................................................... 11

12 U.S.C. § 341(first)–(seventh) .................................................... 6

12 U.S.C. § 341(sixth) ................................................................... 6

12 U.S.C. § 341(seventh) ............................................................... 6

12 U.S.C. §§ 341-361 .................................................................... 5

12 U.S.C. § 342 ................................................................ 2, 4, 5, 10, 20

12 U.S.C. § 343 ............................................................................. 4

12 U.S.C. § 347 ............................................................................. 4

12 U.S.C. § 347c ........................................................................... 4

12 U.S.C. § 347d ........................................................................... 4

iv

12 U.S.C. § 355(1) ............................................................................4

Idaho Stat. § 28-3-102(3) ................................................................19

Idaho Stat. § 28-4-103(3) ................................................................19

Idaho Stat. § 28-4-607 .....................................................................19

U.C.C. § 3-102(c) ............................................................................19

U.C.C. § 4-103(c) .......................................................................19, 20

U.C.C. § 4A-107 ..............................................................................19

Federal Reserve Act of 1913, 12 U.S.C. § 221 *et seq*,
    Pub. L. No. 63-43, 38 Stat. 251 ...............................................2, 9
    Pub. L. No. 63-43, 38 Stat. 251, 263 ............................................10
    Pub. L. No. 63-43, § 9, 38 Stat. 251, 259 .....................................11
    Pub. L. No. 65-25, § 4, 40 Stat. 232, 234-35 .................................11

International Banking Center Regulatory Act,
    Puerto Rico Act No. 52-1989 (Aug. 11, 1989) https://bvirtualogp.
    pr.gov/ogp/Bvirtual/leyesreferencia/PDF/Y%20-%20Ingl%C3%
    A9s/52-1989.pdf ...........................................................................25

Monetary Control Act of 1980, Pub. L. No. 96-221,
    94 Stat. 132..................................2, 9, 11, 15, 16, 17, 24

Riegle-Neal Interstate Banking and Branch Efficiency Act of 1994,
    Pub. L. No. 103-328, 108 Stat. 2338 .............................................24

**Rules**

Fed. R. App. P. 29(a)(2) .....................................................................1

## Regulatory Materials

Guidelines for Evaluating Account and Services Requests,
  86 Fed. Reg. 25,865 (May 11, 2021) (Proposal) .......................... 7, 8
  87 Fed. Reg. 12,957 (Mar. 8, 2022) (Supplemental Notice) ............ 7
  87 Fed. Reg. 51,099 (Aug. 19, 2022) (Guidelines) ........ 7, 8, 9, 20, 21

Policy Statement Regarding Risks on Large-Dollar Wire
  Transfer Systems, 50 Fed. Reg. 21,120 (May 22, 1985) .......... 17, 18

## Other Authorities

Board of Governors of the Federal Reserve System, Minutes of Board
  Meeting (July 26, 1945), https://fraser.stlouisfed.org/files/docs/
  historical/nara/bog_minutes/19450726_Minutes.pdf .................... 14

Board of Governors of the Federal Reserve System, Federal Reserve
  Bulletin (February 1964), https://fraser.stlouisfed.org/title/federal-
  reserve-bulletin-62/february-1964-21350 ................................ 14, 15

Chester Morrill, Secretary, Board of Governors of the Federal Reserve
  System, *Nonmember Bank Clearing Accounts*, Letter X-9187
  (April 26, 1935), https://fraser.stlouisfed.org/archival-collection/
  mimeograph-letters-statements-board-4957/letter-secretary-
  morrill-re-nonmember-bank-clearing-accounts-505912 .... 12, 13, 14

Department of the Treasury, National Money Laundering Risk
  Assessment (Feb. 2022), https://home.treasury.gov/system/files/
  136/2022-National-Money-Laundering-Risk-Assessment.pdf ...... 25

Federal Deposit Insurance Corporation, *The Banking Crises of the
  1980s and Early 1990s: Summary and Implications*,
  https://www.fdic.gov/bank/historical/history/3_85.pdf .................. 24

Federal Reserve Bank Operating Circular 1, Account Relationships
  (Jan. 2, 1998) web.archive.org/web/20000116011948/http://
  www.frbservices.org/Industry/pdf/Oc1.pdf ............................... 18, 19

vi

Federal Reserve Bank Operating Circular 1, Account Relationships
    (Sept. 1, 2023) https://www.frbservices.org/binaries/content/assets/
    crsocms/resources/rules-regulations/090123-operating-circular-
    1.pdf .................................................................................................. 19

H.R. Report No. 69, 63d Cong., 1st Sess. 16 (1913) .................................. 4

Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and
    Payment Systems*, 2022 draft
    No. 1:22-cv-125 (D. Wyo.), ECF No. 160-1 ..................................... 16

Julie Andersen Hill, *Opening a Federal Reserve Account*,
    40 Yale J. on Reg. 453 (2023) .......................................................... 16

Morgan Ricks, Professor, Expert Report
    No. 1:22-cv-125 (D. Wyo.), ECF No. 240-91 ............................. 23, 24

Office of the Comptroller of the Currency, Interpretive Letter No. 1082,
    2007 WL 5393636 (May 17, 2007) .................................................... 7

The Federal Reserve Board, *Interstate Branching: New Account
    Structure,* https://www.federalreserve.gov/generalinfo/isb/
    qanda.htm ......................................................................................... 11

*The Federal Reserve System, The Fed Explained* (11th ed. Aug. 2021)
    https://www.federalreserve.gov/aboutthefed/files/the-fed-
    explained.pdf#page=8 ........................................................................ 4

## INTEREST OF *AMICUS CURIAE*

The Federal Reserve System is the nation's central bank and consists of *Amicus Curiae* Board of Governors of the Federal Reserve System ("Board"), the Federal Open Market Committee, and twelve regional Federal Reserve Banks that serve financial institutions in their respective districts. The Board is responsible, *inter alia*, for exercising general supervisory authority over Reserve Banks and for promoting the health of the U.S. economy and the stability of the U.S. financial system. As such, the Board has an interest in the proper interpretation of the Federal Reserve Act and in ensuring that Reserve Banks retain discretion over access to Reserve Bank accounts and services given the substantial risks that such access may present to an individual Reserve Bank, to the U.S. payment system, and to the overall economy. The Board is authorized to file this *Amicus Curiae* brief pursuant to Federal Rule of Appellate Procedure 29(a)(2).

## ARGUMENT

PayServices' extraordinary position in this case is that Federal Reserve Banks are statutorily prohibited from conducting any risk assessment of institutions seeking Reserve Bank accounts and services.

1

This is entirely untenable and there is no evidence that Congress intended such an anomalous result through the Monetary Control Act ("MCA") or otherwise. Three district courts have correctly held as such in recent, well-reasoned decisions. First, a judge of the U.S. District Court for the Southern District of New York carefully considered these issues and held that, pursuant to the Federal Reserve Act ("FRA"), "Federal reserve banks are authorized to maintain Master Accounts, but are not required to do so." *Banco San Juan Internacional, Inc. v. Fed. Reserve Bank of N.Y.*, No. 23-cv-6414, 2023 WL 7111182, at *1 (S.D.N.Y. Oct. 27, 2023) (citing 12 U.S.C. § 342). Second, a District of Wyoming judge determined—after an extensive statutory analysis—that "[t]he plain language of the relevant statutes can only reasonably be read to give the Federal Reserve Banks discretion in granting or denying requests for master accounts." *Custodia Bank, Inc. v. Fed. Reserve Bd. of Governors*, No. 1:22-cv-125, 2024 WL 1788900, at *12 (D. Wyo. Mar. 29, 2024). Finally, the district court in this case explained in its careful and persuasive decision why Reserve Banks are authorized (but not required) to open master accounts. ER 21–31.

2

As these decisions make clear, neither the plain text of the MCA nor its purpose—to improve the Federal Reserve's control of the money supply—requires Reserve Banks to ignore risks to themselves, the public, the financial system, or the economy in deference to any individual institution. Rather, Reserve Banks must assess risk in their provision of accounts and services to all institutions and PayServices' contrary contention defies law, reason, and longstanding historical precedent.

*     *     *

Because the brief of Appellee Federal Reserve Bank of San Francisco ("FRBSF") correctly addresses the legal and statutory interpretation questions relevant to this case, the Board limits its participation to underscoring three points for the Court: (1) that PayServices' repeated assertions that the Board "delegated" master account decisions to Reserve Banks is erroneous; (2) that Reserve Banks have, throughout their history, assessed risk in providing accounts and services to depository institutions; and (3) that eliminating Reserve Bank discretion would present substantial risk to the financial system.

3

## I. THE BOARD DID NOT DELEGATE MASTER ACCOUNT AUTHORITY TO RESERVE BANKS

### A. Congress granted the authority to open and manage accounts held by depository institutions directly to Reserve Banks

By Congressional design, Reserve Banks carry out a variety of functions subject to the general supervisory authority of the Board. *See The Federal Reserve System, The Fed Explained* 8, 10–11 (11th ed. Aug. 2021) (the "*Fed Explained*").[1] Most notably for present purposes, Reserve Banks are expressly authorized by statute, not by Board delegation, to perform various functions in their capacity as "bankers' banks." *Fed. Reserve Bank of St. Louis v. Metrocentre Improvement Dist.*, 492 F. Supp. 353, 355 (E.D. Ark. 1980) (quoting H.R. Report No. 69, 63d Cong., 1st Sess. 16 (1913)). These activities include check clearing, wire transfers, automated clearing house ("ACH") services, currency and coin services, and other services appurtenant to the business of banking that Congress vested directly in the Reserve Banks. *See, e.g.*, 12 U.S.C. §§ 342, 343, 347, 347c, 347d, 355(1). As a federal

---

[1] https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf#page=8.

4

agency and not a bank, the Board lacks the ability to carry out such functions.

Reserve Banks—not the Board as PayServices erroneously contends, *see* Appellant Br. at 20, 28—are thus responsible for opening, maintaining, and, when appropriate, terminating accounts (and corresponding services) held by depository institutions. *See* 12 U.S.C. § 342 ("Any *Federal reserve bank <u>may</u>* receive from any of its member banks, or other depository institutions, and from the United States, deposits . . . ."); 12 U.S.C. § 248a(a) ("*Federal Reserve bank* services"); *id.* § 248c(3) ("*reserve bank* master account and services"); *see also Banco San Juan*, 2023 WL 7111182, at *1 ("Congress authorized Federal reserve banks to carry out certain banking functions . . . including the authority to accept or reject deposits from depository institutions"); *Custodia Bank*, 2024 WL 1788900, at *6.[2]

---

[2] Although the Board does not revisit FRBSF's careful and correct statutory analysis here, it bears reiterating that the authority to accept deposits (and therefore to open deposit accounts) is found in the section of the FRA governing "Powers and Duties of Federal Reserve Banks" rather than the section dedicated to the "Board of Governors of the Federal Reserve System." *Compare* FRA Subchapter IX (12 U.S.C. §§ 341–361), *with* Subchapter II (*id.* §§ 241–253).

5

Consistent with the relevant statutory authorities, Reserve Banks necessarily exercise their banking functions with due consideration of attendant risks. *See, e.g.*, 12 U.S.C. § 341 (sixth) (Reserve Banks "shall" have the power to prescribe bylaws "regulating the manner in which its general business may be conducted"); § 341 (seventh) (granting Reserve Banks "such incidental powers as shall be necessary to carry on the business of banking within the limitations prescribed by this chapter"); § 301 (Reserve Banks "*may*, subject to the provisions of law and the orders of the Board of Governors of the Federal Reserve System, extend to each member bank such discounts, advancements, and accommodations as *may be safely and reasonably made*" (emphases added)).

Notably, the powers of Federal Reserve Banks under the FRA were closely modeled on the powers granted to national banks (which previously served some of the functions of Reserve Banks) under the National Bank Act, *compare, e.g.*, 12 U.S.C. § 24(first)–(seventh cl. 1) *with id.* § 341(first)–(seventh), and the power granted under the latter act "to receive deposits" has likewise been construed as "discretionary." *In re TD Bank, N.A.*, 150 F. Supp. 3d 593, 611 (D.S.C. 2015) (quoting

6

OCC Interp. Ltr. No. 1082, 2007 WL 5393636, at *2 (May 17, 2007)); *In re HSBC BANK, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 45 (E.D.N.Y. 2014) (same). Risk assessment and mitigation is a necessary feature of operations at both types of banks.

### B.    The Board's master account Guidelines do not reflect a delegation of Board authority

Although the FRA does authorize the Board to delegate certain of its functions to Reserve Banks, *see* 12 U.S.C. § 248(k), when Reserve Banks exercise powers granted directly to them by Congress the Board exercises only supervisory authority. It cannot make decisions statutorily vested in Reserve Banks, though it may exercise its oversight authority. *See* 12 U.S.C. § 248(j). The Board routinely issues guidance as part of this general supervision of Reserve Banks, and did so with respect to Reserve Bank master accounts and services in August 2022 following two public notice and comment periods spanning fifteen months. *See* 87 Fed. Reg. 51,099, Guidelines for Evaluating Account and Services Requests ("Guidelines") (Aug. 19, 2022); 87 Fed. Reg. 12,957 (Mar. 8, 2022) (Supplemental Notice); 86 Fed. Reg. 25,865 (May

7

11, 2021) (Proposal). The Guidelines set forth six principles[3] for use in access decisions and create a three-tiered review framework that "is meant to serve as a guide to the level of due diligence and scrutiny to be applied by Reserve Banks to different types of institutions." 87 Fed. Reg. at 51,109.

The policy goals for issuing the Guidelines included "ensuring the safety and soundness of the banking system" and "ensur[ing] that Reserve Banks evaluate a transparent and consistent set of factors when reviewing requests for accounts and services." 86 Fed. Reg. at 25,866. When proposing the Guidelines, the Board emphasized that it would not disturb the Reserve Banks' "discretionary authority to grant or deny [account] requests." *Id.* The final Guidelines state that "[d]ecisions on individual requests for access to accounts and services are made by the Reserve Bank in whose District the requestor is

---

[3] The principles articulated in the Guidelines include legal eligibility considerations; whether the provision of an account or services presents or creates undue liquidity, credit, operational, settlement, cyber or other risks to the Reserve Bank, overall payment system, or the stability of the U.S. financial system; whether such provision creates undue risk to the overall economy by facilitating illicit activity such as money laundering or terrorism financing; and that such provision should not adversely affect the Federal Reserve's ability to implement monetary policy. 87 Fed. Reg. at 51,107–09.

located," and, consistent with the FRA, that Reserve Banks "retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated." 87 Fed. Reg. at 51,102, 51,106.

Thus, contrary to PayServices' entirely unsupported suggestion that the "Guidelines indicate that the [Board] *provided* Reserve Banks with the authority to deny master accounts on its behalf," Appellant Br. at 28 (emphasis added), the Board did not—and could not—delegate master account decision-making to the Reserve Banks.

## II.  RESERVE BANKS HAVE ALWAYS ASSESSED RISKS WHEN PROVIDING ACCOUNTS AND SERVICES TO DEPOSITORY INSTITUTIONS

Since the passage of the FRA in 1913, and continuing after the enactment of the MCA in 1980, the Federal Reserve Banks have considered risk in providing their banking services. While PayServices discusses the concept of access to or availability of banking services, (Appellant Br. at 32–37), such access to or availability of banking services has never equated to an absolute, non-discretionary requirement that Reserve Banks provide accounts and services to all

9

requesting institutions, regardless of risk. This extraordinary position defies common sense, the historical record, the text of the statute, and the expectations of Congress.

## A. Reserve Banks consistently exercised discretion over access to accounts and services between 1913 and 1980

Since the enactment of the FRA, the Federal Reserve Banks have exercised discretion in granting access to Reserve Bank accounts and services. This longstanding exercise of discretion is rooted in Congress's general grant of banking authority to Reserve Banks, *see supra* at 4–7, as well as Section 13 of the FRA, which stated from its enactment in 1913 that Federal Reserve Banks "*may* receive" deposits from "member banks." Pub. L. No. 63-43, 38 Stat. 251, 263 (currently codified at 12 U.S.C. § 342) (emphasis added). State-chartered banks became "members" of the Federal Reserve System by "mak[ing] application to the reserve bank organization committee, and thereafter to the Federal Reserve Board for the right to subscribe to the stock of the Federal reserve bank organized or to be organized within the Federal reserve district where the applicant is located," and the Federal Reserve could decide membership based upon "such rules and regulations as it may

10

prescribe." Pub. L. No. 63-43, § 9, 38 Stat. at 259 (currently codified at 12 U.S.C. § 321). In 1917, Congress amended Section 13 to allow limited deposit-taking accounts "solely for the purposes of exchange or collection" from "any nonmember bank or trust company." Pub. L. No. 65-25, § 4, 40 Stat. 232, 234–35.[4]

In 1923, the Supreme Court had occasion to opine on the language in Section 13 regarding check collection, and held that the language granted Reserve Banks discretion. Specifically, in interpreting Section 13's language that a Reserve Bank "may receive from any nonmember bank . . . deposits of checks . . . payable upon presentation," the Court rejected an argument that "the Federal Reserve Bank of Richmond is obliged to receive for collection any check upon any North Carolina state bank." *Farmers & Merchs. Bank v. Fed. Reserve Bank of*

---

[4] These limited "exchange or collection" accounts established at Reserve Banks pursuant to Section 13 were referred to as "clearing accounts." Beginning in 1998, the Federal Reserve no longer used the term "clearing account" and incorporated these accounts into its revised "master account" structure. *See* Federal Reserve Board, *Interstate Branching: New Account Structure*, *available at* https://www.federal reserve.gov/generalinfo/isb/qanda.htm ("All credits and debits resulting from the use of Federal Reserve services will be booked to this one account."). This unified account structure was made possible by the MCA's revision of FRA Section 13 to permit general deposit accounts for non-member depository institutions.

11

*Richmond*, 262 U.S. 649, 662 (1923). The Court noted that Congress had from time to time enlarged "[t]he class of cases" to which the Reserve Banks' authority to receive checks applied, "[b]ut in each amendment, as in section 13, the words used were 'may receive'—words of authorization merely." *Id*. The Court further observed that the FRA "appears to have been drawn with great care. Throughout the act the distinction is clearly made between what the [B]oard and the Reserve Banks 'shall' do and what they 'may' do." *Id*. at 663. The Court listed twenty-one provisions of the original FRA where both "may" and "shall" were used, and another seven where only "shall" was used, to illustrate the precision Congress took in distinguishing actions the Board or Reserve Banks were allowed to take from those they were required to take. *Id*. at 663 n.6.

In 1935, a Reserve Bank raised with the Board "a question of policy with respect to the circumstances and conditions under which clearing accounts of nonmember banks should be accepted under the authority of Section 13 of the Federal Reserve Act." Chester Morrill, Secretary, Bd. of Governors of the Fed. Reserve Sys., Letter X-9187

12

(Apr. 26, 1935), at 365.[5] The Board surveyed Reserve Banks, and many reported that they declined to open such accounts in various circumstances. For example, the Federal Reserve Bank of Dallas reported that "in considering an application from a nonmember bank to become a clearing member we simply weigh all the facts." *Id.* at 371. The Federal Reserve Bank of Minneapolis similarly indicated that it did not automatically open clearing accounts for all nonmember banks: "We have received a number of requests recently to open accounts for non-member banks for the purpose of depositing idle funds with us. . . . We have not accepted these accounts and have endeavored to restrict the accounts to active non-member clearing accounts." *Id.* at 369. And the Federal Reserve Bank of Philadelphia stated that, while it had opened accounts for nonmembers in the past, it had stopped doing so. The Board in no way required that Reserve Banks open these accounts and acknowledged that such decisions were left to the discretion of the Reserve Banks, stating "it is the Board's view that requests for the establishment of clearing accounts by non-member banks should be

---

[5] *Available at* https://fraser.stlouisfed.org/archival-collection/ mimeograph-letters-statements-board-4957/letter-secretary-morrill-re- nonmember-bank-clearing-accounts-505912.

passed upon by your directors *in the light of all the circumstances surrounding each application.*" *Id.* at 366 (emphasis added).

In 1945, the Board was asked by The Peoples Savings Bank in Iowa for a definition of a "nonmember clearing account." Minutes of Board Meeting of July 26, 1945, at 2.[6] The Board unanimously approved a response stating that Section 13 of the FRA "reasonably define[s]" the term, and "the Board has never found it necessary to further define it." *Id.* The Board further indicated that it "has not prescribed specific conditions or requirements which should or should not be made by a Federal Reserve Bank in connection with the opening and maintenance of nonmember clearing accounts," but that a Federal Reserve Bank can "*in its discretion* accept[] such an account." *Id.* at 3 (emphasis added). In a similar vein, in 1964 the Federal Reserve Board received an inquiry about whether branches of foreign banks and private banks were "nonmember banks" eligible to open clearing accounts at Reserve Banks pursuant to Section 13. *Federal Reserve Bulletin* (Feb. 1964), at 168–

---

[6] *Available at* https://fraser.stlouisfed.org/files/docs/historical/nara/bog_minutes/19450726_Minutes.pdf.

69.[7] In response, the Board noted that these entities engaged in
banking activities like those typically performed by commercial banks
and were subject to supervision of state banking regulators. *Id.*
Accordingly, the Board concluded that a foreign bank branch or a
private bank was a "nonmember bank" eligible for a clearing account,
but cautioned that *the opening of such accounts was subject to the
"discretion" of the Federal Reserve Bank* whose district encompassed the
institution. *Id.*

Thus, from the earliest days of the Federal Reserve, the provision
of accounts and services was discretionary. And the Supreme Court
validated early on that, in the various places where Congress used
permissive language in the FRA, including in Section 13, this language
merely provided an *authorization* rather than a requirement.

B. **Reserve Banks have continued to exercise discretion
over accounts and services for all institutions
between the enactment of the Monetary Control Act
in 1980 and the present**

The Federal Reserve's exercise of discretion to protect the
financial system did not change following the enactment of the MCA in

---

[7] *Available at* https://fraser.stlouisfed.org/title/federal-reserve-bulletin-62/february-1964-21350.

15

1980.[8] To facilitate its goal of restoring Federal Reserve control over the money supply, the MCA amended Section 13 to authorize Reserve Banks to open deposit accounts for nonmember depository institutions and provided for a pricing schedule in Section 11A under which corresponding Reserve Bank services would "be made available to non-member depository institutions *at the same fees charged member banks.*" *Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221, 1227 (6th Cir. 1983) (emphasis added). The MCA in no way altered the discretion granted Reserve Banks in Section 13, and in the wake of its passage Reserve Banks continued to consider risk in

---

[8] PayServices relies on a paper from law professor Julie Hill for the premise that, "[f]ollowing the [MCA], . . . Federal Reserve Banks opened accounts with little independent investigation as to the riskiness of the applicant." Appellant Br. at 6 (citing Julie Anderson Hill, *Opening a Federal Reserve Account*, 40 Yale J. on Reg. 453 (2023)). But an earlier version of the article posted by Professor Hill in 2022 stated otherwise, observing that "*since the passage of the [MCA], the Federal Reserve Board and Reserve Banks have evaluated risks associated with providing account and payment services to individual banks.*" *See* Julie Andersen Hill, *Bank Access to Federal Reserve Accounts and Payment Systems* (2022 draft), *available at Custodia Bank*, No. 1:22-cv-125, ECF No. 160-1 (emphasis added). Moreover, as discussed below, master account requests from novel, uninsured institutions presenting unique risks have proliferated in recent years.

16

making decisions about access to accounts and services.[9]

For example, in 1985, the Federal Reserve adopted policies on overdrafts that limited some depository institutions' ability to send payments via Fedwire. *See Policy Statement Regarding Risks on Large-Dollar Wire Transfer Systems*, 50 Fed. Reg. 21,120 (1985). In the ordinary course of their businesses, banks may incur negative balances in their master accounts when processing funds transfers on behalf of their customers. There was concern "that a participant could be unwilling or unable to settle a large net debit position," and that "[a]

---

[9] PayServices' recitation of *Bank Stationers Ass'n, Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 704 F.2d 1233 (11th Cir. 1983), Appellant Br. at 12, does not demonstrate any historical inconsistency with the Board's position. There, the Board explained that "the language and legislative history of [the MCA] evince an intent to provide nonmember financial institutions access to Federal Reserve services . . . ." 704 F.2d at 1236 (holding that the producers of a component used in providing a payments mechanism did not fall within the MCA's zone of interests). This is a true statement that does nothing to support PayServices' assertion that all financial institutions may have automatic, unfettered access to Federal Reserve accounts and services regardless of the risks presented. Reliance on similarly worded statements from Board websites that payment services "are *available* to all depository institutions" and that the MCA "gave all depository institutions *access* to the Federal Reserve's payment services," Appellant Br. at 12 (emphases added), in no way speaks to whether the possibility of such availability and access amount to a discretionless mandate.

failure of one participant to settle could seriously jeopardize the financial positions of its net creditors on that network, with serious repercussions spreading from those participants to their creditors." *Id.* at 21,121. To limit the risk of overdrafts, the policy validated that each Reserve Bank had the power "to reject funds transferred" when those transfers "expose[d] the Reserve Bank to excessive risk." *Id.* at 21,124. And in certain cases, a Reserve Bank could "prohibit [an institution] from using Fedwire." *Id.* Thus, an institution's "access" to this Federal Reserve service was explicitly conditioned on risk in accordance with the authority provided by Congress in the FRA.

In 1998, the Federal Reserve Banks began issuing circulars governing the relationship between a Reserve Bank and a master account holder. These circulars make clear that a master account involves a contract between a depository institution and the Reserve Bank and that the Reserve Bank can terminate the relationship at any time. For example, the 1998 Operating Circular 1 "establish[es] the terms for opening, maintaining, and terminating master accounts with the Federal Reserve Bank." Operating Circular 1, Account

18

Relationships (Jan. 2, 1998) ¶ 1.1.[10] In addition, the Circular states that "*[a]ll master accounts* are subject to Reserve Bank approval," *without distinguishing between member or nonmember banks*, and notes that the Reserve Bank "may close your master account . . . at any time but will endeavor to give at least five business days' prior notice." *Id.* ¶¶ 2.3, 2.8. Both of these provisions are substantively similar to the comparable provisions in the most recent operating circular, reflecting the longstanding practice in which decisions about all master accounts are made by Reserve Banks based on their exercise of discretion. *See* Operating Circular 1, Account Relationships (Sept. 1, 2023) ¶¶ 1.0, 2.6, 2.10.[11]

---

[10] *Available at* web.archive.org/web/20000116011948/http://www.frbservices.org/Industry/pdf/Oc1.pdf.

[11] *Available at* https://www.frbservices.org/binaries/content/assets/crsocms/resources/rules-regulations/090123-operating-circular-1.pdf. Notably, Federal Reserve Operating Circulars have been expressly incorporated into the Uniform Commercial Code and Idaho law. *See, e.g.*, U.C.C. § 3-102(c) & Idaho Stat. § 28-3-102(3) (noting, with respect to negotiable instruments, that "[r]egulations of the board of governors of the federal reserve system and operating circulars of the federal reserve banks supersede any inconsistent provision of this chapter to the extent of the inconsistency"); U.C.C. § 4A-107 & Idaho Stat. § 28-4-607 (same with respect to funds transfers); U.C.C. § 4-103(c) & Idaho Stat. § 28-4-103(3) (noting, with respect to bank deposits and

19

More recently, the growth of novel charters and rise of uninsured depository institutions led the Federal Reserve Board to establish more formalized processes to manage risk through its Guidelines. *See supra* at 3. Consistent with 12 U.S.C. § 342, the Board's Guidelines continued to "make clear that legal eligibility does not bestow a right to obtain an account and services." 87 Fed. Reg. at 51,106. Rather, the Board emphasized that "Reserve Banks . . . retain the discretion to deny a request for access to accounts and services where, in the Reserve Bank's assessment, granting access to the institution would pose risks that cannot be sufficiently mitigated." *Id.* at 51,102. The Board emphasized that, even when access is granted, the Reserve Bank "may impose (at the time of account opening, granting access to service, or any time thereafter) obligations relating to, or conditions or limitations on, use of the account or services as necessary to limit operational, credit, legal, or other risks posed to the Reserve Banks, the payment system, financial stability or the implementation of monetary policy or to address other considerations." 87 Fed. Reg. at 51,106–07. However, "[i]f the

---

collections, that "[a]ction or non-action approved by this Article or pursuant to federal reserve regulations or operating circulars" constitutes "the exercise of ordinary care").

obligations, limitations, or controls are ineffective in mitigating the
risks identified or if the obligations, limitations, or controls are
breached, the account-holding Reserve Bank may further restrict the
institution's use of accounts and services or may close the account." *Id.*
at 51,107.

As this historical record makes clear, Reserve Banks have always
exercised discretion to make risk-based account and services decisions
in furtherance of the stability of the U.S. financial and payment
systems. There is no evidence that Congress intended otherwise.[12]

---

[12] Not surprisingly given this historical backdrop, Congress recently
recognized, in a law enacted in 2022, that requests for master accounts
and services from "a depository institution that is not an insured
depository institution"—a category that includes PayServices—may be
"rejected." 12 U.S.C. § 248c(b)(1); *cf.* Appellant Br. at 14–15 (describing
the law's disclosure requirements, though inaccurately expressing it as
an obligation to report "decisions *the board* has reached on such
applications" (emphasis added)). If it were the case that the granting of
a master account to depository institutions is purely ministerial under
the FRA, then Congress could have readily clarified that expectation
during its recent legislation on the issue of master accounts given its
clear awareness of the Board's Guidelines. *See Banco San Juan*, 2023
WL 7111182, at *7 (holding that the recent FRA amendment "confirms
that Federal reserve banks may 'reject' [master account] applications"
by requiring the Board to create a searchable database that includes,
*inter alia*, "rejected" applications (quoting statute)). Regardless of the
purpose of the provision, it would be odd for Congress to contemplate
that master account requests by depository institutions may be

21

III.  **ELIMINATING RESERVE BANK DISCRETION RISKS SUBSTANTIAL NEGATIVE IMPACT TO THE FINANCIAL SYSTEM**

Considering risks in providing access to Reserve Bank accounts and services is not merely an academic exercise; the failure to do so could lead to significant negative consequences to the financial system. As detailed by Judge Skavdahl in the *Custodia Bank* decision, a determination that Reserve Banks lack discretion over the opening of master accounts would result in individual state and territorial chartering provisions serving as "the only layer of insulation for the U.S. financial system," in which "one can readily foresee a 'race to the bottom' among states and politicians to attract business by reducing state chartering burdens through lax legislation, allowing minimally regulated institutions to gain ready access to the central bank's balance sheet and Federal Reserve services." *Custodia Bank*, 2024 WL 1788900, at *12.

---

"rejected" in the newly enacted section 248c, while ignoring just two sections away (in section 248a) a purported Congressional mandate that they be granted in every instance. *Custodia Bank*, 2024 WL 1788900, at *11 ("To avoid immediately rendering the 'rejected' option of § 248c(b)(1)(B)(ii) meaningless, the Court must conclude the Federal Reserve Banks were not stripped of their discretion to deny master account applications.").

22

Indeed, as further explained in an expert report submitted by Professor Morgan Ricks in that case, *see Custodia Bank*, No. 1:22-cv-125, ECF No. 240-91, if a judicial ruling required a Federal Reserve Bank to grant access to each and every chartered entity, regardless of risk, the adverse consequences could be dramatic:

- A state or territory might seek to win market share in digital asset or other financial businesses by enacting a "free banking" statute with no regulatory apparatus or supervision whatsoever. In such a situation, totally unregulated institutions would gain access to Federal Reserve accounts and services, with potentially devastating consequences to financial stability, monetary policy implementation, money laundering, and terrorism financing. *Id.* at 18.

- A state or territory might enact a "self-depository" statute that allowed any individual or entity, from the United States or from abroad, to establish, for a small fee, an unregulated and unsupervised "bank" subsidiary to hold its own cash. In such a situation, the Federal Reserve would be bombarded with master account requests from individuals or entities, both domestic and foreign, including anyone who wanted to use the account for illicit purposes. *Id.*

- Credit risks would be significantly heightened if the Federal Reserve was put in the position of extending credit to unsound institutions. *Id.* at 12–14. For example, risky institutions might incur negative balances in their master accounts when processing funds transfers on behalf of their customers, and there also may be mismatches in check clearing operations. Such conduct could lead to large losses borne by the Federal Reserve, ultimately resulting in lower earnings being remitted to the Treasury. *Id.* at 13.

Professor Ricks also addressed the important adverse monetary policy implications presented by potential new business models. *Id.* at 15. And he correctly concluded that, "if the Fed lacked any discretionary authority over access to master accounts and related services, federal law enforcement and counterterrorism efforts could be hindered," and there would likely be substantial "negative consequences for the Fed, the financial system, and the American public." *Id.* at 12–13, 17. Such consequences would go far beyond any conceivable intention of the Congress that passed the MCA.[13]

A compelling example of the need to allow Reserve Banks to make risk-based determinations was recently considered in the *Banco San Juan* case described above. After the Federal Reserve Bank of New York ("FRBNY") made the decision to terminate the master account of Banco San Juan Internacional, Inc. ("BSJI"), a Puerto Rican bank, the

---

[13] It bears noting that the MCA was passed during a time of traditional, insured depository institutions operating within the bounds of a single state. Interstate banking was not enabled until the enactment in 1994 of the Riegle-Neal Interstate Banking and Branch Efficiency Act. *See* FDIC, *The Banking Crises of the 1980s and Early 1990s: Summary and Implications*, at 11, *available at* https://www.fdic.gov/bank/historical/history/3_85.pdf.

24

institution sued.[14] The court refused to halt the master account closure, noting that "BSJI's specific and numerous risk factors justif[ied] the FRBNY's decision to close BSJI's Master Account." *Banco San Juan*, 2023 WL 7111182, at *11 (citations omitted). In particular, the court observed that "FRBNY's Compliance Office found a significant number of red flags identified in BSJI's transaction activity." *Id.* (citations omitted). The court determined that the FRBNY was justified in seeking to close a risky master account:

> Accepting deposits from and providing financial services to a financial institution with BSJI's record of noncompliance exposes the FRBNY and the financial system to risk. This harm is not just to the FRBNY, but to the fiscal system, because "federal reserve banks are not operated for the profit of shareholders; rather, they were created and are operated in furtherance of the national fiscal policy." Moreover,

---

[14] BSJI is an international banking entity ("IBE"), a type of banking entity chartered by Puerto Rico that first became allowed in 1989. *See* International Banking Center Regulatory Act, Puerto Rico Act No. 52-1989 (Aug. 11, 1989), *available at* https://bvirtualogp.pr.gov/ogp/Bvirtual/leyesreferencia/PDF/Y%20-%20Ingl%C3%A9s/52-1989.pdf. By law, IBEs generally cannot provide services to Puerto Rican residents; they may take deposits and offer loans only to nonresident customers and foreign business entities. The Treasury Department has warned that IBEs operating under this charter are "attractive money laundering vehicles, potentially allowing nefarious actors to misuse them to facilitate illicit financial activity." National Money Laundering Risk Assessment (Feb. 2022), at 69, *available at* https://home.treasury.gov/system/files/136/2022-National-Money-Laundering-Risk-Assessment.pdf.

> maintaining a Master Account with an entity that the FRBNY concluded posed an undue risk of "activities such as money laundering, economic or trade sanctions violations, or other illicit activity," implicates the Federal Reserve in BSJI's questionable transactions.

*Id.* at *12 (citations omitted). Thus, as the court concluded, "granting BSJI's motion for emergency relief [to stop the account closure] would place the public in harm's way." *Id.*

PayServices' attempt to disrupt longstanding practice and introduce unprecedented risk into the financial system should likewise be rejected.

## CONCLUSION

Reserve Banks do not have a ministerial mandate to open a master account for each and every depository institution that desires one. Allowing any institution to receive and maintain a master account, regardless of the risks its presents, is a truly extraordinary proposition. Because this position is unsupported by the text or history of the FRA, the Board respectfully urges the Court to affirm the judgment of the district court.

DATED: August 5, 2024

Respectfully submitted,

/s/ Katherine Pomeroy

Mark Van Der Weide, General Counsel
Richard M. Ashton, Deputy General Counsel
Joshua P. Chadwick, Senior Special Counsel
Katherine Pomeroy, Senior Counsel
Board of Governors of the Federal Reserve System
20th Street & Constitution Avenue, N.W.
Washington, D.C. 20551
Tel. No. (202) 912-4329
Fax No. (202) 736-5615
katherine.pomeroy@frb.gov

*Attorneys for Amicus Curiae Board of Governors of the Federal Reserve System*

# CERTIFICATE OF COMPLIANCE

9th Cir. Case Number: 24-2355

I am the attorney or self-represented party.

**This brief contains 5,403 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    [ ] it is a joint brief submitted by separately represented parties;

    [ ] a party or parties are filing a single brief in response to multiple briefs; or

    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** /s/ *Katherine Pomeroy*      **Date** August 5, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2024, I electronically filed the foregoing using the Court's electronic filing system, which will send notification of such filing to all parties of record.

/s/ Katherine Pomeroy

Katherine Pomeroy

*Attorney for Amicus Curiae Board of Governors of the Federal Reserve System*