No. 24-2355
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

PAYSERVICES BANK,

*Plaintiff-Appellant*,

v.

FEDERAL RESERVE BANK OF SAN FRANCISCO,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Idaho
No. 1:23-cv-00305-REP
Hon. Raymond E. Patricco, Jr.
_____

**APPELLANT'S REPLY BRIEF**
_____

Jade A. Craig, Esq.
Jade A. Craig, P.A.
1048 S. Clearview Avenue, #3
Tampa, Florida 33629
Telephone: (813) 459-1309
jade@jadeacraigpa.com

*Attorney for Appellant*
PayServices

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ................................................................................1

ARGUMENT ......................................................................................5

 I. The plain text of the Federal Reserve Act does not lead to the result provided by the Guidelines. ...............................................................5

  A. FRBSF's interpretation of the FRA is inconsistent with respect for the nation's dual banking system. .......................................14

 II. The Guidelines are not entitled to deference in light of the overruling of *Chevron*. ...............................................................17

 III. Congress has not authorized FRBSF to police eligible depository institutions by denying initial master account applications. ...............24

 IV. FRBSF has failed to establish that it is not an "agency" within the meaning of the apa. ..............................................................26

CONCLUSION ...................................................................................29

# TABLE OF AUTHORITIES

## Cases

*Banco San Juan Internacional, Inc. v. Federal Reserve Bank of New York*, 700 F. Supp. 3d 86 (S.D.N.Y. 2023) ...............................................................7, 25

*Calif. All. of Child & Fam. Servs. v. Allenby*, 589 F.3d 1017 (9th Cir. 2009) ........11

*Cantero v. Bank of America, N.A.*, 144 S. Ct. 1290 (2024).......................... 4, 14, 15

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).......................................................................................3, 17

*Davies Warehouse Co. v. Bowles*, 321 U. S. 144 (1944) .......................................20

*Decatur v. Paulding*, 39 U.S. 497 (1840) ...............................................................20

*Fejes v. Fed. Aviation Admin.*, 98 F.4th 1156 (9th Cir. 2024) ................................7

*Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017) ................................................4, 8

*Hart v. Massanari*, 266 F.3d 1155 (9th Cir. 2001) .....................................7

*Kingdomware Techs., Inc. v. United States*, 579 U.S. 162 (2016) ...........................7

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) ............................................. ……………………...3, 4, 17, 18, 19, 20, 22, 23, 24

*Maine Cmty. Health Options v. United States*, 590 U.S. 296 (2020) .......................7

*Marbury v. Madison*, 1 Cranch 137 (1803) .................................................19

*McCulloch v. Maryland*, 4 Wheat. 316 (1819) ............................................19

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366 (2018).....................13

*NASD Disp. Resol., Inc. v. Jud. Council of State of Cal.*, 488 F.3d 1065 (9th Cir. 2007) .............................................................7

*NLRB v. Noel Canning*, 573 U.S. 513 (2014)...............................................19

*Perez v. Mortgage Bankers Ass'n*, 575 U. S. 92 (2015)........................................22

*Rocap v. Indiek*, 539 F.2d 174 (D.C. Cir. 1976)................................................ 28, 29

*Rudisill v. McDonough*, 601 U.S. 294 (2024) ..........................................13

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168 (1975)..........27

*Skidmore v. Swift & Co.*, 323 U. S. 134 (1944) ........................................21

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)............................................ 27, 28

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) ..........................................22

*West Virginia v. EPA*, 597 U.S. 697 (2022) ................................................24

## Statutes

12 U.S.C. § 248 .............................................................................. 12, 28

12 U.S.C. § 248a ........................................................... 5, 6, 8, 9, 10, 12, 13, 24

12 U.S.C. § 248c ........................................................................ 9, 10, 12, 13

12 U.S.C. § 25b .................................................................................15

12 U.S.C. § 341 .................................................................................27

12 U.S.C. § 342 ................................................................... 6, 8, 9, 10

12 U.S.C. § 632 .................................................................................27

5 U.S.C. § 551 ..................................................................................27

5 U.S.C. § 552 ..................................................................................28

5 U.S.C. § 706 ..................................................................................23

Idaho Stat. § 26-1806 .......................................................................16

Idaho Stat. § 26-217 .........................................................................16

James M. Inhofe National Defense Authorization Act for Fiscal Year 2023, Pub. L. 117-263, Div. E, Title LVII, § 5708, Dec. 23, 2022, 136 Stat. 3419 .............9

**Other Authorities**

*118th Annual Report*, Idaho Dep't of Finance (2023), https://www.finance.idaho.gov/wp-content/uploads/about/Annual-Reports/dor-ar-2023.pdf ..................................................................26

*Circular file*, The Britannica Dictionary, Encyclopaedia Britannica (2024), https://www.britannica.com/dictionary/circular-file .....................................11

*Deny*, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/reject (last visited Aug. 13, 2024)...........................11

*Deny*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (1986) ...............................................................11

Idaho Dep't of Finance, https://www.finance.idaho.gov/ (last visited Aug. 15, 2024) ................................................................................26

Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. 453, 456 (2023)..........................................................................3

*Reject*, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/reject (last visited Aug. 13, 2024) ................................................................................11

*Reject*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (1986) ................................................................................11

iv

**Treatises**

RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 1.2 (5th ed.) (2010) ...27

**Regulations**

31 C.F.R. § 1010.100 ................................................................................25

Guidelines for Evaluating Account and Services Requests ("Guidelines"), 87 Fed.
    Reg. 51,099 (Aug. 19, 2022) .................... 3, 12, 14, 15, 18, 19, 20, 22, 23, 29

*Reserve Requirements of Depository Institutions*, 88 Fed. Reg. 83316 (Nov. 29,
    2023) ............................................................................................16

## INTRODUCTION

From the start of Appellee Federal Reserve Bank of San Francisco's ("FRBSF") answer brief, it reaches outside the record – and notably does not attempt to cite the record – to support divert attention from the legal issues in the case. FRBSF casts aspersions by emphasizing that PayServices Bank ("PayServices") is an online bank with no physical branches. Answer Brief ("AB"), 1 & 14. It suggests that PayServices' founder lives in Florida when the Complaint alleges that *one of the* founders is a Florida resident who obtained intervention from Florida Sen. Marco Rubio's office, which ultimately ended FRBSF's stalling and led to a decision on PayServices' application. *Cf.* (AB, 14) & ER-56, ¶ 40. The references present PayServices as a shadowy figure with an out-of-state relationship to back up FRBSF's unfounded allegations of "undue risk."

FRBSF also argues issues outside of the four corners of the complaint, further emphasizing the need to reverse the District of Idaho's dismissal of this case and to develop the factual record below to test the veracity of FRBSF's claims about PayServices Bank's business model. FRBSF comments on the structure of the business as problematic because it involves "cross-border transactions." (AB, 1) U.S. banks regularly complete "cross-border transactions" involving domestic exporters and foreign governments. The Complaint does not discuss transactions "between domestic exporters and foreign governments," as FRBSF incorrectly

suggests. (*Id*.). Rather, the district court recognized that PayServices provides "payment processing to foreign merchants, buyers, and governments" rather than operating as a lender. Principal Brief ("PB"), 3 (citing ER-18). Of course, the countries include the United States and other nations – not including Pakistan, Nigeria, and Egypt, the terrorist hot spots which are home to the foreign retail banks with which FRBSF works, a fact which its answer brief does not deny.

FRBSF has pointed to no evidence in the record to support the claim that PayServices' business model or operations would "pose undue risk, including risk of money laundering and terrorism financing." It cannot do so because it prevented the development of the record on this matter by filing the motion to dismiss, which the Court granted. Nonetheless, it suggests that PayServices should rely on a "private bank as an intermediary" instead of obtaining the master account to access Federal Reserve bank services to which it is entitled as an eligible institution with no history of wrongdoing. (AB, at 1) The suggestion is not unlike claiming that, despite the fact that a woman has a right to vote under the Nineteenth Amendment to the U.S. Constitution, she should instead exercise her right through her husband voting on her behalf as her "intermediary."

FRBSF proudly refers to an evaluation process that took nine months. (AB, 1). Yet the process of applying for a master account normally took involves a decision within 30 days at the most, and where prior versions of Federal Reserve

2

System Board of Governors ("Board" or the "Fed") operating procedures indicated it would take 5-7 business days. *See* ER-56; Julie Andersen Hill, *Opening A Federal Reserve Account*, 40 Yale J. on Reg. 453, 456 (2023).

PayServices filed a three-count complaint, with counts that were not plead in the alternative, as FRBSF suggests. (AB, 3) The district court incorrectly concluded that FRBSF has discretion to deny master accounts. Section 342 of the Federal Reserve Act ("FRA") is not "the only statutory provision that governs FRBSF's administration of master accounts." (AB, 3) It does not even refer to master accounts, much less serve as the only provision that governs them. Section 248a is more than a "price discrimination provision[.]" (AB, 3) The provision directs that the Board "shall" provide access to Federal Reserve services, and the Board delegated that duty to FRBSF pursuant to 12 U.S.C. 248(k) - subject to the Administrative Procedure Act ("APA").

FRBSF's position and reliance on the Guidelines for Evaluating Account and Services Requests ("Guidelines"), 87 Fed. Reg. 51,099 (Aug. 19, 2022), to support its interpretation of the Federal Reserve Act runs counter to the U.S. Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), which overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The Court decided *Loper Bright* on June 28, 2024, after PayServices filed its initial brief and a month before FRBSF filed its brief. Yet

3

FRBSF's brief ominously fails to address *Loper Bright*'s impact on FRBSF's position.

The Supreme Court also affirmed in a unanimous decision the dual banking system and respect for state-chartered banks in *Cantero v. Bank of America, N.A.*, 144 S. Ct. 1290 (2024). The Court also decided the case between the filing of the briefs, on May 30, 2024, almost two months before FRBSF filed its brief. Yet, FRBSF does not address *Cantero*, perhaps because the Guidelines also run counter to *Cantero*'s principles.

The three federal courts that have held that Reserve Banks have discretion under section 342 to deny master accounts are all district courts with different factual and procedural circumstances. Only one of those courts was in the Ninth Circuit - the court below in this case. The only appeals court judge that has opined on the same question - the 10th Circuit in *Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d 1052 (10th Cir. 2017) (Bacharach, J., concurring) – ruled the opposite way.

The statutory scheme taken as a whole, the Reserve Banks' longstanding practice, and Congress's amendment to the FRA confirm exactly the opposite of what FRBSF has argued. FRBSF has argued that it has the "discretion (and, in fact, an obligation) to deny master account requests from institutions that pose undue risk to the Federal Reserve System." (AB, 3) FRBSF has framed the question to

4

presuppose the answer. The issue is whether it can deny accounts to eligible depository institutions where there is no statutory mandate to police "undue risk" prior to issuing an account. The termination of the case on a motion to dismiss also seeks to evade judicial review as to whether FRBSF's determination that PayServices Bank in particular poses an "undue risk," a determination that is inconsistent with the APA and makes FRBSF, as an arm of the executive branch, unaccountable.

## ARGUMENT

## I.  THE PLAIN TEXT OF THE FEDERAL RESERVE ACT DOES NOT LEAD TO THE RESULT PROVIDED BY THE GUIDELINES.

The analysis of whether an eligible nonmember bank must have access to a master account where it has a right to access Federal Reserve bank services begins with 12 U.S.C. § 248a. FRBSF describes the provision as a requirement "to offer . . . services to nonmember and member banks at the same price." (AB, 2). This description, however, is inconsistent with the breadth of the text.

The district court improperly narrowed the meaning of the text at Section 248a of the Federal Reserve Act. The court reduced the statutory section to a "fee schedule" when it does not provide a fee schedule at all. *See* ER-30. Rather, it sets the terms under which the Fed must make bank services available to eligible nonmember depository institutions. Likewise, FRBSF has attempted to cabin the

5

mandate that provides access to Federal Reserve services for eligible depository institutions by continually minimizing it as a "price discrimination provision." (AB, 3, 15, 18 & 25).

Section 248a(c)(2), however, makes two pronouncements:

All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

12 U.S.C. § 248a(c)(2).

First, "[a]ll Federal Reserve bank services covered by the covered by the fee schedule ***shall be available*** to nonmember depository institutions[.]" *Id*. (emphasis). The second and separate requirement is that "such services shall be priced at the same fee schedule applicable to member banks[.]" *Id*. The first provision provides a mandate to make the services available. The second element is the so-called "price discrimination provision."

FRBSF relies on the term "may" in 12 U.S.C. § 342 claiming that its statement that it may "receive . . . deposits" only in certain forms carries the discretion to deny master accounts to eligible banks. Contrary to this interpretation, the directive "shall" in Section 248a cannot be skirted. "The first sign that the statute imposed an obligation is its mandatory language: 'shall.' 'Unlike the word "may," which implies discretion, the word "shall" usually connotes a requirement.'" *Maine Cmty. Health*

6

*Options v. United States*, 590 U.S. 296, 310 (2020) (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016)). *See also, e.g.*, *Fejes v. Fed. Aviation Admin.*, 98 F.4th 1156, 1162 (9th Cir. 2024) ("When a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty.") (also quoting *Kingdomware*).

FRBSF cites two district court decisions that support its interpretation of the FRA. (AB, 21-22). Both, however, are outside of the Ninth Circuit and have no binding or precedential value for this court. *See NASD Disp. Resol., Inc. v. Jud. Council of State of Cal.*, 488 F.3d 1065, 1069 (9th Cir. 2007); *Hart v. Massanari*, 266 F.3d 1155, 1174 (9th Cir. 2001) (noting that "the binding authority principle applies only to appellate decisions, and not to trial court decisions"). The decision in *Banco San Juan Internacional, Inc. v. Federal Reserve Bank of New York*, 700 F. Supp. 3d 86 (S.D.N.Y. 2023), is also distinguishable because it involves the revocation of a master account after multiple findings of wrongdoing by law enforcement agencies against the entity. It did not involve the issuance of an account to provide access to Federal Reserve services from an initial applicant with no history of misconduct.

By contrast, FRBSF dismisses the opinion of a federal appeals court judge on the Tenth Circuit in the only appeals court opinion to address this specific question. *See Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*, 861 F.3d

1052, 1068 (10th Cir. 2017) (Bacharach, J., concurring) (concluding that the district court in *Fourth Corner* "properly rejected" that the Reserve Bank had discretion to deny accounts under 12 U.S.C. § 342 "for § 248a(c)(2) unambiguously entitles Fourth Corner to a master account"). Section 342 states, in relevant part: "Any Federal reserve bank may receive from any of its member banks, or other depository institutions . . . deposits of current funds in" specified forms. From this language, FRBSF concludes that "[t]he Reserve Banks' discretion to receive deposits includes the discretion to decline deposits." (AB, 22) Then, it cites to one document by the Board from 1964 interpreting the statute to support the argument that the discretion to open "depository account[s] necessarily flow[s] from the authority to accept deposits." (AB, 23).

This single Board interpretation was issued prior to the passage of the Monetary Control Act of 1980 ("MCA"), which brought nonmember depository institutions into the Federal Reserve System by granting them access to Federal Reserve bank services on equal terms as member banks. It also does not displace the consistent history of pronouncements from the Board providing access to accounts for eligible nonmember banks that followed the MCA until recently. (*See* PB, 12-13) (from 1984 through 2016). In short, Section 342 applies to discretion to "receive . . . deposits" if they take certain forms. It does not speak to "services" Congress requires "shall be provided" at 12 U.S.C. § 248a(c)(2), or to accounts which are

8

required to access those services. "Deposits" are not "services", and they are not "accounts" that carry those services.

Section 248c, which Congress adopted and which President Biden signed into law in December 2022, supports this interpretation. *See* Pub. L. 117-263, Div. E, Title LVII, § 5708, Dec. 23, 2022, 136 Stat. 3419. For the first time, Congress defined the term "master account," which still appears nowhere in Section 342. This definition, however, addresses both FRBSF's focus on "deposits" in Section 342 and PayServices' emphasis on "services" in Section 248a.

> The term "reserve bank master account and services" means an account in which a Federal reserve bank—
> (A) receives *deposits* for an entity other than an official accountholder; or
> (B) provides *any service under section 248a(b)* of this title to an entity other than an official accountholder.

12 U.S.C. § 248c(a)(3) (emphasis added).

It specified the intrinsic relationship between the master account and the services that "shall be available" to eligible nonmember banks. Congress established two things: (1) that the Federal reserve banks – not the Board – provide the services specified in Section 248a(b) that "shall be available" in accordance with Section 248a(c)(2); and (2) that the account is tied to those services because the account is the place "in which a Federal reserve bank . . . provides" the services. Thus, one needs the account to receive the services to which one is entitled. This same account,

9

in accordance with Section 248c(3)(A) "receives deposits" or "provides any service" listed in Section 248a – but those roles for the account are separate.

While FRBSF may decline to "receive . . . deposits" for the reasons set out in Section 342, that authority does not override the obligation to grant the account that "provides any service" that "shall be available" to eligible banks. *See* 12 U.S.C. §§ 248a(c)(2) & 248c(3)(B). In the December 2022 amendment, Congress provided the courts, the Board, and the Federal Reserve banks direction to a path that reconciles the dispute at issue here.

FRBSF has argued that the December 2022 amendment actually reinforces its position because Congress required the Board to create an online database that lists whether an application was "rejected," as if requiring transparency in disclosing "rejected" applications means Congress authorized them to actually "reject[]" applications. (AB, 35). Congress required a listing of applications that are "rejected" - not "denied." An application may be rejected because it does not comply with the eligibility requirements. Of course, FRBSF has the authority to *reject* applications that do not comply with the requirements. But that does not mean it can *deny* accounts to eligible institutions based on its own self-selected criteria.

"In interpreting a statute, we first look to the plain meaning of its text. Absent a definition in the statute itself, in attempting to divine the meaning of a particular word we generally use the ordinary, contemporary, common meaning." *Calif. All. of*

*Child & Fam. Servs. v. Allenby*, 589 F.3d 1017, 1021 (9th Cir. 2009) (internal citation and quotation marks omitted). "Reject" and "deny" are not synonymous as FRBSF suggests. To "reject" means "to refuse to *accept*, consider, submit to, take for some purpose, or use."[1] To "deny" means "to refuse to *grant*."[2] Rejection involves refusing to accept or consider at all. In fact, the word "reject" originates from the Latin words *re* & *jacere*, meaning "to throw back."[3] The term is more consistent with discarding than with evaluating a request and not granting it after evaluation.

By contrast, a denial involves a review of a request and a decision not to grant the request after consideration of its contents. The word "deny" comes from the Latin *denegare*, meaning "to say no."[4] The application process which PayServices describes in its complaint involves the latter. FRBSF did not refuse to consider the application and toss it in the proverbial "circular file."[5] Instead, the application was

---

[1]    *Reject*, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/reject (last visited Aug. 13, 2024) (emphasis added) (hereinafter "Merriam-Webster"); *see also Reject*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED (1986) (hereinafter, WEBSTER) ("to refuse to have, use, or take for some purpose; cast or throw away as useless, unsatisfactory, or worthless").

[2] *Deny*, Merriam-Webster; *see also Deny*, WEBSTER (also giving definition of "to turn down or give a negative answer to (a person)").

[3] *Reject*, WEBSTER.

[4] *Deny*, WEBSTER.

[5] "Circular file" is a humorous euphemism for a wastebasket. *Circular file*, The Britannica Dictionary, Encyclopaedia Britannica (2024), https://www.britannica.com/dictionary/circular-file.

submitted. Both parties admit it underwent consideration and review; it remained pending for at least nine months. Then, a letter stating purported reasons for denial was issued. (*See* ER-057 & 58, ¶¶ 40 & 43; AB, 1 & 2). FRBSF did nothing if not "say no" in the classic sense of the word "deny." Thus, the reference to listing "rejected" applications in a database at Section 248c does not contemplate authority to "deny" applications from eligible institutions under the Act.

The district court and FRBSF also rely on the premise that Section 248a does not apply directly to Federal Reserve Banks because the title of the subchapter refers to the "Board of Governors." ER-028 & (AB, 26). The structure of the FRA, however, consistently involves delegation from the Board to the Federal Reserve banks throughout this subchapter. The same provisions under this subchapter, however, authorize the Board to "delegate, by published order or rule and subject to [5 U.S.C. §§ 551-559 & 701-706, referred to as the Administrative Procedure Act ("APA")] . . . Federal Reserve Banks." 12 U.S.C. § 248(k). The Guidelines also establish that the Board created them under its power "[t]o exercise general supervision over . . . Federal reserve banks" under 12 U.S.C. § 248(j). 87 Fed. Reg. at 51,106. The Board has the obligation to provide the services to eligible institutions under Section 248a(c)(2) and it delegated the responsibility to carry out that obligation to the Federal Reserve banks.

12

The relationship of delegation makes it very convenient for FRBSF to argue it lacks one obligation because it is associated with the "Board of Governors" in the title of the subchapter, but the same Board delegates to it another authority. FRBSF also argues that Section 248c(b)(1)(B)(ii) indicates that Congress "affirms Reserve Banks's ability to reject" applications – not the Board's ability– and FRBSF's "discretion" to deny master accounts to eligible institutions. (AB, 35) It contradictorily argues that Section 248a does not apply directly to the Federal Reserve banks because of the subchapter title, but seeks cover from Section 248c within the same subchapter. FRBSF cannot have it both ways.

Section headings become relevant for analyzing substantive provisions in the statute to which the text of the headings relate. *See, e.g.*, *Rudisill v. McDonough*, 601 U.S. 294, 309 (2024) (noting that "section headings supply cues as to what Congress intended" where the section heading was titled "Bar to duplication" and the issue concerned a veteran's right to use of one of two separate entitlements) (internal quotation marks and alterations omitted); *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 380 (2018) (finding as relevant the section heading "Limitations on avoiding powers" for understanding "the close connection between the transfer that the trustee seeks to avoid and the transfer that is exempted from that" power of trustees to avoid certain transactions). The subheadings here, however, do not draw any sharp line between the Board and FRBSF under the structure of the FRA.

13

A.    **FRBSF's interpretation of the FRA is inconsistent with respect for the nation's dual banking system.**

The Guidelines revolve around a three-tiered framework that exists nowhere in the relevant statutes governing master account or access to Federal Reserve bank services. The key distinction between the tiers focuses on whether they have a federal regulator or are federally insured. Tier 3 institutions are "not federally insured" and not "subject (by statute) to prudential supervision by a federal banking agency," and therefore "will generally receive the strictest level of review." 87 Fed. Reg. at 51,110. This framework redlines state-chartered banks out of access to a master account.

On May 30, 2024, in *Cantero v. Bank of America, N.A.*, 144 S. Ct. 1290 (2024), the Supreme Court unanimously affirmed the time-honored principle of respect for state banking systems alongside the federal system in one of its few unanimous decisions this past term. "The United States maintains a dual system of banking, made up of parallel federal and state banking systems. That dual system allows privately owned banks to choose whether to obtain a charter from the Federal Government or from a state government." *Id*. at 1294. "Banks with federal charters, called national banks, are subject primarily to federal oversight and regulation. And banks with state charters, called state banks, are subject to additional state oversight and regulation. Those two banking systems co-exist and compete." *Id*.

14

Several lessons emerge from the Court's opinion. First, the two systems are "parallel." *Id*. The federal banking system does not supersede or displace the state system. Indeed, the state banking system preceded the federal banking system adopted in 1863. *See id*. at 1295. The system, however, hinged on a sharing of powers. Both the federal government and a state government may issue bank charters. *Id*. States have the authority to regulate the reach and activities of all banks, including national banks so long as they do not interfere with the exercise of their powers under federal law. *See id*. at 1294 & 1299 (citing 12 U.S.C. § 25b(b)(1)(B)). Indeed, as Justice Kavanaugh establishes in the opinion, state banks are subject to federal regulation and "*additional* state oversight and regulation." *Id*. at 1294 (emphasis added).

State banks must be able to "co-exist" and "compete" with national banks and with each other. *Id.* A state bank that is denied a master account because it does not have a federal regulator is not allowed to "co-exist" with other federally regulated banks. *See id*. Likewise, it cannot "compete" because it is shut out of the U.S. payment system. It cannot trade with or provide the same services as the banks with a primary federal regulator that does have a master account. *See id*.

The Guidelines upon which FRBSF relied improperly distinguish the state banks that regulate banks differently and do not necessarily require insurance for every single type of banking entity. In this case, the Idaho Bank Act does not

15

mandate that each state bank obtain deposit insurance from the FDIC. Rather, it authorizes them to obtain federal deposit insurance. Idaho Stat. § 26-217. By contrast, state law requires *savings* banks, which it regulates differently, to maintain deposit insurance. *See* Idaho Stat. § 26-1806.

The Complaint alleges that 100% of PayServices Bank's deposits are to be kept in reserve, in accordance with the provisional charter the Idaho Department of Finance ("IDF") has issued. *See* ER-059, ¶ 46(iii). This directive is very different from the Federal Reserve's requirement of *zero* cash reserves for banks.[6] The Complaint, taken as true at this stage, also alleges that the FDIC, FRBSF, and IDF all agreed that FDIC insurance was not warranted given PayServices' business model and its restrictions. *See* ER-059, ¶ 46(ii). Yet FRBSF blocks access to master accounts for institutions that do not have federal insurance, regardless of their state charter requirements, without any authority to do so by statute.

The FRBSF, like other Federal Reserve banks, holds access to the U.S. payment system in its hands for every single bank. As multiple courts have recognized - including the district court - without a master account, "a depository institution is nothing more than a vault." *See* ER-016. The FRBSF's position that

---

[6] *Reserve Requirements of Depository Institutions*, 88 Fed. Reg. 83316, 83316 (Nov. 29, 2023) ("Effective March 26, 2020, the Board reduced reserve requirement ratios on all net transaction accounts to zero percent, eliminating reserve requirements for all depository institutions.").

PayServices poses a danger because PayServices' primary regulator is a state government renders banks with state charters unequal in dignity and rights to banks with federal charters, which inherently come with a federal regulator. For these reasons, this Court should reject FRBSF's interpretation of the statute.

## II.    THE GUIDELINES ARE NOT ENTITLED TO DEFERENCE IN LIGHT OF THE OVERRULING OF *CHEVRON*.

On June 28, 2024, the U.S. Supreme Court held that the APA requires courts to exercise their independent judgment in deciding whether an agency has acted within its statutory authority, and courts may not defer to an agency interpretation of the law simply because a statute is ambiguous. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). This decision overruled the holding in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which adopted a test which required courts "to defer to the agency if it had offered a 'permissible construction of the statute,' even if not 'the reading the court would have reached if the question initially had arisen in a judicial proceeding[.]'" *Loper Bright*, 144 S. Ct. at 2247 (2024) (quoting *Chevron*, 467 U.S. at 843). The Court also set the standard for interpreting statutes where agencies have made determinations that fill in purported ambiguities in a statute:

> Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires. Careful attention to the judgment of the Executive Branch may help inform that inquiry. And when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect

17

the delegation, while ensuring that the agency acts within it. But courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous.

*Id*. at 2273.

In this case, the district court relied heavily on the Guidelines to reach its conclusion about a statutory question: whether the Federal Reserve Bank of San Francisco has the discretion under the Federal Reserve Act to deny master accounts to eligible depository institutions. ER-017 (noting that the Federal Reserve Board of Governors adopted the Guidelines "in response to the rapidly-evolving payments landscape and uptick in novel charter types"); ER-025 & 26 (relying in part on the Guidelines to conclude that "Federal Reserve Banks have the absolute discretion to grant or deny master account requests"). The district court also relied on Operating Circulars, the Fed's own internal regulations, to justify the position that FRBSF has absolute discretion to reject applications from eligible depository institutions. ER-026 & 27. The district court framed the issue not based on the terms of the FRA. Instead, it incorporated the standard from the Guidelines and asked "must Federal Reserve Banks grant master accounts to an otherwise eligible depository institution regardless of its risk profile?" ER-022. FRBSF also specifically based its denial of a master account on the same Guidelines. ER-019. The Guidelines' purported assessment for access to a master account or Federal Reserve services based on a so-called "three-tier" framework and "risk profile" is found nowhere in the statute.

18

The Supreme Court urges courts to consider "the question that matters: Does the statute authorize the challenged agency action?" *Loper Bright*, 144 S. Ct. at 2269. It requires this Court to thoroughly consider the reasonableness of the FRBSF's interpretation of the relevant provisions of the FRA upon which it relies to block PayServices Bank's application for a master account. The decision calls into question the authority of the Fed to issue Guidelines that control access to master accounts even for eligible depository institutions.

Federal courts have historically respected executive branch interpretations where the interpretation "issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Id*. at 2258 (2024) (citing cases). As the time-honored rule in *Marbury v. Madison* provides, "[i]t is emphatically the province and duty of the judicial department to say what the law is." 1 Cranch 137, 177 (1803). As a result, "the longstanding 'practice of the government'—like any other interpretive aid—'can inform [a court's] determination of "what the law is."'" *Loper Bright*, 144 S. Ct. at 2258 (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014); *see also Noel Canning*, 573 U.S. at 525 (first quoting *McCulloch v. Maryland*, 4 Wheat. 316, 401 (1819); then quoting *Marbury*, 1 Cranch at 177). The Constitution has always drawn the line here. "Whatever respect an Executive Branch interpretation was due, a judge 'certainly would not be bound to adopt the

19

construction given by the head of a department.'" *Id*. (quoting *Decatur v. Paulding*, 39 U.S. 497, 503 (1840)).

The Guidelines were neither issued contemporaneously with the underlying statute and the Fed's past practice has been wholly inconsistent with the Guidelines. The Guidelines were issued in 2022, more than a week after PayServices Bank submitted its master account application. This recent development took place more than 100 years after the enactment of the FRA in 1913 and more than 35 years after the passage of the MCA in 1980, which provided access to Federal Reserve services to eligible depository institutions. The Guidelines are also wholly inconsistent with the Fed's earlier pronouncements and actions relating to granting access to services for non-member banks. The extent to which the Guidelines deviate from the Fed's historic practice are clearly spelled out in PayServices' initial brief. (*See* PB, 12-13). Clearly, the Guidelines have not "seasoned or broadened into a settled administrative practice" like those the Court has long expected to warrant outweighing this Court's "proper construction of the statute." *See Loper Bright*, 144 S. Ct. at 2260 (quoting *Davies Warehouse Co. v. Bowles*, 321 U. S. 144, 156 (1944)).

The Guidelines are wholly inconsistent with the practice of granting master accounts to eligible banks under the Act without blocking them on the host of specious grounds FRBSF provided in the letter it introduced below. ER-79. Thus, FRBSF's interpretation of the Act is not even entitled to deference under *Skidmore*.

20

*Skidmore v. Swift & Co.*, 323 U. S. 134, 140 (1944) ("The weight of such a judgment in a particular case . . . depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").

FRBSF claims, without evidence, that "[r]ecently, a growing number of novel institutions - some with little to no U.S. footprint - have requested Federal Reserve deposit accounts and services." (AB, 2); *see also* (AB, 12) (referring again without evidence to a "rapidly changing landscape of novel financial institution charters and increased master account requests from a variety of institutions"). FRBSF does not explain how this "novel[ty]" just started when FRBSF has had master accounts for decades is not explained - or why "novel institutions" requesting Federal Reserve accounts is a problem, standing alone.

The Fed's subject matter expertise when it comes to issuing master accounts has also shown that Federal Reserve banks issued master accounts to eligible applicants as a matter of policy without incident. It did not start to set these restrictions until a few years ago. It is not a coincidence that the number of *de novo* banks applying for FDIC insurance has dropped precipitously during the same time period. In 1984, there were 384 newly chartered banks that applied for insurance.[7]

---

[7] *BankFind Suite: Find Annual Historical Bank Data*, FDIC (last visited Aug. 15, 2024), https://t.ly/IyyUO.

From 2010, even as the country came out of the Great Recession, the number dropped from 10 to 5 and not exceeded 14 since then, with several years of no charter applications at all.[8] Why start a bank or seek FDIC insurance as a lending-based bank when the Fed makes it nearly impossible to obtain a master account? Put simply, the APA makes clear, as the Court ruled in *Loper Bright*, that it "remains the responsibility of the court to decide whether the law means what the agency says." *Perez v. Mortgage Bankers Ass'n*, 575 U. S. 92, 109 (2015) (Scalia, J., concurring in judgment); *see also Loper Bright*, 144 S. Ct. at 2261 (quoting same). The regime of the Reserve Banks like FRBSF under the Guidelines is stifling innovation and competition in the nation's banking sector.

The Court reaffirmed the purpose of the Administrative Procedure Act, which Congress enacted in 1946. The APA serves "as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright*, 144 S. Ct. at 2261 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). The APA provides that courts - not agencies, whether they are the Fed, the FRBSF, or otherwise - decide "*all* relevant questions of law" arising on review of agency action - a responsibility which federal courts may not yield. *See Loper Bright*, 144 S. Ct. at 2261 & 2270 (quoting 5 U.S.C. § 706). The FRA's language concerning master accounts is unambiguous. It

---

[8] *See id.*

provides that eligible depository institutions "shall" be granted access to Federal Reserve services. All of these services require the use of a master account. To the extent that the Court finds the language ambiguous, despite the provision "shall," the Federal Reserve's unilateral interpretation of the statute, which the Guidelines reflect, is not entitled to deference.

In this case, the district court consistently deferred to the agency's interpretation. Indeed, it found that the fact that the Guidelines "squarely contradicted" the interpretation of the statute by a federal judge on the Tenth Circuit was a basis in itself for rejecting that judge's opinion. ER-031. This very reasoning indicates the extent to which the district court allowed the agencies to drive the bus in terms of interpreting the Federal Reserve Act. The interpretation is not true just because the government says so. Deference to the Guidelines is the least appropriate way to resolve any purported statutory ambiguity related to the issuance of master accounts. As the Court emphasized in *Loper Bright*, "when the ambiguity is about the scope of an agency's own power—perhaps the occasion on which abdication in favor of the agency is *least* appropriate." *Loper Bright*, 144 S. Ct. at 2266 (emphasis in original).

The issuance of master accounts to the nation's eligible depository institutions is also one of "deep economic and political significance." *See id.* at 2269 (internal quotation marks omitted). In those cases, the Court "expect[s] Congress to delegate

23

such authority expressly if at all for extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." *Id.* (quoting *West Virginia v. EPA*, 597 U.S. 697, 723 (2022)) (internal quotation marks and alterations omitted). Squeezing the life out of two words – "receive . . . deposits" in 12 U.S.C. § 342 – FRBSF has arrogated an unreasonable degree of power to itself that the courts should limit.

## III.   CONGRESS HAS NOT AUTHORIZED FRBSF TO POLICE ELIGIBLE DEPOSITORY INSTITUTIONS BY DENYING INITIAL MASTER ACCOUNT APPLICATIONS.

FRBSF claims that it has the authority to deny master accounts based on its "risk assessment" or "discretion." (AB, 3) It is undisputed that it is important to protect the safety and soundness of the financial system and to limit access by individuals and entities that pose serious, unmitigated risk to the system. Congress, however, did not provide the statutory scheme at issue here to police the financial system. A Federal Reserve bank facilitates transactions between eligible member and nonmember depository institutions. *See* 12 U.S.C. §§ 248a & 342. It does not police them on its own authority. It must comply with law enforcement directives regarding removing access for institutions that have violated federal law. But Congress has not placed FRBSF in a position to deny applications for master accounts or services from eligible institutions on the front end at the master account application stage.

24

The regulators of those institutions police their compliance with state and federal law as they hold the master account. *Banco San Juan* provides an excellent illustration. The entity at issue "had 14 account holders that maintained a total of 15 deposit accounts[,]" largely belonging to "close family members [of the owner] and the offshore entities they control." *Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, 700 F. Supp. 3d 86, 94 (S.D.N.Y. 2023). Before the Reserve Bank closed Banco San Juan Internacional, Inc.'s ("BSJI") account, the FBI had investigated BSJI's transactions and compliance, and a federal district court issued a search warrant ordering the Reserve Bank to transfer a large portion of BSJI's assets to the U.S. Marshals. *Id.* At that point, the Reserve Bank "suspended BSJI's account[.]" *Id*. The U.S. Attorney's Office then announced an agreement for BSJI to pay a fine and improve its money laundering policies. *See id*. BSJI also had failed to file Suspicious Activity Reports as required under the Bank Secrecy Act ("BSA"). *See id.* at 95; 31 C.F.R. § 1010.100(d)(7) (defining "bank" covered by BSA to include "[a]ny other organization (except a money services business) chartered under the banking laws of any state and subject to the supervision of the bank supervisory authorities of a State").

To be sure, if the institution loses its charter for violating state or federal law, it is no longer "eligible" to hold an account and may be stripped of that account. Likewise, if a court concludes that the entity has seriously violated the BSA or any

other law, it may order it to cease its operations. Pursuant to such an order, the entity may be stripped of its master account. None of these situations, however, exist here at the outset of the application process for PayServices Bank.

With respect to state regulation, the Idaho Department of Finance – unlike Puerto Rico's banking regulator – has a sterling reputation for policing its banks. Idaho has ten state-chartered banks and IDF has more than 70 employees.[9] Idaho has not reported any enforcement actions against these entities. According to state records, none of the banks has had a civil or administrative enforced action determined on its own or issued by a federal regulator or law enforcement agency.[10]

## IV.  FRBSF HAS FAILED TO ESTABLISH THAT IT IS NOT AN "AGENCY" WITHIN THE MEANING OF THE APA.

FRBSF argues that Reserve Banks are not a governmental agency specifically in the instance of exercising discretion to grant or deny master accounts. (AB, 3) Instead, "maintaining a depository account" is a function that is "separate from the sovereign." (AB, 4). Even FRBSF's jurisdictional statement belies the argument that the entity is not a "federal agency" under the APA, the Mandamus Act, or the U.S. Constitution. Congress specifically provided that a civil suit against a Federal

---

[9] *118th Annual Report*, Idaho Dep't of Finance (2023), at 7 & 30, https://www.finance.idaho.gov/wp-content/uploads/about/Annual-Reports/dor-ar-2023.pdf.

[10] *See* Idaho Dep't of Finance, https://www.finance.idaho.gov/ (last visited Aug. 15, 2024) (search Legal, "Administrative Actions" & "Civil Actions").

Reserve bank "arise[s] under the laws of the United States." 12 U.S.C. § 632. The Federal Reserve Act also authorizes FRBSF to "sue and be sued." 12 U.S.C. § 341. Such grants of authority, including the sovereign's consent to be sued, are the kind reserved for federal agencies or instrumentalities of the federal government.

There is no doubt that the Federal Reserve Banks have characteristics of a private entity, many of which FRBSF emphasizes as it downplays the public characteristics. The key question at issue in this case is whether the Federal Reserve Banks are "agencies" within the meaning of the APA.  "In determining whether some entity is an agency for APA purpose[s], the most important word in the definition may be 'authority.'" RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 1.2 (5th ed.) (2010) (quoting 5 U.S.C. § 551(1)). While "[t]he statutory definition of 'agency' is not entirely clear, . . . the APA apparently confers agency status on any administrative unit with substantial independent authority in the exercise of specific functions." *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971) (footnote omitted).

The Supreme Court has viewed the power to make final dispositions as strong evidence that an entity constitutes an agency under the APA as strong evidence in support of applying the APA or related provisions of the Freedom of Information Act ("FOIA"). *See Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 187 (1975) (finding Renegotiation Board was not an agency because "[t]here is

simply no sense in which Regional Boards have the power to make 'final dispositions' and thus no sense in which the explanations of their recommendations can be characterized as 'final opinion.'").

Even if the Court determines that Federal Reserve banks are not agencies under the APA, the delegation of authority from the Board of Governors to the Reserve Banks is still subject to the APA. This relationship under Section 248 establishes that the Reserve Banks' exercise of authority to issue master accounts is reviewable under the APA. *See* 12 U.S.C. § 248(k).

Courts regularly rely on decisions involving FOIA to interpret the reach of the APA. *See Soucie*, 448 F.2d at 1073. FOIA indicates that the term 'agency' as defined in the APA includes "any . . . Government controlled corporation[.]" 5 U.S.C. 552(e). The term "government controlled corporation," added to the definition of agency under FOIA at 5 U.S.C. § 552(e), often requires courts to draw lines based on the degree of control the government exercises over an entity. In *Rocap v. Indiek*, 539 F.2d 174 (D.C. Cir. 1976), the D.C. Circuit held that the Federal Home Loan Mortgage Corporation ("FHLMC") qualified as an "agency," namely a "Government controlled corporation," in part because "the Corporation is chartered solely under federal law, and not according to the laws of any state[,]" "its operations are tight controlled by statute" and "at least for some purposes, it is treated by

28

Congress as the equivalent of a federal agency [and] its employees as 'officers or employees of the United States.'" *Id*. at 176.

Like the FHLMC, FRBSF and other Federal Reserve banks are "subject to such substantial federal control over its day-to-day operations[.]" *Rocap*, 539 F.2d at 177. FRBSF describes the "tight control" that the Fed has over its operations regarding master accounts based on the Fed's establishment of Guidelines upon which FRBSF states it relied in denying PayServices' application for a master account. (AB, 12-13). Taken together, FRBSF falls within the meaning of "agency" under the APA and its actions must be subject to judicial review.

## CONCLUSION

PayServices respectfully requests that this Court reverse the U.S. District Court for the District of Idaho's decision to dismiss Appellant's complaint and remand for proceedings consistent with its opinion. Appellant re-asserts the arguments in the Principal Brief not further discussed herein.

Date: August 15, 2024

Jade A. Craig, P.A.

*s/ Jade A. Craig*
Jade A. Craig

*Attorney for Appellant PayServices Bank*

29

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 15th day of August, 2024, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, and caused a copy of the foregoing to be electronically served on all parties registered with the system to receive service in this action, including the following:

Jonathan K. Youngwood
Meredith Karp
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(202) 455-2000
jyounwood@stblaw.com
meredith.karp@stblaw.com
managingclerk@stblaw.com

*Counsel for Defendant-Appellee*

Jade A. Craig, P.A.

*s/ Jade A. Craig*_____
Jade A. Craig

*Attorney for Appellant PayServices Bank*

30

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**: 24-2355_____

I am the attorney.

**This brief contains 7,000_____ words,** excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties;
   [ ] a party or parties are filing a single brief in response to multiple briefs; or
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Jade A. Craig_____ **Date** 8/15/2024_____